## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

SAMANTHA STINSON and JONATHAN STINSON, on behalf of themselves and on behalf of their minor children, A.R.S. and A.W.S.; STEPHEN CALDWELL, on behalf of himself and on behalf of his minor child, W.C.; JOSEPH ARMENDARIZ, on behalf of himself and on behalf his minor children, M.A. and W.A.; TALARA TAYLOR and SHANE TAYLOR, on behalf of themselves and on behalf of their minor children, K.T. and M.T.; CAROL VELLA, on behalf of herself and on behalf of her minor children, E.M.V. and N.M.V.; DANIEL RIX, on behalf of himself and on behalf of his minor children, A.R., J.R., and W.R.; and LEAH BAILEY, on behalf of herself and on behalf her minor children, C.T. and D.T.,

        Plaintiffs,

        v.

FAYETTEVILLE SCHOOL DISTRICT NO. 1; SPRINGDALE SCHOOL DISTRICT NO. 50; BENTONVILLE SCHOOL DISTRICT NO. 6; and SILOAM SPRINGS SCHOOL DISTRICT NO. 21,

        Defendants.

CIVIL ACTION NO. 5:25-cv-05127

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## <u>COMPLAINT</u>

1.    Consistent with Arkansas law requiring parents to send their minor children to school, upwards of 470,000 students are enrolled in more than 1,000 public elementary and secondary schools across the state. These children and their families adhere to an array of faiths, and many do not practice any religion at all. Nevertheless, because of Arkansas Act 573 of 2025 ("Act 573" or "the Act"), which requires public schools to post a state-approved version of the Ten Commandments in every classroom and library, all of these students will be forcibly subjected to

1

scriptural dictates, day in and day out, including: "I am the Lord thy God"; "Thou shalt have no other gods before me"; "Thou shalt not make to thyself any graven images"; "Thou shalt not take the Name of the Lord thy God in vain"; "Remember the Sabbath day, to keep it holy"; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." This simply cannot be reconciled with the fundamental religious-freedom principles that animated the founding of our nation.

2.      These founding principles are reflected in a long line of Supreme Court jurisprudence that prohibits public schools from imposing religious doctrine and practice on students. Indeed, for nearly half a century, it has been well settled that the First Amendment forbids public schools from permanently posting the Ten Commandments in this manner. In *Stone v. Graham*, 449 U.S. 39, 42 (1980), the Supreme Court struck down a Kentucky law mandating classroom displays of the Ten Commandments, holding that such displays would unconstitutionally "induce [ ] schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments."

3.      Last year, a federal district court ruled that a Louisiana law similar to Act 573 violated the Establishment and Free Exercise Clauses of the First Amendment and was "facially unconstitutional and unconstitutional in all applications." *Roake v. Brumley*, 756 F. Supp. 3d 93, 219 (M.D. La. 2024) (all-caps removed). So, too, are the elementary- and secondary-school provisions of Arkansas's statute. The Act, which takes effect on August 5, 2025, requires a Protestant version of the Ten Commandments to be "prominently" displayed "in a conspicuous place" in every elementary and secondary public-school classroom and library across Arkansas.

4.      Permanently posting the Ten Commandments in every classroom and library—rendering them unavoidable—unconstitutionally pressures students into religious observance,

veneration, and adoption of the state's favored religious scripture. It also sends the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that Act 573 requires schools to display—do not belong in their own school community and pressures them to refrain from expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And it substantially interferes with and burdens the right of parents to direct their children's religious education and upbringing.

5.      The state's main interest in displaying the Ten Commandments in public schools under Act 573 is to impose religious beliefs on public-school children, regardless of the harm to students' and families' religious freedom. As one Arkansas legislator proclaimed in defending the school scriptural displays: "I think that anything we can do to try to increase access to or spread that gospel . . . would be something that I would want us to do as a person of faith."

6.      For these reasons, Plaintiffs seek a declaratory judgment that the Act's requirement mandating the display of the Ten Commandments in each public "elementary and secondary school library and classroom" in Arkansas is unconstitutional. Plaintiffs also seek preliminary and permanent injunctive relief to prevent Defendants from complying with the Act by displaying the Ten Commandments in elementary and secondary public-school classrooms and libraries.

## JURISDICTION & VENUE

7.      Plaintiffs bring this matter under 42 U.S.C. §1983, for violations of civil rights under the First and Fourteenth Amendments to the U.S. Constitution. Because this action arises under the U.S. Constitution and the laws of the United States, it presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

8.    The Court is authorized to award the declaratory and injunctive relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202.

9.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Western District of Arkansas. All Plaintiffs reside in this district, and their minor children attend public schools in this district. All Defendants conduct their official duties in this district. Accordingly, Defendants' actions to administer, implement, and enforce the Act, giving rise to the claims herein, will necessarily occur within this district.

10.    Plaintiffs Samantha Stinson and Jonathan Stinson bring this suit on behalf of themselves and on behalf of their minor children, A.R.S. and A.W.S.[1] The Stinsons are domiciled in Fayetteville, Washington County, Arkansas. A.R.S. and A.W.S. are enrolled in public schools in Fayetteville School District No. 1. During the 2025-2026 school year, one child will attend an elementary school and the other a middle school in the district.

11.    Plaintiff Stephen Caldwell brings this suit on behalf of himself and on behalf of his minor child, W.C. They are domiciled in Fayetteville, Washington County, Arkansas. W.C. is enrolled in and will attend a public elementary school in Fayetteville School District No. 1 during the 2025-2026 school year.

12.    Plaintiff Joseph Armendariz brings this suit on behalf of himself and on behalf his minor children, M.A. and W.A. They are domiciled in Fayetteville, Washington County, Arkansas. The children are in enrolled in and will attend a public elementary school in Fayetteville School District No. 1 during the 2025-2026 school year.

13.    Plaintiffs Talara Taylor and Shane Taylor bring this suit on behalf of themselves and on behalf of their minor children, K.T. and M.T. They are domiciled in Springdale,

---

[1] In accordance with Federal Rule of Civil Procedure 5.2(a)(3), all minor Plaintiffs are identified by their initials.

Washington County, Arkansas. The children are enrolled in and will attend a public elementary school in Springdale School District No. 50 during the 2025-2026 school year.

14.     Plaintiff Carol Vella brings this suit on behalf of herself and on behalf of her minor children, E.M.V. and N.M.V. They are domiciled in Bentonville, Benton County, Arkansas. The children are enrolled in and will attend public middle and junior high schools in Bentonville School District No. 6 during the 2025-2026 school year.

15.     Plaintiff Daniel Rix brings this suit on behalf of himself and on behalf of his minor children, A.R., J.R., and W.R. The family is domiciled in Bella Vista, Benton County, Arkansas. The children are enrolled in and will attend public elementary and junior high schools in Bentonville School District No. 6 during the 2025-2026 school year.

16.     Plaintiff Leah Bailey brings this suit on behalf of herself and on behalf of her minor children, C.T. and D.T. The family is domiciled in Siloam Springs, Benton County, Arkansas. C.T. and D.T. are enrolled in and will attend a public school in Siloam Springs School District No. 21 during the 2025-2026 school year.

17.     Defendant Fayetteville School District No. 1 is located in Washington County, Arkansas, and is a political subdivision and "body corporate" that "may contract and be contracted with, and may sue and be sued" under Arkansas law. *See* Ark. Code Ann. § 6-13-102.

18.     Defendant Springdale School District No. 50 is located in Washington County and Benton County, Arkansas, and is a political subdivision and "body corporate" that "may contract and be contracted with, and may sue and be sued" under Arkansas law. *See id.*

19.     Defendant Bentonville School District No. 6 is located in Benton County, Arkansas, and is a political subdivision and "body corporate" that "may contract and be contracted with, and may sue and be sued" under Arkansas law. *See id.*

20.     Siloam Springs School District No. 21 is located in Benton County, Arkansas, and is a political subdivision and "body corporate" that "may contract and be contracted with, and may sue and be sued" under Arkansas law. *See id.*

## FACTUAL ALLEGATIONS

21.     On April 14, 2025, Arkansas Governor Sarah Huckabee Sanders signed into law Act 573, mandating the display of the Ten Commandments in each public "elementary and secondary school library and classroom."[2] The Act will take effect on August 5, 2025.[3]

22.     On May 1, 2025, speaking at the Arkansas Observance of the National Day of Prayer, Governor Sanders stated that she was "proud to sign legislation this session putting the Ten Commandments up in every classroom[.]" She went on to decry what she claimed were efforts to misrepresent the law and implored: "[T]oday I ask that we come together, and we send a clear message: 'Here we are from every corner of our state, every background, every denomination united in one God to say, in one prayer, in one voice, that we will always stand and we will always follow the one true Creator.'"

23.     The Act's mandatory classroom and library displays are not part of the Arkansas Education Code. Instead, they are included in Title 1, Chapter 4 of the state code, which addresses "State Symbols, Motto, etc."[4] Specifically, the Act amends Arkansas Code § 1-4-133, which

---

[2] The Act also requires displays of the Ten Commandments to be posted in every public-university classroom and library and every other "[p]ublic building or facility in this state that is maintained or operated by taxpayer funds." This lawsuit challenges only the Act's provisions pertaining to the display of the Ten Commandments in each public elementary and secondary school library and classroom.

[3] *See* Att. Gen. Op. No. 2025-032 (May 12, 2025), https://ag-opinions.s3.amazonaws.com/uploads/2025-032.pdf.

[4] Among other designations, this chapter recognizes the official state motto ("Regnat Populus"), nickname ("the Natural State"), floral emblem (apple blossom), insect (honeybee), gem (diamond), beverage (milk), musical instrument (fiddle), bird (mockingbird), tree (pine), dance (square dance), mammal (white-tailed deer), nut (pecan), grain (rice), and firearm (shotgun).

requires the display of the national motto, American flag, and Arkansas flag in every government building, including in every elementary and secondary public-school classroom and library.

24.    Under the Act, all "local school superintendents" or "chief administrators of the public schools" in Arkansas,[5] or their designees, are required to "prominently display" a poster or framed copy of the state-approved version of the Ten Commandments in a "conspicuous place" in every classroom and library in all schools under their jurisdiction.

25.    As prescribed by the Act, the classroom and library displays must state:

"The Ten Commandments

I am the Lord thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

---

[5] The Superintendent for each Defendant School District is an employee and agent of the District.

7

26.     As alleged further below, *infra* ¶¶ 42-47, this version of the Ten Commandments is associated with Protestant faiths and conflicts with the version of the Ten Commandments followed by many Jews and Catholics.

27.     The Act further requires that each poster or copy of the Ten Commandments be at least sixteen inches by twenty inches in size. The prescribed text of the Commandments must be printed "in a size and typeface that is legible to a person with average vision from anywhere in the room."

28.     Under the Act, the required displays will be donated to school districts or purchased by school districts using donated funds. The Act also authorizes schools to use public funds to replace any noncompliant display in its possession with a compliant display.

29.     The displays will be permanent and year-round; the Act does not provide for a time limit on the displays.

30.     The Act requires that the displays of the Ten Commandments be posted in classrooms without regard to the grade level or literacy comprehension of students. For example, the Act requires the Ten Commandments displays to be hung in both kindergarten and high-school classrooms.

31.     The Act requires the displays to be placed in every classroom, regardless of the subject matter taught. For example, the Act requires the state-approved version of the Ten Commandments to be posted in math and science classrooms. For younger children, who may remain in the same classroom for much the day, the displays will be visible at all times, no matter the topic or instruction at hand.

32.     While the Kentucky statute struck down in *Stone* and the Louisiana law held unconstitutional in *Roake* each required an accompanying "context statement" that purported to

explain the historical relevance and use of the Ten Commandments, Act 573 does not include a similar provision.

33.    In fact, this nation's core founding documents—the Declaration of Independence, the United States Constitution, and the Bill of Rights—were not based on the Ten Commandments, and there is no longstanding history or tradition of prominently and permanently displaying the Ten Commandments in public-school classrooms.

34.    In addition, while Act 573 purports to demand that the framed copy or poster feature a "historical representation of the Ten Commandments" as alleged further below, *infra* ¶¶ 42-47, no such definitive representation exists.

35.    As evinced by the Act's minimum requirements for the classroom and library displays and comments made by various lawmakers, *see infra* ¶¶ 59-62, the state's main interest in enacting and implementing Act 573 in public schools is the imposition of religious beliefs and tenets on public-school children.

**The Act Officially Approves and Prescribes One Particular Version of the Ten Commandments, to Which Many People Do Not Subscribe.**

36.    Act 573 is not neutral with respect to religion. By design, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom and library. It also requires a specific, state-approved, Protestant version of that scripture to be posted, taking sides on theological questions regarding the correct content and meaning of the Ten Commandments and enshrining in state law an official denominational preference.

37.    Numerous Arkansans do not subscribe to the specific text of Act 573's version of the Ten Commandments.

38.    Many people in Arkansas are nonreligious and do not adhere to the religious tenets set forth in any version of the Ten Commandments, including the one mandated by Act 573.

39.     There are many faith traditions that do not teach, recognize, or reference the Ten Commandments at all. For example, followers of Hinduism, Buddhism, and Taoism generally do not consider the Ten Commandments to be part of their belief system.

40.     Some Christians, including Jehovah's Witnesses, reject the proposition that the Ten Commandments are authoritative or binding.

41.     Some faith traditions consider the Ten Commandments to be part of their theology and authoritative but do not believe in elevating the Commandments set forth in Act 573 over other biblical teachings.

42.     Contrary to the Act's characterization, there is no definitive "historical representation of the Ten Commandments." Even for faith traditions that view the Ten Commandments to be authoritative and important, there are many different versions, depending on religious denomination and biblical translation.

43.     Among those who may believe in some version of the Ten Commandments, the particular text they follow can differ by religious denomination or tradition. For instance, Catholics, Jews, and many Protestants differ in the way that they number, organize, and translate the Ten Commandments from Hebrew to English.

44.     The version of the Ten Commandments mandated by Act 573 is Protestant.

45.     The version of the Ten Commandments mandated by Act 573 does not match any version or translation found in the Jewish tradition.

46.     The version of the Ten Commandments mandated by Act 573 omits key language and context that is included in the version set forth in the Torah. For example, it is missing the important message in the Jewish story about God bringing the Israelites out of Egyptian slavery to freedom. It also states "[t]hou shall not kill," whereas the translated version followed by most Jews

prohibits "murder." The different language reflects deep theological differences as to the Ten Commandments' meaning and scope.

47.    The version of the Ten Commandments mandated by Act 573 does not match the version followed by most Catholics. For example, the Catholic version does not include the language prohibiting "graven images." Indeed, given how common iconography, sculpture, and other artwork is in the Catholic faith, this prohibition conflicts with how many Catholics practice their faith.

**The Displays Mandated By Act 573 Will Coerce Students, Including the Minor Plaintiffs, into Religious Observance, Veneration, and Adoption of the State's Official Religious Scripture.**

48.    Arkansas law requires parents to send their minor children to school and to "ensure the attendance of the child." Ark. Code Ann. § 6-18-201(a).

49.    When a student exceeds the number of allowable unexcused absences from school, students and parents are subject to sanctions, including educational punishments, such as "denial of course credit, promotion, or graduation," and civil penalties. *See* Ark. Code Ann. §§ 6-18-222(a)(1)(A)(i), (a)(5). Specifically, "the school district . . . shall notify the prosecuting authority and the community truancy board . . . and the student's parent, guardian, or person in loco parentis shall be subject to a civil penalty . . . in circuit court . . . not to exceed five hundred dollars ($500) plus costs of court and any reasonable fees assessed by the court." *Id*. § 6-18-222(a)(5)(A). The purpose of this penalty is "to impress upon the parents . . . the importance of school . . . attendance." *Id.* § 6-18-222(7)(A).

50.    Students who are "[h]abitually and without justification absent from school while subject to compulsory school attendance" also may be reported to the circuit court through a "Family in Need of Services" Petition. *See, e.g.*, Wash. Cnty. Juvenile Court, Wash. Cnty., Ark.,

*FINS FAQ*, https://www.washingtoncountyar.gov/government/departments-a-e/circuit-courts/circuit-court-division-3-juvenile/fins-faq#q1 (last visited June 9, 2025). Once such proceedings are commenced, "[t]he family is now under the supervision of the court and will be expected to follow all court orders," including orders for the student to attend school or orders for parents to attend school with their children. *See id*. "Failure to comply with the court orders may result in essay assignments, community service, fines of up to $500, and ultimately jail" for parents or incarceration of the student in a Juvenile Detention Center. *See id*.

51.    Consistent with Arkansas's compulsory education law, more than 474,000 children are enrolled in Arkansas's public schools across the state.[6]

52.    These children and their families practice a wide array of faiths. And within these faith systems, students and families adhere to a variety of denominations, branches, and sects.

53.    Many public-school children and families in Arkansas, including some of the Plaintiffs, do not adhere to any faith and cherish their right to be nonreligious to the same extent that people of faith cherish their right to religious belief and exercise.

54.    Given the religious diversity present in Arkansas's public schools, many students and families, including some of the Plaintiffs, do not subscribe to any version of the Ten Commandments. *See infra ¶¶* 79, 88, 100, 121, 131.

55.    Many other public-school students and their families who believe in their faith's version of the Ten Commandments, including some of the Plaintiffs, do not subscribe to the specific state-selected version set forth in Act 573. *See infra ¶¶* 67-73, 108-12.

56.    Under the Act, each of these children will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school.

---

[6] *Ark. K-12 Profile: 2024-2025*, Ark. Dep't of Educ. https://adedata.arkansas.gov/Ark12 (last visited June 9, 2025).

57.    Because Arkansas public schools must be in session for at least 1,068 instructional hours or 178 days each year, Ark. Code Ann. §6-17-2403(c), for students entering the Arkansas public-school system in kindergarten, Act 573 will subject them to the state's preferred religious dogma for approximately 13,884 hours across thirteen academic years.

58.    As alleged above, the Act requires that public schools "prominently display" the Ten Commandments in "a conspicuous place" in every library and classroom—with no exceptions. The poster or framed copy must be at least sixteen inches by twenty inches in size, and the text of the Commandments must be printed "in a size and typeface that is legible to a person with average vision from anywhere in the room."

59.    These minimum requirements of the Act are designed to, and will, ensure that students are more likely to observe, absorb, accept, follow and live by the religious directives in the Ten Commandments. For example, responding to an Arkansas reverend's testimony against the proposed law, Act 573 co-sponsor Rep. Stephen Meeks asserted: "You had stated that . . . the Ten Commandments should be taught in church and all that. And I don't disagree with that. I'm a fellow Christian. But there are a large number of students who don't go to church. They're not involved in any religious activities. And so, would you rather them have zero exposure to this or have it in their classroom so they can at least have some exposure?" After the reverend testified that she did not "believe the public schools should be the ones providing that access," Rep. Jeremy Woolridge proclaimed: "I think that anything we can do to try to increase access to or spread that gospel, I guess, would be something that I would want us to do as a person of faith. I guess I'm a little bit shocked that you, as a pastor, would not have that same view."

60.    Further defending the Act's mandatory school displays, Rep. Meeks also stated: "[W]hat we've been pushing here in America is atheism. And atheism is a religion. And ever since

we took God out of the schools, we see all the problems that have come in. You look at the statistics. When the Supreme Court took God out of the schools, all the problems and violence started flooding into our school systems." Rep. Howard Beatty echoed the sentiment: "[W]hat I find hypocritical is that we can sit here, some of the very members and some of the folks have spoken against the posting of the Ten Commandments on the wall of our schools are the same individuals that fault and take issue with some of the filth and trash that we have available that our children can access in our school libraries. So that's hypocritical to me. I'd much rather have the Ten Commandments on the walls that those children can read and see good moral lessons that are there and virtues and qualities that we should all aspire to as Christians or just as common citizens."

61.     Sen. Kim Hammer expressed a similar understanding of Act 573 during the Senate discussion: "[I]f we would follow those Ten Commandments, we wouldn't have to have the thousands of laws that we have on the books… I don't think it's too much to ask that they be displayed on the wall. Because while some debate that it is a religious situation that we take, you can't take any of those ten and be able to say that they're not good for the moral values of our nation. I don't want to reduce them down to just being the moral value or the moral compass of our nation. But you've got to start with the idea that the Ten Commandments are a great place to start. And it's good for our kids to see it visually, because hopefully it'll make a positive impact on our society."

62.     Other lawmakers also made clear the intended religious impact of Act 573. For example, speaking in support of the proposed Act, Sen. Matt McKee asked Sen. Jim Dotson, the lead sponsor of the bill: "Senator Dotson, do you think it would be a valuable thing for everyone if we were reminded once a day that there is a God and we're not him." Sen. Dotson replied, "Yes." And Rep. Alyssa Brown, the Act's primary House sponsor, touted her introduction of the bill on

14

social media and her wish that the "same God who gave those sacred commandments to Moses continue to bless the great state of Arkansas!"

63.     As a result of the displays mandated by Act 573, students who do not subscribe to the state's official version of the Ten Commandments—including the minor-child Plaintiffs—will be pressured into religious observance, veneration, and adoption of this religious scripture.

64.      As a result of the displays mandated by Act 573, students who do not subscribe to the state's official version of the Ten Commandments—including the minor-child Plaintiffs—also will feel pressure to suppress expression or practice of their own faiths and religious beliefs or nonreligious beliefs in view of their peers, teachers, and other school staff.

**Plaintiffs Will Be Harmed by the Religious Displays Mandated by Act 573.**

*Samantha Stinson, Jonathan Stinson, and their minor children*

65.     Plaintiffs Samantha and Jonathan Stinson are Jewish. Ms. Stinson is the Cantor at Temple Shalom of Northwest Arkansas in Fayetteville. She also directs the temple's weekend religious school and instruction. In addition, because the temple currently has no Rabbi, she serves as the congregation's spiritual leader.

66.     The Stinsons are raising their minor children, A.R.S. and A.W.S., in the Jewish faith tradition. The family attends temple together, where the children receive religious education, and the children attend a Jewish camp every summer, which instills core Jewish values.

67.     On behalf of themselves and their minor children, the Stinsons object to the school displays mandated by Act 573 because the displays will promote, and forcibly impose on the children, scripture in a manner that is contrary to the family's faith.

68.     While the Stinsons' faith recognizes the Ten Commandments and regards them as a sacred Jewish text, the Stinsons do not follow or teach their children the Christian version adopted and required by Act 573. Moreover, they believe strongly that it is important to teach their

children about the Ten Commandments within the context of the Jewish faith. They object to Act 573's displays because the displays will decontextualize the Commandments in several significant ways and because the version of the Commandments approved by the state does not comport with the version they follow as Jews.

69.    For example, Act 573's version of the Commandments uses the male-gendered word "Lord." But in the Jewish faith, G-d is beyond gender.[7] Because G-d is incorporeal and neither male nor female, to ascribe male traits to G-d through use of the word "Lord" violates the Stinsons' religious beliefs and the beliefs they teach their children.

70.    As another example, the third Commandment as translated in Act 573, "Thou shalt not make to thyself any graven image," omits a key part of that Commandment in the Jewish faith. The translation of the Torah adhered to by the Stinsons goes further, directing that one shall not make "any likeness of what is in the heavens above." They understand this to prohibit any visual depiction of G-d. The Stinsons believe that the Act's narrower focus on "graven image[s]" allows for altars, icons, and likenesses of G-d that are prohibited in their faith and, therefore, that the text of this Commandment, as set forth in Act 573, is in conflict with the religious tenets they teach their children.

71.    Further, for the Stinsons, Act 573's translation of the Commandment stating, "Thou shalt not take the Name of the Lord thy God in vain," is another example of a translation that presents a religious requirement outside of its Jewish context and thus misrepresents its meaning in the Jewish faith. While many Christian traditions may understand this Commandment as forbidding utterance of the word "G-d," the Stinsons' Jewish faith has no such prohibition. What is important is not the utterance but what comes after it. Thus, if a child says they "swear to G-d

---

[7] Out of respect for the Stinsons' religious beliefs, "G-d" is used in this section.

that they will not steal a cookie," the Commandment is not violated. But it would be a violation to utter those words and then steal the cookie. The Stinsons' understanding of this Commandment is found in the precise English translation of the Hebraic text in the Torah: One must "not swear falsely by the name of your G-d." As a result, the Commandment as translated in the Act incorrectly presents a narrow and incomplete view of what the Stinsons believe (and what they teach their children to believe) it means to take G-d's name in vain.

72.    The displays mandated by Act 573 also violate Jewish tenets, followed by the Stinsons, that oppose proselytizing. Specifically, the family adheres to Talmudic interpretations of the Torah, which include a belief that only Jews are mandated to follow the laws of Torah. If people choose to convert, the faith will welcome them, but the Torah instructs that those who have no desire to convert should not be forced to do so. Consistent with these beliefs, the Stinsons impress upon their children that it is not their job (or anyone else's) to promote Judaism or Jewish doctrine to non-Jews.

73.    The Stinsons also teach their children that, as matter of faith, they welcome the stranger and do not exclude others. They believe that the displays required by Act 573 will, contrary to these values, impress upon every student, including A.R.S. and A.W.S., not only that they must follow the Ten Commandments to be a good person, but that they must follow the Christian scriptural text prescribed by the Act because being Christian is the "correct" path. As such, the displays will send an exclusionary and marginalizing message to those who do not follow this particular version of religious doctrine, including A.R.S. and A.W.S., that they are outsiders in their school and community because their family does not share the religious beliefs preferred by the government.

74.     The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for A.R.S. and A.W.S., ensuring that A.R.S. and A.W.S. will be subjected to a Christian version of the Ten Commandments every day, in every classroom, throughout their public-school education.

75.     As a result, it will be more difficult for A.R.S. and A.W.S. to maintain and express their Jewish identity. The displays will pressure A.R.S. and A.W.S. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine as well as to suppress their Jewish faith while in school to avoid being perceived as different by their peers and school staff merely because they are not part of the majority religion with which the displays are associated.

76.     Unfortunately, A.R.S. and A.W.S. have already been treated differently in school because of their Jewish faith. For example, one time another student told A.R.S. that she "wouldn't want to be Jewish." And the children have been singled out to explain what Jewish holidays mean and pressured to participate in activities highlighting Christmas or Easter.

77.     Additionally, the displays mandated by Act 573 will directly interfere with and substantially burden the Stinsons' parental role in directing their children's religious education and upbringing in matters of faith, including their ability to guide their children in the proper Jewish understanding of the Ten Commandments. The responsibility to direct and guide their children in the development of their Jewish faith is an essential aspect of the Stinsons' religious exercise.

### *Stephen Caldwell and his minor child*

78.     Plaintiff Stephen Caldwell is an atheist. He and his wife are raising their minor child, W.C., in a nonreligious household and tradition to provide W.C. with the space and autonomy to develop W.C.'s own beliefs and views about religion.

79.    Mr. Caldwell and his family do not subscribe to the religious dictates of the Ten Commandments generally or the specific version that must be displayed in public schools under Act 573.

80.    On behalf of himself and W.C., Mr. Caldwell objects to the displays mandated by Act 573 because the displays will promote, and forcibly subject W.C. to, religious scripture that the family does not follow. The displays will impose on W.C. one set of religious beliefs over the family's values, which are not based in religion. As a parent and nonreligious individual, Mr. Caldwell does not want the government to push any particular religion or religious doctrine on W.C.

81.    Mr. Caldwell believes that the displays mandated by Act 573 will signal to students, including W.C., that it is "wrong" not to be Christian. The displays will thus convey a harmful message to Mr. Caldwell and his child that they are outsiders in the community because they do not share the religious beliefs preferred by the government.

82.    In addition, Mr. Caldwell believes that the religiously preferential message conveyed by the displays will create a religiously discriminatory school environment, leading teachers and staff to inject other religious beliefs into the classroom and giving rise to peer-on-peer harassment and proselytization of W.C. because W.C. is nonreligious.

83.    The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for W.C., ensuring that W.C. will be subjected to the Ten Commandments every day, in every classroom, throughout W.C.'s public-school education.

84.    As a result, W.C. will be pressured to observe, meditate on, venerate, and adopt the state's preferred religious doctrine, as well as to suppress expression of W.C.'s own nonreligious background and views at school.

85.    Furthermore, Mr. Caldwell believes that subjecting W.C. to permanent, prominently placed displays of religious directives, in accordance with Act 573, will directly interfere with and substantially burden and undermine his ability to raise W.C. in a nonreligious tradition. He views the responsibility he has, along with his wife, for directing W.C.'s nonreligious upbringing as a fundamental aspect of his role as a parent.

### *Joseph Armendariz and his minor children*

86.    Plaintiff Joseph Armendariz is a member of the Unitarian Universalist Fellowship of Fayetteville, where he serves as member of the board of directors at large and leads the church's weekly Youth Religious Exploration classes for teens ages twelve to eighteen.

87.    He is raising his children, M.A. and W.A., in the Unitarian Universalist faith. The children attend the church's weekly classes in Children's Religious Exploration, and, throughout the year, the family participates in various worship services and events at the church.

88.    Mr. Armendariz's family does not subscribe to the religious dictates of the Ten Commandments generally or the specific version that must be displayed in public schools under Act 573. In fact, the family's Unitarian Universalist faith does not endorse specific scripture or dogma, although it does affirm principles and values that help guide one's ethical and moral decision-making. When put into terms that children can understand, these principles are: (1) Every person is important; (2) Be kind in all you do; (3) We're free to learn together; (4) We can search for what is true; (5) All people need a voice; (6) Build a fair and peaceful world; and (7) We care for the earth.

89.    While all these principles are important, the belief in searching for what is true is especially pertinent when it comes to the family's religious education of M.A. and W.A. At home and at church, the children are taught that it is the right and responsibility of every person,

including youth, to undertake a free and responsible search for truth and meaning. When youth are old enough, they have the right to decide what faith system and religious beliefs, if any, they will follow. Mr. Armendariz believes that this free spiritual inquiry cannot happen when the government or other authority figures impose religious doctrine on someone.

90.    On behalf of himself and his children, Mr. Armendariz objects to the school displays mandated by Act 573 because the displays will promote, and forcibly subject his children to, religious scripture to which the family does not subscribe, in a manner that violates the family's religious beliefs and practice.

91.    Mr. Armendariz believes that the displays mandated by Act 573 will communicate to his children that the posted scripture are rules that must be followed and that these rules identify the "correct" religious path. The displays will order the children to adopt and conform to specific, Christian religious beliefs and practices, including: to accept that there is one, male-gendered God ("I am the Lord thy God;" "Thou shalt have no other gods before me"); to refrain from making "any graven image[s]"; to "not take the Name of the Lord thy God in vain"; to "[r]emember the Sabbath day, to keep it holy"; and to "[h]onor thy father and thy mother" so that "thy days may be long upon the land which the Lord thy God giveth thee." The Unitarian Universalist faith does not impose such religious dictates on children or anyone, in part, because an authoritative assertion that one specific scripture or religious dogma is "correct" would impede an individual's ability to conduct their own free and responsible inquiry for the truth.

92.    Mr. Armendariz also objects to the displays mandated by Act 573 because they will convey to his children that treating people as property is permissible, in violation of Unitarian Universalist teachings that every person is important, has inherent worth and dignity, and should be treated equally. The final Commandment required under the Act, "Thou shalt not covet thy

neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's," suggests an endorsement of personal servitude and slavery. In addition, by prohibiting one from coveting a "wife" but not a husband, this language centers and favors a male, heterosexual viewpoint.

93.     Moreover, Mr. Armendariz believes that the displays will introduce to his children age-inappropriate topics, including adultery. His children are not old enough to discern such matters and even if they were, he believes that such questions should be introduced and addressed at home and in the context of the family's faith community and belief system, not by government officials.

94.     In violation of the Unitarian Universalist values taught to his children, the displays required by Act 573 also will convey a message of religious intolerance. They will signal to W.A. and M.A. that Christian students who follow the precise version of the Ten Commandments posted in classrooms and the library are favored by their peers, teachers, and school staff, and that those who do not follow this religious doctrine, including M.A. and W.A., are outsiders who will be rejected by others in school and the broader community.

95.     The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for M.A. and W.A., ensuring that M.A. and W.A. will be subjected to the Ten Commandments every day, in every classroom, throughout their public-school education.

96.     As a result, the displays mandated by Act 573 will pressure M.A. and W.A. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine as well as to suppress expression of their own Unitarian Universalist background and views at school. Indeed, Mr. Armendariz's children have adored their teachers and, like many young children, crave their approval as well as the approval of other authority figures. For example, his eldest child is very

responsible and especially concerned about following the rules and would not feel comfortable questioning the religious directives on permanent display. This religious coercion will harm M.A. and W.A. spiritually and substantially interfere with, impede, and burden their ability to conduct a free and responsible inquiry for truth and meaning and to decide, for themselves, what to believe when it comes to matters of faith.

97.    The displays will also usurp Mr. Armendariz's parental role in guiding his children's religious education. The ability to direct and guide his children in matters of faith and to protect their ability to undertake a free and responsible search for truth and meaning is an essential aspect of his religious exercise.

### *Talara Taylor, Shane Taylor, and their minor children*

98.    Plaintiffs Talara and Shane Taylor are Humanists and atheists. Both were raised on a Cherokee reservation. Ms. Taylor was raised in the Christian faith, and Mr. Taylor occasionally attended church. Today, Ms. Taylor also follows some Native American spiritual traditions.

99.    The Taylors are raising their minor children, K.T. and M.T., with strong moral values in a nonreligious household and tradition. They allow their children to independently develop their own decisions on religious matters and do not want their children's public school to interfere with these decisions.

100.    The Taylors do not subscribe to the religious dictates of the Ten Commandments generally or the specific version that must be displayed in public schools under Act 573.

101.    On behalf of themselves and their minor children, the Taylors object to the school displays mandated by Act 573 because the displays will promote, and forcibly subject their children to, religious scripture to which their family does not subscribe. Specifically, the displays will impose on K.T. and M.T. one set of religious values and beliefs over their family's values,

which are not based in religion. The Taylors do not want the government to push religious morality or religious doctrine on their children.

102.    The Taylors believe that the displays mandated by Act 573 will send the message to their children that the school, as an institution of authority, favors Christianity over other religious beliefs and nonbelief. For example, the phrase, "I am the Lord thy God," suggests that the Ten Commandments reflects the religion of all people in every classroom. This proselytizing phrase will dictate to students, including K.T. and M.T., what their religion is or should be. The displays will thus convey a harmful message to the Taylors and their children that they are outsiders because they do not share the religious beliefs preferred by the government.

103.    The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for K.T. and M.T., ensuring that the children will be subjected to the Ten Commandments every day, in every classroom, throughout their public-school education.

104.    As a result, K.T. and M.T. will be pressured to believe in God and to observe, meditate on, venerate, and adopt the state's favored religious doctrine. In addition, the displays mandated by Act 573 will pressure them to suppress their own nonreligious background and views at school, particularly given that they have already experienced significant pressure at school to conform to the beliefs of their peers and teachers.

105.    For example, K.T. previously experienced coercion and trauma due to unwanted religious proselytizing when K.T. attended a different public school. At that school, a teacher became angry at K.T. for not believing in God and told K.T. that the family's beliefs were wrong, and that God was real. The teacher told K.T. that K.T. would get in trouble for saying K.T. did not believe in God, pressuring K.T. to pretend to believe in God while at school. At the same school, K.T. was also repeatedly subjected to a monthly class at school, taught during the school day,

where missionaries proselytized Christianity to K.T. and other students. Being subjected every day to the Ten Commandments in every classroom and the library will remind K.T. of this trauma and further pressure K.T. to observe, meditate on, venerate, and adopt the religious directives, as well as to suppress any expression of K.T.'s nonreligious beliefs and background.

106.    Imposing permanent, prominently placed displays of religious directives for nearly every hour that the children are in school, in accordance with Act 573, will directly interfere with and substantially burden and undermine the Taylors' ability to raise their children in a nonreligious tradition. The Taylors believe that their role in directing their children's nonreligious upbringing and protecting their children's ability to develop their own beliefs on religious matters is one of the most important responsibilities they have as parents.

### Carol Vella and her minor children

107.    Plaintiff Carol Vella is Jewish and is raising her children, E.M.V. and N.M.V., in the Jewish faith. The family belongs to Temple Shalom in Fayetteville and participates in community events sponsored by the temple. In addition, Ms. Vella served as the director of the religious school at Temple Shalom from 2018 to 2020, where the children's early religious education also took place.

108.    On behalf of herself and her children, Ms. Vella objects to the school displays mandated by Act 573 because the displays will promote, and forcibly impose on E.M.V. and N.M.V., scripture in a manner that is contrary to the family's Jewish faith.

109.    As a Reform Jew, Ms. Vella believes that introducing the Ten Commandments to E.M.V. and N.MV., and any action that could be construed as attempting to convey their proper religious meaning and interpretation, must occur in the context of the broader Reform Jewish tradition. The Commandments must be interpreted and reconciled with many other parts of the

Torah and the interpretive body of work that has emerged over millennia to understand the Torah. Ms. Vella objects to the school displays required by Act 573 because they present the Ten Commandments to her children outside of the broader Jewish tradition and send the message to her children that the government's mandated Christian version of the Commandments is authoritative.

110.    Ms. Vella also objects to the version of the Ten Commandments that Act 573 requires because she does not follow or teach her children the Christian version of the Ten Commandments. It does not reflect her family's religious beliefs.

111.    For example, Ms. Vella believes that the Act's final commandment, "Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's," is explicitly from a man's point of view, giving the impression that the Commandment should apply based on gender. In addition, the Commandment's discussion of "manservant[s]" and "maidservant[s]" suggests that it endorses personal servitude. It is fundamental to Ms. Vella's practice of Judaism and the religious values she teachers her children that all people are created equal, that any rule or law or obligation such as this would apply to all people equally—not just to one gender—and that any support for human slavery or servitude is immoral, wrong, and against God's will. She believes that this context and modern Jewish interpretive principles are vital so as not to imply that Judaism endorses or supports gender discrimination or any form of servitude.

112.    In addition, Ms. Vella objects to the school displays mandated by Act 573 because they would violate Jewish tenets that oppose proselytizing. Her Jewish faith teaches, and she teaches her children, that religious beliefs should not be imposed on anyone.

113.    The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for E.M.V. and N.M.V., ensuring that the children will be subjected to the Ten Commandments every day, in every classroom, throughout their public-school education.

114.    As a result, the displays mandated by the Act will make it difficult for Ms. Vella's children to maintain and express their Jewish identity. The displays will convey that the state-selected, Christian version of the Ten Commandments is the "correct" or authoritative version of scripture and pressure E.M.V. and N.M.V. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

115.    The displays mandated by Act 573 will also send the harmful message to Ms. Vella and her children that they are outsiders in their community, leading the children to feel "othered" because they do not subscribe to the state's preferred version of the Ten Commandments.

116.    Unfortunately, Ms. Vella's children have already been treated differently at school because of their Jewish faith. For example, students have asked E.M.V. and N.M.V. why they are not Christian, do not attend church, or do not believe in Jesus Christ as their savior. In addition, the children feel left out because they do not attend a Christian after-school club that serves snacks and is attended by their friends.

117.    Posting the Ten Commandments in the classrooms of Ms. Vella's children will reinforce the othering they already experience as just one of a few Jewish students in their classes and pressure them to suppress expression of their own Jewish background and beliefs at school.

118.    Further, the ability to direct and guide her children in matters of faith, including the text and meaning of Jewish beliefs surrounding the Ten Commandments, is an essential aspect of Ms. Vella's religious exercise. The displays mandated by Act 573 will directly interfere with and substantially burden this religious exercise.

_Daniel Rix and his minor children_

119.    Plaintiff Daniel Rix grew up as an evangelical Christian and converted to the Mormon faith at the age of 18. Until three years ago, he was a member of, and served in ministerial and leadership positions with, the Mormon Church. Since leaving the Church, he is no longer affiliated with any organized religion and is an atheist. His minor children, W.R., J.R., and A.R., are also nonreligious.

120.    Mr. Rix and his spouse strive to raise their children with strong moral values, but they do not teach the children those values in conjunction with a particular faith system. Because they believe their children should have the space and autonomy to develop their own views on religious matters, they avoid pressuring the children to hold or practice any specific religious belief.

121.    Mr. Rix's family does not subscribe to the religious dictates of the Ten Commandments generally or the specific version that must be displayed in public schools under Act 573.

122.    On behalf of himself and his children, Mr. Rix objects to the school displays mandated by Act 573 because the displays will promote, and forcibly subject his children to, religious scripture to which his family does not subscribe. Specifically, the displays will impose on W.R., J.R., and A.R. one set of religious values and beliefs over the family's values, which are not based in religion. Mr. Rix does not want the government to push religious precepts or doctrine on W.R., J.R., and A.R.

123.    Mr. Rix believes that the displays mandated by Act 573 will send the message to his children that the school, as an institution of authority, favors Christianity over other religious beliefs and nonbelief. For example, the phrase, "I am the Lord thy God," suggests that the Ten

Commandments reflects the religion of all the people in every classroom. This proselytizing phrase will dictate to students, including W.R., J.R., and A.R., what their religion is or should be—even though the specific beliefs promoted in the Ten Commandments display are not universal. The displays will thus convey a harmful message to him and his children that they are outsiders because they do not share the religious beliefs preferred by the government.

124.    Further, Mr. Rix is concerned that the displays are likely to create opportunities for additional proselytizing in the classroom by teachers.

125.    The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for W.R., J.R., and A.R., ensuring that his children will be subjected to the Ten Commandments every day, in every classroom, throughout their public-school education.

126.    As a result, his children will be pressured to observe, meditate on, venerate, and adopt the state's preferred religious doctrine as well as to suppress their own nonreligious background and views at school.

127.    For example, one of Mr. Rix's children is already grappling seriously with questions about life and religion. To be confronted with the Ten Commandments for nearly every hour of every single school day, especially as the child is learning to read, will only make the experience more confusing and difficult.

128.    Subjecting his children to permanent, prominently placed displays of religious directives, in accordance with Act 573, will also directly interfere with and substantially burden and undermine Mr. Rix's ability to raise his children, together with his wife, in a nonreligious tradition. He views the responsibility he has for directing his children's nonreligious upbringing as one of his most important responsibilities as a parent.

*Leah Bailey and her minor children*

129.    Plaintiff Leah Bailey was raised as a Christian but today considers herself agnostic. She is raising her minor children, C.T. and D.T., in a nonreligious household and tradition.

130.    Ms. Bailey allows her children to independently develop their own opinions on religious matters. C.T. is agnostic and continues to explore various religious beliefs. D.T. is an atheist.

131.    Ms. Bailey's family does not subscribe to the religious dictates of the Ten Commandments generally or the specific version that must be displayed in public schools under Act 573.

132.    On behalf herself and her children, Ms. Bailey objects to the school displays mandated by Act 573 because the displays will promote, and forcibly subject her children to, religious scripture to which her family does not subscribe. Specifically, the displays will impose on C.T. and D.T. one set of religious values and beliefs that are at odds with the family's nonreligious tradition. Ms. Bailey does not want the government to push religious tenets or doctrine on C.T. and D.T.

133.    Ms. Bailey believes that the displays required by Act 573 will indicate to students, including her children, that the school, as an institution of governmental authority, favors Christianity over other religious beliefs and nonbelief. For example, the phrase, "I am the Lord thy God," suggests that the Ten Commandments reflects the religion of all the people in every classroom and makes it sound like students have no choice in the matter of their religion. This proselytizing phrase and other Commandments will dictate to students, including C.T. and D.T., what their religion is or should be. The displays will thus convey a harmful message to them that they are outsiders because they do not share the religious beliefs preferred by the government.

134.    The baseline requirements set forth in Act 573 for the displays will render the displays unavoidable for C.T. and D.T., ensuring that the children will be subjected to the Ten Commandments every day, in every classroom, throughout their public-school education.

135.    As a result, Ms. Bailey's children will be pressured to observe, meditate on, venerate, and adopt the state's preferred religious doctrine as well as to suppress their own nonreligious background and views at school.

136.    Ms. Bailey believes that directing her children's nonreligious upbringing and protecting their ability to develop their own views on religious matters is one of her most important responsibilities as a parent. Imposing permanent, prominently placed displays of religious directives for nearly every hour that her children are school, in accordance with Act 573, will directly interfere with and substantially burden and undermine her ability to do this.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

137.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

138.    The Establishment Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion."

139.    In *Stone v. Graham*, the Supreme Court struck down a statute similar to Act 573, holding that posting the Ten Commandments in public-school classrooms violates the Establishment Clause of the First Amendment. 449 U.S. at 41-42. *Stone* remains binding precedent, and Act 573 is thus unconstitutional.

140.    By mandating that this state-sanctioned version of the Ten Commandments be displayed in every public elementary- and secondary-school classroom and library in Arkansas, Act 573 impermissibly prefers and will impose a set of distinct religious beliefs and dictates on Arkansas's public-school children, including the minor-child Plaintiffs.

141.    As a result of the Ten Commandments displays mandated by Act 573, Arkansas students—including the minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress their personal religious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

142.    In addition, by mandating that a Protestant version of the Ten Commandments be displayed in public elementary and secondary schools and prescribing an official religious text for schoolchildren to venerate, Act 573 adopts an official position on religious matters, violating the Establishment Clause's prohibition against taking sides in questions over theological doctrine and violating the "clearest command" of the Establishment Clause that "the government may not 'officially prefe[r]' one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, No. 24-154, 2025 WL 1583299, at *5 (U.S. June 5, 2025) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982) (alteration in original)). The Act's mandatory, religiously preferential displays will not further a compelling governmental interest and, even if they did, they will not be narrowly tailored to any such interest under the Establishment Clause.

143.    There is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in public-school classrooms. On the contrary, the Supreme Court unambiguously held in *Stone* that such a practice is proscribed by the Constitution.

144.    By implementing Act 573, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

145.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Establishment Clause constitutional rights.

## COUNT II

### VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

146.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

147.    The Free Exercise Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

148.    Act 573 and the religious displays it requires are not neutral with respect to religion. By design, the Act mandates the display of expressly religious scripture, the Ten Commandments, in every public-school classroom and, moreover, requires that a specific, Protestant version of that scripture be used.

149.    The religiously discriminatory displays mandated by Act 573 will substantially burden the religious exercise of the parent-Plaintiffs, who do not subscribe to the state-sanctioned version of the Ten Commandments, by interfering with, conflicting with, and usurping their ability to direct their children's religious education and religious or nonreligious upbringing.

150.    The displays mandated by Act 573 will substantially burden the religious exercise of the minor-child Plaintiffs, who do not subscribe to the state-sanctioned version of the Ten Commandments, by pressuring them to suppress or limit expression of their religious or

nonreligious backgrounds, beliefs, or practices while in school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

151.    The displays mandated by Act 573 will also substantially burden the religious exercise of the minor-child Plaintiffs by pressuring them into observance, veneration, and adoption of the state's favored religious scripture, in violation of their own religious or nonreligious beliefs, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

152.    Under the Free Exercise Clause, when the government burdens religious exercise pursuant to a policy that is not religiously neutral, courts will find a constitutional violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). The displays mandated by Act 573 will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Free Exercise Clause.

153.    By administering and implementing Act 573, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

154.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Free Exercise Clause rights.

## **REQUEST FOR RELIEF**

The Plaintiffs respectfully request the following relief:

A.    An order declaring that Act 573's requirement mandating the display of the Ten Commandments in every public elementary- and secondary-school classroom and library in

Arkansas violates the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution;

B.    An order preliminarily and, thereafter, permanently enjoining the Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from complying with Act 573 by displaying the Ten Commandments in public elementary- and secondary-school classrooms and libraries;

D.    An award, from Defendants to Plaintiffs, of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

E.    An order retaining this Court's jurisdiction of this matter to enforce the terms of the Court's order; and

F.    Such other relief as the Court deems just and proper.


DATED: June 11, 2025                         Respectfully submitted,

                                             By: */s/* John C. Williams
                                             ARKANSAS CIVIL LIBERTIES UNION
                                             FOUNDATION, INC.
                                             John C. Williams (ABN 2013233)
                                             Shelby H. Shroff (ABN 2019234)
                                             904 W. 2nd St.
                                             Little Rock, AR 72201
                                             (501) 374-2842
                                             *john@acluarkansas.org*
                                             *shelby@acluarkansas.org*

                                             AMERICAN CIVIL LIBERTIES UNION
                                             FOUNDATION
                                             Daniel Mach*
                                             Heather L. Weaver*
                                             915 15th Street, NW, Suite 600
                                             Washington, DC 20005
                                             (202) 675-2330

*dmach@aclu.org*
*hweaver@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*
Jess Zalph*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
Nancy A. Noet*
PO Box 750
Madison, WI 53701
(608) 256-8900
*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*

*Counsel for Plaintiffs*

* Motion for *Pro Hac Vice* Admission
Forthcoming