# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

SAMANTHA STINSON and JONATHAN STINSON, on behalf of themselves and on behalf of their minor children, A.R.S. and A.W.S.; STEPHEN CALDWELL, on behalf of himself and on behalf of his minor child, W.C.; JOSEPH ARMENDARIZ, on behalf of himself and on behalf his minor children, M.A. and W.A.; TALARA TAYLOR and SHANE TAYLOR, on behalf of themselves and on behalf of their minor children, K.T. and M.T.; CAROL VELLA, on behalf of herself and on behalf of her minor children, E.M.V. and N.M.V.; DANIEL RIX, on behalf of himself and on behalf of his minor children, A.R., J.R., and W.R.; and LEAH BAILEY, on behalf of herself and on behalf her minor children, C.T. and D.T.,

       Plaintiffs,

      v.

FAYETTEVILLE SCHOOL DISTRICT NO. 1; SPRINGDALE SCHOOL DISTRICT NO. 50; BENTONVILLE SCHOOL DISTRICT NO. 6; and SILOAM SPRINGS SCHOOL DISTRICT NO. 21,

      Defendants.

CIVIL ACTION NO.
5:25-cv-05127-TLB

## PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND THE STATE OF ARKANSAS'S MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

ARGUMENT ...................................................................................................................... 4

I.    THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER
      PLAINTIFFS' FIRST AMENDMENT CLAIMS ....................................................... 4

      A.    Defendants' claims that they are not required to put up displays pursuant
            to Act 573 are not credible. ............................................................................. 7

            1.    *There is a substantial likelihood that funding and/or posters will
                  be donated to the School District Defendants imminently.* ................... 8

            2.    *Act 573 does not prohibit school districts from using general-
                  purpose voluntary contributions to purchase displays.* ..................... 10

      B.    Plaintiffs Meet All Three Prongs of the Article III Standing Inquiry ............. 11

            1.    *Plaintiffs have demonstrated imminent injuries in fact.* .................... 11

            2.    *Plaintiffs' injuries are fairly traceable to Defendants.* ...................... 19

            3.    *Plaintiffs' injuries will be redressed by injunctive and declaratory
                  relief.* .................................................................................................... 22

      C.    Plaintiffs' Claims Are Ripe .............................................................................. 23

            1.    *This case is fit for judicial decision.* .................................................. 23

            2.    *The hardship to Plaintiffs in withholding a decision is significant* .... 26

II.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE
      GRANTED. ............................................................................................................. 27

      A.    Plaintiffs Have Shown That They Are Likely to Succeed on The Merits of
            Their Establishment Clause Claim ................................................................. 28

            1.    Stone *is not "dead" and remains binding law* ................................... 29

            2.    Stone *is directly applicable here* ....................................................... 32

            3.    *The school displays mandated by Act 573 are unconstitutionally
                  coercive.* .............................................................................................. 33

4. *Act 573 impermissibly takes sides on theological questions and is denominationally preferential.* ............................................................ 37

5. *Permanently displaying the Ten Commandments in every public-school classroom is not permissible under* Kennedy*'s "original meaning and history" test* .................................................. 38

B. Plaintiffs Have Shown That They Are Likely To Succeed On The Merits Of Their Free Exercise Claim. ........................................................ 40

1. *Act 573 is unconstitutionally coercive under the Free Exercise Clause.* .............................................................................. 41

2. *The Act is not religiously neutral, and its mandatory displays will violate parent-Plaintiffs' free exercise rights.* ................................... 43

C. Plaintiffs Have Shown That Their Facial Challenge Is Likely To Succeed ... 44

D. Each of the Remaining Preliminary Injunction Factors Has Been Met. ......... 44

III. THE COURT HAS THE AUTHORITY TO GRANT PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF. ................................................. 45

CONCLUSION ................................................................................ 48

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*,
   638 F.3d 621 (8th Cir. 2011) ............................................................................... 20

*520 S. Mich. Ave. Assocs., Ltd. v. Devine*,
   433 F.3d 961 (7th Cir. 2006) ............................................................................... 24

*ACLU-NJ v. Twp. of Wall*,
   246 F.3d 258 (3d Cir. 2001).......................................................................... 16, 17

*Agostini v. Felton*,
   521 U.S. 203 (1997).......................................................................... ..…... 29

*Am. Legion v. Am. Humanist Ass'n*,
   588 U.S. 19 (2019)....................................................................... 13, 31

*Animal Legal Def. Fund v. Vaught*,
   8 F.4th 714 (8th Cir. 2021) ............................................................... 4, 16

*Auto., Petrol. & Allied Indus. Emps. Union, Local 618 v. Gelco Corp.*,
   758 F.2d 1272 (8th Cir. 1985) ............................................................... 23

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979)....................................................................... 16, 25

*Bennett v. Spear*,
   520 U.S.154 (1997)....................................................................... 22

*Berger v. Rensselaer Cent. Sch. Corp.*,
   982 F.2d 1160 (7th Cir. 1993) ............................................................... 35

*Bosse v. Oklahoma*,
   580 U.S. 1 (2016)....................................................................... 29

*Braitberg v. Charter Commc'ns, Inc.*,
   836 F.3d 925 (8th Cir. 2016) ............................................................... 11

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ............................................................... 45

*Browning-Ferris Indus. v. Ala. Dep't of Env't Mgmt.*,
   799 F.2d 1473 (11th Cir. 1986) ............................................................... 25

*Busch v. Marple Newtown Sch. Dist.*,
   567 F.3d 89 (3d Cir. 2009).......................................................................... 35

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................... 45

*Carson v. Makin*,
    596 U.S. 767 (2022) ............................................................................... 41

*Carson v. Simon*,
    978 F.3d 1051 (8th Cir. 2020) ............................................................... 27

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*,
    690 F.3d 996 (8th Cir. 2012) ........................................................... 27, 44

*City of Kennett v. EPA*,
    887 F.3d 424 (8th Cir. 2018) ................................................................. 19

*City of Ocala v. Rojas*,
    143 S. Ct. 764 (2023Roa) ...................................................................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................... 16, 25

*Collins v. Yellen*,
    594 U.S. 220 (2021) ............................................................................... 11

*Cont'l Ins. Co. v. Daikin Applied Ams., Inc*,
    No. 17-cv-552, 2019 WL 6873797 (D. Minn. Dec. 17, 2019) ......................................... 23, 24

*Dakotans for Health v. Noem*,
    52 F.4th 381 (8th Cir. 2022) .................................................................... 4

*Dataphase Sys. v. C L Sys.*,
    640 F.2d 109 (8th Cir. 1981) (en banc) ................................................ 27

*De Beers Consol. Mines Ltd. v. United States*,
    325 U.S. 212 (1945) ............................................................................... 45

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................... 16

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
    241 F.3d 154 (2d Cir. 2001) .................................................................. 24

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ......................................................................... 34, 35

*Edwards v. Beck*,
    786 F.3d 1113 (8th Cir. 2015) ............................................................... 29

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................... 27, 45

*Engel v. Vitale,*
  370 U.S. 421 (1962)..................................................................................... 30

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
  45 F.3d 530 (1st Cir. 1995)......................................................................... 23

*Espinoza v. Mont. Dep't of Revenue,*
  591 U.S. 464 (2020)............................................................................... 26, 27

*Fayetteville Pub. Library v. Crawford Cnty.,*
  No. 23-cv-05086, 2023 WL 4849849 (W.D. Ark. July 29, 2023)........................ 15, 16, 20, 21

*Fleck v. Wetch,*
  937 F.3d 1112 (8th Cir. 2019) .................................................................... 29

*Goodwin v. Cross Cnty. Sch. Dist. No. 7,*
  394 F. Supp. 417 (E.D. Ark. 1973)............................................................. 35

*Herden v. United States,*
  726 F.3d 1042 (8th Cir. 2022) ...................................................................... 4

*Hilsenrath v. Sch. Dist. of the Chathams,*
  136 F.4th 484 (3d Cir. 2025) ...................................................................... 30

*Hohn v. United States,*
  524 U.S. 236 (1998)..................................................................................... 29

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
  88 F.3d 274 (5th Cir. 1996) ....................................................................... 16

*Jackson v. Nixon,*
  747 F.3d 537 (8th Cir. 2014) ...................................................................... 42

*Johnson v. Griffin,*
  69 F.4th 506 (8th Cir. 2023) ...................................................................... 22

*Johnson v. Poway Unified Sch. Dist.,*
  658 F.3d 954 (9th Cir. 2011) ...................................................................... 35

*Jusino v. Fed'n of Catholic Teachers, Inc.,*
  54 F.4th 95 (2d Cir. 2022) ......................................................................... 30

*K.P. v. LeBlanc,*
  627 F.3d 115 (5th Cir. 2010) ...................................................................... 20

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022)............................................................................... passim

*Lee v. Weisman,*
  505 U.S. 577 (1992)............................................................................... passim

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ............................................................................... 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................... 11

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) ............................................................................... 31

*Mahmoud v. McKnight*,
  688 F. Supp. 3d 265 (D. Md. 2023) ....................................................... 42

*Mahmoud v. McKnight*,
  102 F.4th 191 (4th Cir. 2024) ................................................................ 19

*Mahmoud v. Taylor*,
  No. 24-297, 2025 WL 1773627 (U.S. June 27, 2025) ................... passim

*Mainstreet Org. of Realtors v. Calumet City*,
  505 F.3d 742 (7th Cir. 2007) ................................................................. 24

*Mallory v. Norfolk S. Ry. Co.*,
  600 U.S. 122 (2023) ............................................................................... 29

*Marsh v. Chambers*,
  463 U.S. 783 (1983) ............................................................................... 31

*McCreary Cnty. v. ACLU of Ky.*,
  545 U.S. 844 (2005) ......................................................................... 31, 38

*McFarlin v. Newport Special Sch. Dist.*,
  980 F.2d 1208 (8th Cir. 1992) ............................................................... 12

*MKB Mgmt. Corp. v. Stenehjem*,
  795 F.3d 768 (8th Cir. 2015) ................................................................. 29

*Neb. Pub. Power Dist. v. MidAmerican Energy Co.*,
  234 F.3d 1032 (8th Cir. 2000) ............................................................... 23

*New Doe Child #1 v. United States*,
  901 F.3d 1015 (8th Cir. 2018) ............................................................... 36

*NLRB v. Cath. Bishop of Chicago*,
  440 U.S. 490 (1979) ............................................................................... 30

*Osborn v. United States*,
  918 F.2d 724 (8th Cir. 1990) ................................................................... 4

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Devel. Comm'n*,
  461 U.S. 190 (1983) ............................................................................... 24

*Parents Involved in Comm'y Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007).............................................................................. 25

*Parrish v. Dayton,*
    761 F.3d 873 (8th Cir. 2014) ............................................................... 26

*Ramos v. Louisiana,*
    590 U.S. 83 (2020)............................................................................... 29

*Red River Freethinkers v. City of Fargo,*
    679 F.3d 1015 (8th Cir. 2012) .............................................. 12, 16, 17

*Riva v. Massachusetts,*
    61 F.3d 1003 (1st Cir. 1995).............................................................. 25

*Roake v. Brumley,*
    756 F. Supp. 3d 93 (M.D. La. 2024)......................................... passim

*Roake v. Brumley,*
    No. 24-30706, 2025 WL 1719978 (5th Cir. June 20, 2025)........... passim

*Rodgers v. Bryant,*
    942 F.3d 451 (8th Cir. 2019) ............................................................. 46

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
    490 U.S. 477 (1989)............................................................................ 29

*Sandell v. FAA,*
    923 F.2d 661 (9th Cir. 1990) .............................................................. 24

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000)............................................................... 33, 35, 47

*Schanou v. Lancaster Cnty. Sch. Dist. No. 160,*
    62 F.3d 1040 (8th Cir. 1995) .............................................................. 11

*Sch. Dist.of Abington Twp. v. Schempp,*
    374 U.S. 203 (1963)......................................................................... passim

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022)................................................................ 33, 38, 39

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997)................................................................................. 29

*Steele v. Van Buren Pub. Sch. Dist.,*
    845 F.2d 1492 (8th Cir. 1988) ...................................................... 12, 15

*Steffel v. Thompson,*
    415 U.S. 452 (1974)............................................................... 7, 16, 22

*Stone v. Graham,*
    449 U.S. 39 (1980)...................................................................................... passim

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)................................................................... 7, 15, 16, 23

*Tenet v. Doe,*
    544 U.S. 1 (2005)........................................................................................ 29

*Thomas v. Union Carbide Agr. Prods. Co.,*
    473 U.S. 568 (1985).................................................................................... 23

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,*
    460 U.S. 533 (1983).................................................................................... 28

*Titus v. Sullivan,*
    4 F.3d 590 (8th Cir. 1993) .......................................................................... 4

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014)............................................................................ 31, 36

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021).................................................................................... 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017).................................................................................... 42

*Trump v. CASA, Inc.,*
    No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...................... 47

*Trump v. Int'l Refugee Assist. Project,*
    582 U.S. 571 (2017).................................................................................... 46

*United States v. Barnett,*
    574 F.3d 600 (8th Cir. 2009) ................................................................... 28

*United States v. Davis,*
    260 F.3d 965 (8th Cir. 2001) ................................................................... 29

*Van Orden v. Perry,*
    545 U.S. 677 (2005)........................................................................ 30, 31, 35

*Wallace v. Jaffree,*
    472 U.S. 38 (1985)...................................................................................... 42

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)............................................................................ 28, 43

**Statutes**

Act 573 of 2025 (amending Ark. Code. Ann. § 1-4-133 (2025)) ......................................... passim

Ark. Code Ann. § 6-13-102 ................................................................................................ 20

Ark. Code Ann. § 6-16-303 ................................................................................................ 10

Ark. Code Ann. § 6-23-902 ................................................................................................ 10

Ark. Code Ann. § 6-51-207 ................................................................................................ 10

**Secondary Sources**

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,
    FEDERAL PRACTICE & PROCEDURE (3d ed. 2022) (updated June 2024) ................................ 45

Ark. Att'y Gen. Op. No. 2025–032 (May 12, 2025),
    *available online at* https://ag-opinions.s3.amazonaws.com/uploads/2025-032.pdf ................ 3

## INTRODUCTION

In moving to dismiss Plaintiffs' Complaint and opposing Plaintiffs' preliminary-injunction motion,[1] the School District Defendants and the State have demonstrated a fundamentally flawed understanding of what is at issue in this case. This case is not about the content of any individual display posted under Act 573. Whether public schools decide to hang displays of the Ten Commandments standing alone or, for instance, accompanied by a random Nietzsche or Socrates quote,[2] has no bearing on Plaintiffs' facial challenge under the First Amendment. Rather, Plaintiffs' claims strike at the heart of the Act's statutory regime as it pertains to elementary and secondary public schools.[3] Regardless of variations in content or the displays' surroundings, the minimum requirements of the Act demand permanent displays in every single public-school classroom and library, all featuring one unavoidable constant as their focus: a state-adopted, Protestant version of the Ten Commandments.

Students may switch classrooms between courses, progress from elementary to middle to high school, or and even transfer schools or school districts—but so long as they attend an Arkansas public school, they will not be able to escape the specific biblical scripture adopted and prescribed by the State. No matter the details of any one display, the Act's broad scheme to impose on students—for nearly every hour they are in school, day in and day out, for the duration of their

---

[1] Plaintiffs filed their Complaint (ECF No. 2) on June 11, 2025, and their Motion for Preliminary Injunction (hereinafter "Plfs. Mot.") (ECF No. 8) and Memorandum in Support of their Motion for Preliminary Injunction (hereinafter "Plfs. Br.") (ECF No. 9) on June 12, 2025. On June 17, 2025, the State of Arkansas (referred to herein as the "State") moved to intervene. ECF No. 39. The State's motion was unopposed and granted on June 18, 2025. ECF No. 42. Pursuant to this Court's June 23, 2025, order (ECF No. 43), the School District Defendants (also referred to herein as "School Districts" or "Defendants") and the State separately filed oppositions (ECF Nos. 51, 53) to Plaintiffs' preliminary-injunction motion as well as motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) (ECF Nos. 49, 52). For the Court's convenience, and in anticipation of the July 18, 2025, preliminary-injunction hearing (ECF No. 44), Plaintiffs submit this combined response to these motions and opposition papers.

[2] Ark. Mem. in Support of State's Mot. to Dismiss & Opp. to Plfs. Preliminary Injunction Mot. (hereinafter "Ark. Br."), ECF No. 53, 8-9.

[3] *See* Plfs. Mot., Ex. 1, Act 573 (providing that the Ten Commandments "shall be displayed in each . . . elementary and secondary school library and classroom in this state").

1

public-school education—an official, denominational version of the Ten Commandments will injure the minor-child Plaintiffs and their parents. That harm is more than sufficient to support Article III standing, and it is imminent. Act 573 takes effect on August 5, 2025, shortly before the upcoming school year begins, and there are already extensive, high-profile fundraising campaigns under way to ensure that every school district receives donated posters. As the Supreme Court reaffirmed just last month, "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *20 (U.S. June 27, 2025). Contrary to the Defendants' and the State's arguments, the harm is looming, and Plaintiffs' claims are ripe for adjudication.

The issue before this Court then becomes whether the State may constitutionally mandate that the Ten Commandments be permanently displayed, consistent with the minimum requirements of the Act, in every elementary and secondary public-school classroom and library. *Stone v. Graham*, 449 U.S. 39 (1980), which struck down a similar Kentucky statute under the Establishment Clause, precludes it. *Stone* remains good law, binding on this Court, unless and until the Supreme Court overrules it. And even if *Stone* were no longer binding, the displays violate original First Amendment principles and conflict with longstanding precedents because the Act's mandatory scriptural displays will be religiously coercive and will give preference to particular denominations. Finally, the displays will "strip away the critical right of parents to guide the religious development of their children." *See Mahmoud*, 2025 WL 1773627, at *20. Accordingly, Plaintiffs respectfully request that this Court deny the Defendants' and the State's motions to dismiss and grant Plaintiffs' preliminary-injunction motion.

## FACTUAL BACKGROUND

On April 14, 2025, Arkansas Governor Sarah Huckabee Sanders signed into law Act 573 of 2025,[4] which mandates the display of a state-approved version of the Ten Commandments in every classroom and library of every public elementary and secondary school in Arkansas. The Act will take effect on August 5, 2025,[5] just in time for most public-school openings for the 2025-2026 academic year. Lawmakers' comments regarding the Act make clear that the displays are designed to ensure that students are more likely to observe, absorb, accept, follow and live by the religious directives in the Ten Commandments. *See* Compl. ¶¶ 59-62; Plfs. Br. 4-5.

Under the Act, all public-school districts must "prominently display" a poster or framed copy of the Ten Commandments in a "conspicuous place" in every classroom and library of every elementary and secondary school. Plfs. Mot., Ex. 1, Act 573 §§ (a)(1)-(2). The displays will be permanent; the Act does not set or contemplate a time limit on them. *See generally id*. Further, the Act sets very specific visual requirements for the displays, including a minimum requirement that each display be "at least sixteen inches by twenty inches" with the Ten Commandments printed "in a size and typeface that is legible to a person with average vision from anywhere in the room in which the durable poster or framed copy is displayed." *Id.* Act 573 §§ (a)(1)(B)(ii)(a)-(b). The Act sets out "[t]he text of the durable poster or framed copy of the Ten Commandments," which is a state-approved version of the Ten Commandments that public schools *must* use—a Protestant rendition of scripture that conflicts with the beliefs of many Jews and Catholics. *See* Compl. ¶¶ 21-35; Plfs. Mot., Ex. 12, Expert Report of Dr. Steven K. Green, J.D., Ph.D. (hereinafter "Green Rep."), ¶¶ 52-58; *infra* pp. 37-38.

---

[4]    Codified at Ark. Code. Ann. § 1-4-133 (2025). *See generally* Plfs. Mot., Ex 1, Act 573.
[5]    *See* Ark. Att'y Gen. Op. No. 2025-032 (May 12, 2025), *available online at* https://ag-opinions.s3.amazonaws.com/uploads/2025-032.pdf.

## ARGUMENT

## I.    THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' FIRST AMENDMENT CLAIMS

To defeat a motion to dismiss, Plaintiffs must allege "sufficient facts to support a reasonable inference that they can satisfy the elements of standing." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021). For the purposes of assessing standing at the preliminary-injunction stage, the Court must assume that "the complaint's allegations are true and view[] them in the light most favorable to the plaintiff." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022). Plaintiffs easily overcome this threshold.

The 12(b)(1) motions to dismiss filed by Defendants and the State make three main arguments: (1) the Defendant Schools Districts are not required to post displays under Act 573 because they have not yet acquired funding for the displays and have not yet received any donated posters;[6] (2) the displays of the Ten Commandments have yet to be imposed on the minor-child Plaintiffs;[7] and (3) Plaintiffs cannot assert harm based on any future displays because the complete content of each display is uncertain and has not been decided.[8] Only the first argument poses a "factual attack" as to the Plaintiffs' standing.[9] None of these contentions obviates subject-matter jurisdiction here.

---

[6] Ark. Br. 8; Defs. Mem. in Support of Mot. to Dismiss (hereinafter "Defs. Br."), ECF No. 50, 5-6.

[7] Ark. Br. 7-8; Defs. Br. 6-7.

[8] Ark. Br. 8-10, 15-16; Defs. Br. 6-7.

[9] The School District Defendants and the State dispute the factual underpinnings of Plaintiffs' claims relating to whether posters will be donated or funding for the displays will be made "available." *See infra* pp. 7-10. As to this issue, the Court may consider matters outside of the pleadings to determine whether subject-matter jurisdiction exists. *See, e.g., Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) ("We may look outside the pleadings to determine the threshold question of jurisdiction."); *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) ("[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." (citations omitted)). Thus, a party opposing a 12(b)(1) motion to dismiss may put forth, and a trial court may consider, additional "competent evidence such as affidavits, deposition testimony, and the like in order to" resolve questions of jurisdiction. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). Plaintiffs have offered additional factual support as to this issue to reinforce their position that this Court has proper jurisdiction to hear this case. *See* Decl. of Nicholas J. Prendergast ("Prendergast Decl."), Exs. 1-10, 22.

As a threshold matter, Act 573 will become effective in less than one month, on August 5, 2025. Without intervention by this Court, School Districts that have acquired donated displays or that have identified the necessary funding for them will be required to immediately comply with Act by "prominently display[ing]" the Ten Commandments in a "conspicuous place" in every elementary and secondary school classroom and library within their jurisdiction. Plfs. Mot., Ex. 1, Act 573 §§ (a)(1)-(2). And make no mistake: Defendants' protests aside, there is every reason to believe that the School Districts will either receive donated posters or have funding "available" to purchase the posters themselves. *See infra* pp. 7-10. Thus, as soon as the minor-child Plaintiffs begin school next month, there is a substantial, imminent threat that they will be subjected to permanent displays of the Ten Commandments in every classroom, every day, for the duration of their public-school education.

Defendants and the State nevertheless argue that Plaintiffs cannot show an injury sufficient for Article III standing because the minor-child Plaintiffs have not seen what the individual displays themselves will precisely entail. But the Act's minimum requirements for the displays are not disputed. And Plaintiffs do not need to have seen every individual display that will be imposed on them to demonstrate injury. Plaintiffs know and allege the following indisputable facts: (1) the Act requires that the Ten Commandments be placed in every public-school classroom and library as soon as funds are made available or the poster are donated; (2) the Act does not limit the duration of the displays; they will be permanent and year-round; (3) the Act requires that a state-approved, denominational version of the Ten Commandments be used as the text of each display; (4) the Act requires that this version of the Ten Commandments be "prominently displayed" in a "conspicuous place" in each classroom and library; (6) the Act requires that the posters be at least sixteen by twenty inches with the text of the Commandments printed in a "size and typeface that is legible to

a person with average vision from anywhere in the room"; and (7) because the Act has no exceptions, the displays will be placed in every public-school classroom and library, regardless of the instructional topics at hand or the age of students. Compl. ¶¶ 23-35; *see generally* Plfs. Mot., Ex. 1, Act 573 §§ (a)(1)-(2).

These minimum requirements, drawn from the face of the statute, are unambiguous and apply to *all* school displays posted under the Act. Regardless of the content that may be added to any one display, the minimum statutory requirements, operating together, will injure the minor-child Plaintiffs and their parents in the myriad ways set forth in the Complaint and Plaintiffs' declarations. Plfs. Br. 6-7. These injuries will commence as soon as the Act is effectuated in less than one month and displays of the Ten Commandments are put up in the minor-child Plaintiffs' schools.

Neither Supreme Court nor Eighth Circuit precedents require Plaintiffs to sit on their hands until their rights have been violated and the Ten Commandments posters are actually on display in classrooms across the state. *Infra* pp. 12-19, 23-26. And if there were any doubt, the Supreme Court's recent decision in *Mahmoud* closed the door on Defendants' standing and ripeness arguments. There, parents alleged that a school district's inclusion of certain children's books in the English curriculum, along with the inability of their children to "opt out" from that curriculum, unconstitutionally burdened their religious exercise under the First Amendment. *Mahmoud*, 2025 WL 1773627, at *13. The Court held that the plaintiffs were entitled to a preliminary injunction despite the parents' inability to allege "how a particular book was used or *is planned for use* at a particular time." *Id.* at *20 (emphasis added). Reaffirming a long line of caselaw, the Court ruled that the parents need not "'wait and see' how a particular book is used in a particular classroom on a particular day" because, "when a deprivation of First Amendment rights is at stake, a plaintiff

need not wait for the damage to occur before filing suit." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))). The motions to dismiss should be denied.

### A.    Defendants' claims that they are not required to put up displays pursuant to Act 573 are not credible.

In an attempt to evade this Court's jurisdiction, the School District Defendants assert in their declarations that they "have not received any voluntary monetary contributions or donations of a durable poster or framed copy. . . . of the Ten Commandments for the purpose of implementing the requirements of Act 573" and, therefore, do not "presently intend to display the Ten Commandments."[10] But that is beside the point when it comes to the standing and ripeness analyses for pre-enforcement First Amendment challenges. Under these circumstances, a plaintiff is not required to suffer harm before filing suit if there is a "substantial risk" that the harm will occur. *Infra* pp. 15-19, 23-26.

In that respect, Defendants' declarations are most notable for what they *do not* say. The declarants do *not* deny that:

- The cost associated with printing the Ten Commandments displays prescribed by the Act are *de minimis* and will be easily met, *see infra* pp. 8-10;

- There are several wide-ranging, well-organized campaigns—supported by a prominent state lawmaker—to raise funds and secure poster donations to ensure that all Arkansas schools promptly comply with the Act, *see infra* pp. 8-9;

- Funding and donations can come from *anyone*, *anywhere*, at *any time*, *see infra* pp. 8-10.

- Schools or other government institutions that receive excess poster donations must give the surplus to other qualifying public entities, *see infra* p. 9; and

---

[10] *See, e.g.*, Defs. Br., Ex. A, Decl. of Dr. John Mulford, ¶¶ 4-5; Defs. Br., Ex. B, Decl. of Dr. Jared Cleveland, ¶¶ 4-5; Defs. Br., Ex. C, Decl. of Dr. Debbie Jones, ¶¶ 4-5; Defs. Br., Ex. D, Decl. of Shane Patrick, ¶¶ 4-5; *see also, e.g.*, Ark. Br. 8.

- Defendants intend to comply with the Act and post displays in every classroom as soon as the minimal, requisite funds are identified or donations are received, *see infra* p. 9.[11]

The allegedly dispositive "contingencies" that the Defendants (and the State) point to are thus trivial and irrelevant. There is a substantial likelihood that, in short order, Defendants will receive donated posters or funding through the organized campaigns specifically dedicated to ensuring that the displays are posted in public schools and that Defendants will then comply with the statute by hanging the displays in every classroom and library.

     1.    *There is a substantial likelihood that funding and/or posters will be donated to the School District Defendants imminently.*

There is a wealth of evidence indicating that private donations directed to supporting the Act are imminent. As Senator Jim Dotson, the Act's lead legislative sponsor, recently explained:

> There are so many organizations working right now to implement this law as far as a project to help volunteer and pay for the displays in schools. All of these displays are donated, they are not paid for by tax-payer dollars, so it's all voluntary contributions of the framed copies or copies of the posters themselves. . . . Many of these organizations will be contributing posters, and since they haven't existed for the last 40-50 years, there will be many attempts to come up with designs and posters that fit the parameters of the law, and as those are released over the next month—through organizations like yours [Million Voices]—people can begin to go and contribute to that effort, and even sponsor their own local public buildings and schools.[12]

Indeed, Million Voices and their partner organization Restore American Schools have already launched an organized campaign to ensure that the Ten Commandments displays are posted in Arkansas classrooms.[13] The groups estimate that a $30 donation is sufficient to fund the

---

[11] At least one of the Defendant School Districts has affirmatively promised to put up the displays: In a recent interview, Dr. Debbie Jones, Superintendent of the Bentonville School District, stated that she did not believe the displays would "harm any kid in any way" and that she will "follow the law" by posting the Ten Commandments when schools in her district receive donations. Prendergast Decl., Ex. 1.

[12] Prendergast Decl., Ex. 2.

[13] *See, e.g.*, Prendergast Decl., Ex. 3; Prendergast Decl., Ex. 4.

"printing and delivery of Ten Commandments posters" for an *entire school*,[14] at a cost of merely $1 *per classroom*.[15]

Furthermore, a group of Arkansas clergy and other advocates have likewise started a campaign to "mak[e] sure that Ten Commandments are posted in Arkansas K-12 . . . classrooms."[16] The group is convening a "July 28 strategy session and conference to advance the Biblical laws," with the "goal of registration from all 75 Arkansas counties during the first 10 days in July."[17]

Finally, in the improbable event that some school districts do not receive any donated Ten Commandments posters, Section (d) of Act 573 mandates that, where a school district or other government institution receives more posters than is necessary to comply with the law, it *must* donate its surplus to another qualifying institution (such as another school district).[18]

Given the multiple high-profile, coordinated campaigns specifically focused on directing donated posters to Arkansas public schools, it strains credulity and common sense to claim that there exists any genuine hurdle to the Defendant School Districts' compliance with Act 573. There is a substantial likelihood and risk that the Defendants are, or imminently will be, in a position to post displays of the Ten Commandments in every classroom. And not only have Defendants failed to disavow any intention to do so, but they are *required* by state law to immediately follow through with this obligation, which will cause Plaintiffs irreparable harm. Plfs. Br. 5-6, 29-30; *infra* pp. 26-27. Per *Mahmoud*, and as discussed further below, *infra* pp. 15-19, 23-26. Plaintiffs are required to show no more for this Court to have jurisdiction over their claims. Allowing Defendants to delay adjudication of this case until the posters are literally in the hands of School District officials, and

---

[14] *See, e.g.*, Prendergast Decl., Ex. 5 ("A $30 donation sponsors one school, with larger contributions expanding our impact across more communities.").

[15] *See, e.g.*, Prendergast Decl., Ex. 6.

[16] Prendergast Decl., Exs. 7-9.

[17] Prendergast Decl., Exs. 7, 22 (noting that cost of ticket for conference will cover attendance, lunch, and "the Arkansas Ten Media Kit which has 10 Posters for School Placements").

[18] Plfs. Mot., Ex. 1, Act 573 § (d).

consequently displayed with no notice to Plaintiffs, would undermine abundantly clear precedent allowing individuals to bring First Amendment challenges *before* they are harmed. *See infra* pp. 15-19, 23-26.

        2.      *Act 573 does not prohibit school districts from using general-purpose voluntary contributions to purchase displays.*

Under Section (b) of Act 573, "[t]he copies or posters authorized under this section shall either be donated or purchased solely with funds made available through voluntary contributions to the local school boards[.]"[19] Although these "voluntary" monetary contributions may be designated for, as the Defendants' declarations put it, "*the purpose of implementing the requirements of Act 573*," *supra* p. 79 (emphasis added), the Act *does not* require that donors earmark funds in this manner.[20] Thus, there is nothing prohibiting Defendants from using general-purpose, unrestricted, "voluntary" monetary contributions to purchase displays. For example, Defendant Fayetteville School District operates campus activity funds "used for things such things as donations . . . and revenue from approved fundraisers."[21] Defendants' declarations ignore this source of "available" funds and fail to disclaim any intent to rely on these funds to purchase posters.

---

[19] *Id.* Act 573 § (b).

[20] *Cf., e.g., Stone*, 449 U.S. at 39 n.1 ("The copies required by this Act shall be purchased with funds made available through voluntary contributions made to the state treasurer *for the purposes of this Act.*" (emphasis added)); Ark. Code Ann. § 6-23-902 (providing that the state-established Open-Enrollment Public Charter School Facilities Loan Fund "may be funded by. . . . [d]onations or bequests from organizations or individuals received by the division *that are designated for the fund*" (emphasis added)); Ark. Code Ann. § 6-16-303 ("The State Board of Education or school district boards of directors may accept gifts, grants, donations, equipment and materials, and bequests of money and real and personal property *for the purposes of this subchapter*"— the Early Childhood and Adult Education Act (emphasis added)); Ark. Code Ann. § 6-51-207 ("The Arkansas Higher Education Coordinating Board is granted authority to accept gifts, grants, donations, equipment and materials, and bequests of money and real and personal property *for the purposes of this section*." (emphasis added)).

[21] Prendergast Decl., Ex. 23; *see also id.* Ex. 10 (noting balance in Activity Fund of more than $5 million).

**B.**    <u>**Plaintiffs Meet All Three Prongs of the Article III Standing Inquiry.**</u>

"To establish Article III standing, a plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-561 (1992)). Plaintiffs meet all three requirements.

1.    *Plaintiffs have demonstrated imminent injuries in fact.*

To establish standing, a plaintiff's injury must be concrete, particularized, and actual or imminent. *See, e.g.*, *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016). In the First Amendment context, the coercive imposition of religious activity and messages in public schools constitutes a concrete injury sufficient to confer standing. *See, e.g.*, *Roake v. Brumley*, 756 F. Supp. 3d 93, 54, 136 (M.D. La. 2024) (recognizing standing in parents' and children's challenge to Louisiana law similar to Act 573), *aff'd* No. 24-30706, 2025 WL 1719978, at *1 (5th Cir. June 20, 2025).[22]

Defendants' contention that that Plaintiffs have failed to allege an injury sufficient to confer Article III standing cannot be reconciled with the Supreme Court's ruling in *School District of Abington Township v. Schempp*, 374 U.S. 203 (1963), or the Eighth Circuit's precedents. Here, as in *Schempp*, the Plaintiffs "are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed." *Id.* at 224 n.9. And here, as there, "[t]hese interests surely suffice to give the parties standing to complain." *Id.* The Eighth Circuit has repeatedly affirmed *Schempp*'s Establishment Clause standing principles. *See*, *e.g.*, *Schanou v. Lancaster Cnty. Sch. Dist. No. 160*, 62 F.3d 1040, 1044 (8th Cir. 1995) (citing *Schempp* for the

---

[22] The defendants in *Roake* petitioned the Fifth Circuit for rehearing en banc. *Roake v. Brumley*, No. 24-30706 (5th Cir. June 26, 2025), ECF No. 226. The plaintiffs filed an opposition to the petition on July 7, 2025. *Roake*, No. 24-30706, ECF No. 233.

proposition that parent-plaintiffs have standing to challenge allegedly unconstitutional school-sponsored religious practices that directly affect their children); *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1211 (8th Cir. 1992) (recognizing the "clearly established" right of parents to have children educated in public schools free from unlawful religious practices); *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492, 1495 (8th Cir. 1988) (holding that "[p]arents have a cognizable interest in their children's religious education," and in "hav[ing] one's children educated in public schools that do not impose or permit [unlawful] religious practices"). And Plaintiffs have evinced various ways that they will be directly affected and harmed by displays posted in accordance with the Act. Plfs. Br. 6-7; *infra* pp. 13, 26-27.

### a. Plaintiffs' injuries are concrete and particularized.

In asserting that Plaintiffs have not demonstrated adequate injury, the State incorrectly argues that the Eighth Circuit's "offended-observer precedent has been 'cast into doubt by an intervening Supreme Court decision.'" Ark. Br. 10. In fact, spiritual offense resulting from direct, unwelcome contact with, or exposure to, a governmental religious display or practice has long been a sufficient basis for standing under the Establishment Clause. *See, e.g.*, *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1024 (8th Cir. 2012) (holding that "direct, offensive, and alienating contact with [a] Ten Commandments monument" was sufficient to confer standing); *cf. Roake*, 2025 WL 1719978, at *6 ("Unwanted exposure to government-sponsored religious displays and exercises can, under certain circumstances, violate a plaintiff's First Amendment rights."). This standing doctrine was not changed by *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022).[23]

---

[23] Defendants' argument that *Kennedy* altered Establishment Clause standing law rests on a statement regarding the denial of certiorari in *City of Ocala v. Rojas*, 143 S. Ct. 764 (2023), and a concurring opinion in *American Legion v. American Humanist Association*, 588 U.S. 19, 80 (2019). Ark. Br. 11. But *Kennedy* did not address

No matter—the State's erroneous argument is also irrelevant here because Plaintiffs' claims do not depend on this form of standing. Rather, Plaintiffs' demonstrated injuries go far beyond the right of "observers" to be free from "offense." *See Roake*, 2025 WL 1719978, at *10 ("Plaintiffs are more than mere 'offended observers.' Students and Parents will be 'directly affected' by H.B. 71; this is sufficient to confer standing." (quoting *Schempp*, 374 U.S. at 224 n.9)). The minor-child Plaintiffs will be subjected to a state-mandated, religiously preferential version of the Ten Commandments in every classroom, each day of every school year, for the remainder of their elementary and secondary public-school education. Compl. ¶¶ 56-58. Those displays will: (1) substantially burden the parent-Plaintiffs' religious exercise by usurping their parental authority to direct their children's religious upbringing and education; (2) forcibly subject their children to religious doctrine and beliefs in a manner that conflicts with the families' own religious beliefs and practices; (3) send a message to their children that they do not belong in their own school community because they do not subscribe to the State's preferred religious doctrine; and (4) religiously coerce their children by pressuring them to observe, mediate on, venerate, and follow the State's favored religious text, and by pressuring them to suppress expression of their own religious beliefs and backgrounds at school. *See* Compl. ¶¶ 65-136; Plfs. Br. 6-7 (citing Plaintiffs' declarations). Thus, Plaintiffs seek to prevent both the coercive injury that state-sponsored religious observance in public schools inflicts on students and the harm that such coerced observance causes parents by interfering with their right to guide the religious education and upbringing of their children. Due to Arkansas's compulsory-education laws and the pervasive

---

Establishment Clause standing at all because the petitioner there, a football coach, did not bring an Establishment Clause claim. The ruling did not, therefore, preclude standing based on direct contact and spiritual offense. *American Legion* also undermines Defendants' claim that the demise of the *Lemon* test ended so-called "offended-observer standing." There, despite declining to apply *Lemon*, *Am. Legion*, 588 U.S. at 48-52, and notwithstanding Justice Gorsuch's concurring opinion, the Court adjudicated the plaintiffs' claims, which the plaintiffs brought because they were "offended by the sight of the memorial on public land." *Id.* at 37.

nature of Act 573 displays, students will be a captive audience, and there will be no way to opt out of this harm. *Infra* pp. 33-36.

These are the very sort of injuries that courts have repeatedly recognized as sufficiently concrete to confer standing. For example, in *Roake*, 2025 WL 1719978, the Fifth Circuit held that the plaintiffs had "allege[d] more than 'offense alone,'" explaining:

> [I]f H.B. 71 goes into effect, [s]tudents will be subjected to unwelcome displays of the Ten Commandments for the entirety of their public school education. There is no opt-out option. Plaintiffs are not mere bystanders who have failed to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which they disagree. . . . Nor are Plaintiffs asking the courts to redress generalized grievances about the conduct of Government. . . . They allege that [s]tudents "will be pressured to observe, meditate on, venerate, and follow this scripture and to suppress expression of their own religious beliefs and backgrounds at school.

*Id.* at *9 (cleaned up); *accord Roake*, 756 F. Supp. 3d at 166 ("Looking holistically at the Act, Louisiana law, and the facts as pled in the Complaint and as supported by Plaintiffs' declarations, the Court finds that the Plaintiff parents and their minor children will suffer more than mere subjective offense . . . rather, they face a real and substantial likelihood of coercion, because in every practical sense they will be compelled to attend and participate in a religious exercise." (cleaned up)).

The Supreme Court has likewise held that students who are or will be subjected to allegedly coercive school-sponsored religious observance have standing to challenge it. *See Lee v. Weisman*, 505 U.S. 577, 584 (1992) (affirming standing to challenge future graduation invocations based on student's enrollment in high school and likelihood that her graduation would include a prayer); *Schempp*, 374 U.S. at 224 n.9.[24] And, under the Court's recent ruling in *Mahmoud*, a cognizable

---

[24] *Cf. Stone*, 449 U.S. at 39 (adjudicating claims of parents who stood in the same position as Plaintiffs here vis-à-vis their facial challenge to a materially identical Kentucky).

injury to the "critical right of *parents* to guide the religious development of their children" occurs whenever a public school "requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *See* 2025 WL 1773627, at *5, *20 (emphasis added) (cleaned up); *see also Roake v. Brumley*, 2025 WL 1719978, at *8 ("Parents have likewise pleaded an injury-in-fact sufficient to confer standing to assert their Establishment Clause claims. Because of [s]tudents' regular exposure with the H.B. 71 displays, [p]arents are 'directly affected' by the challenged statute.") (quoting *Schempp*, 374 U.S. at 224 n.9; citing *Steele*, 845 F.2d at 1495). In light of these precedents, Plaintiffs' myriad harms are adequately concrete and particularized.

> b.    Plaintiffs' future injuries are "certainly impending," or there is a "substantial risk" that the threatened harm will occur.

Defendants' and the State's insistence that Plaintiffs have no cognizable injury because the minor-child Plaintiffs have yet to encounter a Ten Commandments display under Act 573,[25] and because Defendants' "presently" have no intent to display the Ten Commandments in their schools,[26] misconstrues basic standing principles. To demonstrate standing, Plaintiffs are not required to first suffer the very harms they seek to prevent. *See, e.g., Fayetteville Pub. Library v. Crawford Cnty.*, No. 23-cv-05086, 2023 WL 4849849, at *2 (W.D. Ark. July 29, 2023) ("Defendants contend that Plaintiffs' injuries are too speculative and hypothetical because they have not happened yet. Where a plaintiff brings a facial challenge, a prior enforcement action is not required to establish standing." (citing *Susan B. Anthony List*, 573 U.S. at 158-59)). Nor are they required to "demonstrate that it is literally certain that the harms they identify will come

---

[25] *See* Ark. Br. 7 (arguing that "Plaintiffs have failed to show a cognizable injury in fact" because "it is speculative that any future contact [with a Ten Commandments display] will occur").

[26] *See* Defs. Br. 7-8 ("[A]t this point, the Districts cannot take any steps to comply with the Act" because "the Districts cannot post Ten Commandments displays . . . unless funds are made available through private donations, or such displays are donated."); *see also* Ark. Br. 8.

about." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412-14 n.5 (2013); *Fayetteville Pub. Library*, 2023 WL 4849849, at *2 ("'A plaintiff who challenges a statute must demonstrate a *realistic danger* of sustaining a direct injury as a result of the statute's operation or enforcement.'" (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (emphasis added)).

The Supreme Court's recent ruling in *Mahmoud* could not have been clearer on both points: "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff *need not wait* for the damage to occur before filing suit. . . . Instead, to pursue a pre-enforcement challenge, a plaintiff must show that 'the threatened injury is certainly impending, or there is a *substantial risk* that the harm will occur.'" 2025 WL 1773627, at *20 (citing *Susan B. Anthony List*, 573 U. S. at 158 (citing *Steffel*, 415 U. S. at 459) (emphasis added)). *Mahmoud* is just the most recent precedent in a long history of caselaw recognizing that standing may be based on an allegation of future, threatened injury. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435, (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."); *Dep't of Com. v. New York*, 588 U.S. 752, 766-67 (2019) (holding that states had standing to challenge the inclusion of a citizenship question in the decennial census in light of alleged "future injuries"); *Susan B. Anthony List*, 573 U.S. at 158; *Animal Legal Def. Fund*, 8 F.4th at 718; *Roake*, 2025 WL 1719978, at *7 ("[A] plaintiff need not wait for 'actual implementation of [a] statute' or an 'actual violation[] of his rights' to seek relief." (quoting *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996)).

*Red River Freethinkers*, 679 F.3d at 1015, and *ACLU-NJ v. Township of Wall*, 246 F.3d 258, 266 (3d Cir. 2001), *see* Ark. Br. 7, are not to the contrary. The State mischaracterizes both.

While the Eighth Circuit did recognize in *Red River Freethinkers* that "direct and unwelcome personal contact" is *sufficient* to confer standing in the First Amendment context, the court also explicitly reiterated that such contact can be either "actual" *or* "imminent." 679 F.3d at 1023. In *Township of Wall*, meanwhile, the Third Circuit found no standing to challenge a *temporary* religious display because the display had been dismantled *nearly two years* before the court issued its opinion. 246 F.3d at 260-61. But the court explained: "While the lack of standing prevents plaintiffs from obtaining a ruling from a federal court regarding the constitutionality of the Township's *past* display—which apparently *will not be exhibited again*—it does not prevent plaintiffs from attempting to challenge any *future display*[.]" *Id.* at 266 (emphases added). Further, neither case involved permanent religious displays in a public school.

As demonstrated above, *supra* pp. 7-10, there is a substantial risk, if not a virtual certainty, that Defendants will receive donated posters or identify other "available" funds for the displays, which will implicate their legal obligations under Act 573 and cause Plaintiffs irreparable harm. There can be no serious contention that School Districts will lack requisite funding or poster donations to effectuate the Act, as several organized fundraising campaigns are well underway, and the cost of printing a display is *de minimis* at best. (One group estimates the total cost of compliance to be $1 per *classroom*, *see supra* p. 9.) Further still, the Act requires that districts' surplus donations be re-allocated across other qualifying institutions. Plfs. Mot., Ex. 1, Act 573 § (d); *see also supra* p. 9. And, if necessary, a school can use *public* funds to replace defective displays. Plfs. Mot., Ex. 1, Act 573 § (c). Given the trivial financial burden associated with complying with the Act and the wealth of evidence showing concerted efforts to ensure compliance, *see supra* pp. 7-10, any argument that the pending harm is too speculative for adjudication rings hollow. A violation of Plaintiffs' First Amendment rights is not only impending,

17

but inevitable. This is more than enough to confer standing. *See Lee*, 505 U.S. at 584 (holding that "a live and justiciable controversy is before us" as to prayers at "future graduations" because the plaintiff was "enrolled as a student at [the high school] and from the record it appear[ed] likely, if not certain, that an invocation and benediction will be conducted at her high school graduation"); *see also infra* pp. 23-26 (discussing ripeness).

The State and Defendants also complain that Plaintiffs lack a certainly impending injury because the "context" of any display under Act 573 is unknown, and displays may not "lead [the minor-child Plaintiffs] to feel coerced in some fashion."[27] Ark. Br. 8; *see also* Defs. Br. 6-8. But, as discussed above, *supra* pp. 5-6, Plaintiffs' injuries are not dependent on the context of any individual display; the threatened harms to Plaintiffs will occur because of Defendants' implementation of the Act's minimum requirements alone.[28] Based on these minimum requirements—and notwithstanding the State's irrelevant speculation as to what *may* appear with the "prominently" and "conspicuously" displayed posters—Act 573's mandatory displays will religiously coerce the minor-child Plaintiffs and interfere with their parents' right to direct their religious education. Furthermore, the Act has an obvious legal effect on Plaintiffs: It conditions their access to Arkansas's public schools on their acquiescence to unavoidable, state-mandated displays of scripture. *See Mahmoud,* 2025 WL 1773627, at *20 ("Public education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise."). The district court held as much in *Roake*, finding that parents and children had standing to sue to prevent implementation of a Louisiana law similar to

---

[27] *See* Ark. Br. 9 (dismissing Plaintiffs' "worries about students feeling pressured to venerate the Ten Commandments" as "too abstract, conjectural, and hypothetical to support standing").

[28] That the Act purports to require a "historical representation of the Ten Commandments," Ark. Br. 8, makes no difference here. There is no definitive "historical representation" of the Ten Commandments, and in any event, the Act negates this requirement by dictating the exact text of the display.

Act 573. The court explained that the Plaintiffs "face an *imminent* infringement of their First Amendment rights . . . [which] will occur based on the minimum requirements" of the law alone. *See Roake*, 756 F. Supp. 3d at 115. *Mahmoud* also illustrates the point. There, the Court asserted jurisdiction even though the plaintiffs did not know, and could not allege with certainty, how the challenged classroom materials would be used on any future occasion. 2025 WL 1773627, at *20. ("We do not need to 'wait and see' how a particular book is used in a particular classroom on a particular day before evaluating the parents' First Amendment claims.").[29] So too here: Parents need not wait and see how a particular display of the Ten Commandments is presented in a particular classroom before suing to vindicate their First Amendment rights. Indeed, all that is necessary to warrant First Amendment standing in this context is a public-school "educational requirement or curriculum" that would "'substantially interfere with the religious development of [a] child or pose a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Id.* at *18 (cleaned up). Such a threat is manifest here.[30]

2.    *Plaintiffs' injuries are fairly traceable to Defendants.*

Somewhat astonishingly, the School District Defendants assert that "Plaintiffs cannot actually draw a link between any particular plaintiff and any particular district" and argue that Plaintiffs "do not suggest that the Districts somehow 'caused' Act 573." Defs. Br. 7-8 ("Plaintiffs have not demonstrated that any alleged injury is fairly traceable to the [Defendants'] [c]onduct.").

---

[29] In *Mahmoud*, teachers were "expected to incorporate the [challenged] Storybooks into the curriculum in the same way that other books are used, namely, to put them on a shelf for students to find on their own; to recommend a book to a student who would enjoy it; to offer the books as an option for literature circles, book clubs, or paired reading groups; or to use them as a read aloud for all students in the class. . . . Although the adoption of the Storybooks came with the expectation [and requirement] that teachers would incorporate them into the classroom environment in some way, the [school district] represented that the decision about which books to use and how they'd be used in an individual classroom [was] left to each teacher's discretion." *Mahmoud v. McKnight*, 102 F.4th 191, 198 (4th Cir. 2024).

[30] Along similar lines, the Eighth Circuit has held that, before filing suit, a city did not need to wait and see whether the Environmental Protection Agency ("EPA") approved certain caps on pollutants flowing into a body of water. *City of Kennett v. EPA*, 887 F.3d 424, 431-32 (8th Cir. 2018). The mere *possibility* that the EPA *might* issue the approval was adequate to confer standing. *Id.*

The State also contends that the Complaint "offers only conclusory allegations that by administering and 'implementing Act 573' Defendants will 'violate Plaintiffs' rights.'" Ark. Br. 13.

Both the State and Defendants appear to mistake Article III's traceability prong for a proximate-cause requirement. However, "[t]racing an injury is not the same as seeking its proximate cause." *K.P. v. LeBlanc,* 627 F.3d 115, 123 (5th Cir. 2010). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014). So, while "a defendant official must have 'some connection' to a challenged statute to be a proper party . . . that official 'does not need to be the primary authority to enforce the challenged law.'" *Fayetteville Pub. Library*, 2023 WL 4849849, at *2 (quoting *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011)). Here, Defendant School Districts are the primary enforcers, and Plaintiffs' threatened injuries are traceable to each Defendant.

As alleged in the Complaint, and not disputed by the State or Defendants, each School District Defendant is a "political subdivision and 'body corporate' that 'may contract and be contracted with, and may sue and be sued' under Arkansas law." Compl. ¶¶ 17-20 (citing Ark. Code Ann. § 6-13-102). Under Act 573, once funds or donations are made available, "local school superintendents . . . or chief administrators of the public schools . . . *shall* prominently display" the Ten Commandments in each "elementary and secondary school library and classroom." Plfs. Mot., Ex. 1, Act 573 §§ (a)(1) (emphasis added); Compl. ¶ 24. As the school superintendent is the head of any given school district, it is axiomatic that each Defendant School District *must* comply

with the Act, and Plaintiffs' minor children attend schools in each Defendant School District.[31] Because the Act requires the display of the Ten Commandments in every public-school classroom in each district, including the schools attended by the minor-child Plaintiffs, these allegations demonstrate that Plaintiffs' injuries are fairly traceable to the Defendant School Districts. *See, e.g.*, *Fayetteville Pub. Library,* 2023 WL 4849849, at *2 (finding traceability where the plaintiff's alleged injuries "will result from the enforcement" of the challenged state statute and the "Defendants will play a significant role in implementing and enforcing" the law).

In their traceability argument, the School District Defendants also incorrectly suggest that future harm is an inadequate basis to find traceability under Article III. *See* Defs. Br. 8 (asserting that Plaintiffs cannot draw a "link between any particular Plaintiff and any particular District" because the allegations in the Complaint "do not mention any of the districts and do not allege any ongoing or intended conduct by any of the Districts"). The Complaint makes clear, however, that this link will occur once Defendants take actions, as required by Act 573, to "administer, implement, and enforce the Act." *See* Compl. ¶ 9 (Defendants' enforcement actions "*will necessarily occur* within this district" (emphasis added)); *id.* ¶ 144 ("By implementing Act 573, Defendants . . . will unavoidably violate Plaintiffs' rights under the Establishment Clause[.]"); *id.* ¶ 153 ("By administering and implementing Act 573, Defendants . . . will unavoidably violate Plaintiffs' rights under the Free Exercise Clause[.]"). As the Complaint alleges, the School District Defendants are legally required to comply with the provisions of the Act. They do not dispute that

---

[31] The children of Plaintiffs Samantha and Jonathan Stinson, Stephen Caldwell, and Joseph Armendariz are enrolled in public schools in Defendant Fayetteville School District No 1. Plfs. Mot., Ex. 2, Decl. of Samantha Stinson ¶ 2; Plfs. Mot., Ex. 3, Decl. of Jonathan Stinson ¶ 2; Plfs. Mot., Ex. 4, Decl. of Stephen Caldwell ¶ 2; Plfs. Mot., Ex. 5, Decl. of Joseph Armendariz ¶ 2. The children of Plaintiffs Talara and Shane Taylor are enrolled in public schools in Defendant Springdale School District No. 50. Plfs Mot., Ex. 6, Decl. of Talara Taylor ¶ 2; Plfs. Mot., Ex. 7, Decl. of Shane Taylor ¶ 2. The children of Plaintiffs Carol Vella and Daniel Rix are enrolled in public schools in Defendant Bentonville School District No. 1. Plfs. Mot., Ex. 8, Decl. of Carol Vella ¶ 2; Plfs. Mot., Ex. 9, Decl. of Daniel Rix ¶ 2. And the children of Plaintiff Leah Bailey attend a public school in Defendant Siloam Springs School District No. 21. Plfs. Mot., Ex. 10, Decl. of Leah Bailey ¶ 2.

they will carry out these duties, contending only that they do not "*presently* intend to display the Ten Commandments" due to a purported lack of donations or available funds.[32]

### 3.    *Plaintiffs' injuries will be redressed by injunctive and declaratory relief.*

The School District Defendants and the State fail to offer any redressability argument beyond reiterating their injury-in-fact and traceability claims. Defs. Br. 8-9; Ark. Br. 13-14. The redressability prong for Article III standing is satisfied if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). This is a "relatively modest" pleading burden. *Johnson v. Griffin*, 69 F.4th 506, 510 (8th Cir. 2023) (internal quotation marks omitted).

Here, Plaintiffs' injuries would be redressed by both an injunction and declaratory judgment. An injunction blocking implementation of the law by the School District Defendants will ensure that the minor-child Plaintiffs are not subjected to the unavoidable displays of the Ten Commandments mandated by the Act, preventing the religious coercion they would otherwise experience and shielding them from an officially sponsored religious message that they are less worthy in the eyes of the State because of their own religious or non-religious beliefs. It will also preserve the ability of the parent-Plaintiffs to direct their children's religious education and upbringing. *See, e.g.*, *Mahmoud*, 2025 WL 1773627, at *24 (holding that issuance of preliminary injunction was warranted). An order declaring that the Act violates the Establishment Clause and Free Exercise Clause of the First Amendment will further alleviate Plaintiffs' injuries. *See Steffel*, 415 U.S. at 466-71 (noting that declaratory relief is "valuable to the plaintiff" as it has "the force and effect of a final judgment" (internal quotation marks omitted)).

---

[32] *See, e.g.*, Defs. Br., Ex. A, Decl. of Dr. John Mulford ¶ 5 (emphasis added); Defs. Br., Ex. B, Decl. of Dr. Jared Cleveland ¶ 5 (emphasis added); Defs. Br., Ex. C, Decl. of Dr. Debbie Jones ¶ 5 (emphasis added); Defs. Br., Ex. D, Decl. of Shane Patrick ¶ 5 (emphasis added).

C.    **Plaintiffs' Claims Are Ripe.**

Ripeness is a question of timing, with courts seeking to avoid "premature adjudication" of "abstract disagreements." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Id.* at 581 (internal quotation marks omitted). "There are two factors relevant to a ripeness decision: the fitness of the issue for judicial resolution and the hardship to the parties of withholding court consideration." *Auto., Petrol. & Allied Indus. Emps. Union, Local 618 v. Gelco Corp.*, 758 F.2d 1272, 1275 (8th Cir. 1985). These factors "operate on a sliding scale." *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000); *see also Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) ("[W]e acknowledge the possibility that there may be some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness (such as a degree of imprecision in the factual circumstances surrounding the case), or vice versa.").

As one court in this Circuit has aptly noted, "ripeness is not a black-or-white assessment, but rather a 'matter[] of degree.'" *Cont'l Ins. Co. v. Daikin Applied Ams., Inc*, No. 17-cv-552, 2019 WL 6873797, at *4 (D. Minn. Dec. 17, 2019). Because the standard for constitutional ripeness mirrors the injury-in-fact requirement for standing, *see Susan B. Anthony List*, 573 U.S. at 157-58 n.5, it follows that both ripeness factors weigh in Plaintiffs' favor here.

1.    *This case is fit for judicial decision.*

This case is fit for judicial decision for several reasons. First, Plaintiffs will suffer serious—indeed, irreparable—injuries once the Act is implemented. *See* Plfs. Br. 5-6, 29-30; *infra* pp. 25-26, 45-46. Second, as discussed above, the harm Plaintiffs allege is not speculative or hypothetical: Plaintiffs' injuries will commence as soon as Defendants comply with the Act, which they are

required to do on August 5, 2025, and as soon as donated posters are received (high-profile efforts are being made across the state now) or *de minimis* "available" funds are located. *See supra* pp. 7-10, 17-19.

Plaintiffs' claims do not "depend on *numerous* contingencies," as Defendants and the State contend. Ark. Br. 16 (emphasis added); *see also* Defs. Br. 5. In any event, "[t]hat a contingency is involved is not fatal to ripeness." *Sandell v. FAA*, 923 F.2d 661, 664 (9th Cir. 1990). This is particularly true where "common sense indicates that review should be afforded even though the ultimate injury to the [plaintiffs] depends on the occurrence of further events." *Id.* (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Devel. Comm'n*, 461 U.S. 190, 200-03 (1983)). Thus, in assessing the effect of contingencies on the ripeness of a claim, "courts should focus on the *practical likelihood* that the contingencies will occur." *Cont'l Ins. Co.*, 2019 WL 6873797, at *4 (emphasis added) (quoting *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001)); *cf., e.g.*, *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006) ("Standing depends on the *probability* of harm, not its temporal proximity." (emphasis added)); *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007) (standing exists if "there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress").

This is why, for example, a utility company was not required to spend millions of dollars to formally apply for a license *before* challenging a moratorium on nuclear plants. *See Pac. Gas & Elec. Co.*, 461 U.S. at 200-03. Nor was a waste disposal business required to wait to challenge a state law mandating legislative approval of new hazardous waste-treatment facilities, even though it would have been at least five years before the statute could have been enforced against the business, and construction of the site itself was contingent on legislative and regulatory

approval. *See Browning-Ferris Indus. v. Ala. Dep't of Env't Mgmt.*, 799 F.2d 1473, 1475, 1477, 1480 (11th Cir. 1986).[33]

Here, Plaintiffs have shown that there is a "substantial risk" that the "threatened injury" will occur. *See Mahmoud*, 2025 WL 1773627, at \*20. That posters have not yet been donated to the Defendants or purchased by them is simply insufficient to sideline Plaintiffs when there exists ample evidence that the threat of infringement of their First Amendment rights is both credible and looming. Because there is a "realistic danger" that Plaintiffs will be harmed, they need not wait to suffer those harms before this Court may exercise jurisdiction over their claims. *See Babbitt*, 442 U.S. at 298; *Mahmoud*, 2025 WL 1773627, at \*20. Indeed, federal courts regularly adjudicate cases that involve *far greater* contingencies than any uncertainty that may arguably exist here. The Supreme Court held, for example, that a group of parents had standing to challenge a school district's use of racial criteria to maintain diversity in certain high schools, even though the parents' children might not have applied for admission to the affected high schools, or their chances of admission might have been *increased* by the challenged criteria. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718-19 (2007); *see also Riva v. Massachusetts*, 61 F.3d 1003, 1006, 1010-11 (1st Cir. 1995) (retiree's challenge to statute that would have reduced his disability-related benefits was ripe, even though statute would not have affected him for at least seven more years, and potentially would not have affected him at all because he might have recovered from his disability or died, or the statute might have been repealed).

Finally, notwithstanding Defendants' mistaken view that Plaintiffs' injuries and claims are dependent on the content of individual displays, this case needs no further factual development for

---

[33] The State's reliance on *Clapper* is misplaced. Ark. Br. 8. Unlike here, *Clapper* involved a "highly speculative" and "highly attenuated chain of possibilities." 568 U.S. at 410.

this Court to determine whether the government's imposition of the Ten Commandments on the minor-child Plaintiffs, in accordance with the minimum requirements of the Act, violates the First Amendment. The Arkansas legislature has made a number of decisions regarding the Act's mandatory, permanent displays, including where they will be posted (in every classroom and library in every public elementary and secondary school, without exception); what the content of the text will be (the state's preferred, denominational version of the Ten Commandments); their size (no smaller than sixteen by twenty inches); how they will be displayed in each classroom and library ("prominently" in a "conspicuous place"); and even how legible the Commandments must be (printed in a "size and typeface that is legible to a person with average vision from anywhere in the room"). *See generally* Plfs. Mot., Ex. 1, Act 573; *see also Roake*, 2025 WL 1719978, at *4 (finding no further factual development was needed to establish ripeness because the text of the statute provided "sufficient information for a fact-intensive and context-specific analysis"). Displays posted in accordance with this statutory scheme will harm Plaintiffs and violate their rights, making this case fit for judicial decision.

2.    *The hardship to Plaintiffs in withholding a decision is significant.*

The hardship prong of the ripeness analysis "asks whether delayed review 'inflicts significant practical harm' on the plaintiffs." *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014). Absent judicial intervention, the Defendants will implement Act 573 and "[s]tudents will be subjected to displays that accord with the statute's minimum display requirements, in every classroom during every school day." *Roake*, 2025 WL 1719978, at *5. The Act "therefore inflicts significant practical harm on [the minor-child] Plaintiffs' First Amendment rights." *Id.* Moreover, the Act will inflict significant harm on the parent-Plaintiffs' rights to direct their children's religious upbringing. *See id.* (citing *Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464, 486

(2020)); *see also Mahmoud*, 2025 WL 1773627, at *20. Because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the hardship suffered by Plaintiffs will be significant. *See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also Roake*, 2025 WL 1719978, at *5 ("Plaintiffs have demonstrated that there is hardship in withholding consideration sufficient to justify judicial intervention." (cleaned up)). In fact, as the displays will be permanent and present in every classroom, the injuries incurred by Plaintiffs will last far longer than a "minimal" period of time, casting a shadow over every hour and every day they are in school. For these reasons, this Court should not delay reviewing Plaintiffs' claims.

## II.  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED.

The State's merits arguments fare no better than their jurisdictional objections. All four preliminary-injunction factors weigh decisively in Plaintiffs' favor. *See Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (reciting factors); *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) ("While no single factor is determinative, the probability of success factor is the most significant." (internal quotation marks omitted)).

*Stone v. Graham* is dispositive here: The Establishment Clause forbids states from mandating the indiscriminate display of the Ten Commandments in every elementary and secondary public-school classroom. *See, e.g.*, *Roake*, 756 F. Supp. 3d at 165 (holding that *Stone* "directly control[s] this case" and granting preliminary injunction preventing Defendants from implementing Louisiana law similar to Act 573). And for good reason—permanent displays of religious scripture in public-school classrooms would directly contravene the fundamental principles animating the First Amendment and would have been anathema to the Founders, who

27

deftly understood the perils of religious coercion and denominational preference. *See, e.g.*, Plfs. Mot., Ex. 12, Green Rep. ¶¶ 18-26. The State's demands for contrary findings, which manipulate or otherwise disregard centuries of American history, are best left unheeded. In light of *Stone*, as well as other Establishment Clause precedent barring religious coercion of public-school students and denominationally preferential State action, Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.

For the reasons detailed in their preliminary-injunction motion, Plfs. Br. 24-29, Plaintiffs are also likely to succeed on the merits of their Free Exercise Clause claim. The Supreme Court's intervening decision in *Mahmoud* only strengthens Plaintiffs' arguments. Act 573's blanket posting of religious scripture in every public-school classroom will, on a *daily* basis, "impose upon children a set of values and beliefs that are hostile to their parents' religious [or non-religious] beliefs," and "exert upon children a psychological pressure to conform to [the government's] specific [religious] viewpoints." *See Mahmoud*, 2025 WL 1773627, at *17 (internal quotation marks omitted). The displays thus "present the same kind of objective danger to the free exercise of religion that [the Court] identified in [*Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)]." *See Id.* (internal quotation marks omitted).

A.  **Plaintiffs Have Shown That They Are Likely to Succeed on The Merits of Their Establishment Clause Claim.**

The State is wrong in asserting that *Stone* is "effectively dead." *See* Ark. Br. 18. *Stone* remains binding Supreme Court precedent, and it is dispositive in this case. "'[O]nly the Supreme Court may overrule one of its precedents.'" *United States v. Barnett*, 574 F.3d 600, 602 (8th Cir. 2009) (quoting *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983)). Defendants offer no persuasive reason for this Court to depart from this ironclad rule.

*Stone* should end the Court's inquiry, but even if Defendants' assessment of *Stone* were correct, the Act does not pass constitutional muster under any Establishment Clause standard.

1.    Stone *is not "dead" and remains binding law.*

The Supreme Court has repeatedly held that it is the "Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (internal quotation marks omitted).[34] Lower courts must follow that precedent. *See Fleck v. Wetch*, 937 F.3d 1112, 1115 (8th Cir. 2019) ("We must be mindful of the principle that, '"if a precedent of [the Supreme] Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls[.]'" (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).[35]

This is true even where a party believes that subsequent Supreme Court jurisprudence has called into question the continuing validity of a prior ruling: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Agostini*, 521 U.S. at 237-38 ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").[36]

---

[34] *See also, e.g.*, *Tenet v. Doe*, 544 U.S. 1, 10-11 (2005); *Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

[35] The Eighth Circuit routinely recognizes and applies this principle. *See, e.g.*, *United States v. Davis*, 260 F.3d 965, 969 (8th Cir. 2001) ("It is our role to apply Supreme Court precedent as it stands, and not as it may develop."); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772 (8th Cir. 2015) (noting that the Eighth Circuit is not "empower[ed] to overrule the Supreme Court"); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) ("As an intermediate court of appeals, this court is *bound* by the Supreme Court's decisions[.]").

[36] *Accord Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (precedent remains binding even if "the lower court thinks the precedent is in tension with some other line of decisions" (internal quotation marks omitted)); *State Oil Co. v. Khan*, 522 U.S. 3, 20-22 (1997) (holding that appellate court properly applied binding precedent even though subsequent Supreme Court rulings had "gravely weakened" the precedent's "conceptual foundations," leaving little "to salvage"); *Ramos v. Louisiana*, 590 U.S. 83, 124 n.84 (2020) (Kavanaugh, J., concurring) ("[V]ertical stare decisis

The State asserts that "*Stone* is part of the *Lemon* progeny that *Kennedy* overruled because it undisputedly relied on *Lemon.*" Ark. Br. 22. This is wrong. As an initial matter, while *Stone* cites *Lemon*, it also relies on *Schempp* and *Engel v. Vitale*, 370 U.S. 421 (1962). The Supreme Court has thus explained: "As evidenced by *Stone'*s almost exclusive reliance upon two of our school prayer cases, . . . it stands as an example of the fact that we have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools[.]" *Van Orden v. Perry*, 545 U.S. 677, 690-91 (2005) (plurality opinion) (internal quotation marks omitted). And "*Kennedy* does not mention *Stone* or purport to overrule the decisions (other than *Lemon*) on which *Stone* relies, *i.e.*, *Schempp* or *Engel.*" *Roake*, 2025 WL 1719978, at *14. Like *Stone*, the school-prayer cases bind lower courts unless overturned by the Supreme Court.

The Second Circuit has likewise rejected the suggestion that all Supreme Court rulings based on *Lemon* are no longer binding. *See Jusino v. Fed'n of Catholic Teachers, Inc.*, 54 F.4th 95, 102 (2d Cir. 2022) (holding that the Supreme Court's ruling in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), "remains good law notwithstanding its reliance . . . on *Lemon*" because *Kennedy* "indisputably did not . . . overrule—or even mention—*Catholic Bishop*"); *see also Hilsenrath v. Sch. Dist. of the Chathams*, 136 F.4th 484, 492-93 (3d Cir. 2025) (citing *Stone* favorably in distinguishing between *Stone'*s classroom Ten Commandments displays and two lessons regarding Islam, included as part of a year-long World Cultures and Geography class).

It is of no moment that, since issuing *Stone*, the Supreme Court has decided cases supporting the idea "that not all religious acknowledgments must be purged from public spheres." Ark. Br. 19. None of these cases overturned *Stone*, and all are easily distinguishable from *Stone* (and the case at bar) because they did not involve prominent, permanent displays of religious

---

is absolute . . . [lower] courts have a constitutional obligation to follow a precedent of this Court unless and until it is overruled by this Court." (internal citation and quotation marks omitted)).

scripture in public-school classrooms. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783 (1983) (assessing the constitutionality of opening legislative sessions with prayer); *Lynch v. Donnelly*, 465 U.S. 668 (1984) (assessing the constitutionality of displaying nativity scene in town park); *Town of Greece v. Galloway*, 572 U.S. 565 (2014) (assessing constitutionality of legislative prayers); *Am. Legion*, 588 U.S. at 29 (assessing constitutionality of cross monument in public park).[37]

Indeed, the only two Supreme Court cases to consider Ten Commandments displays since *Stone* contradict Defendants' arguments. In *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 911-12 (2005), the Court *affirmed* a preliminary injunction prohibiting a display of the Ten Commandments in a county courthouse. And even in the one Establishment Clause case where the Supreme Court *upheld* a governmental display of the Ten Commandments, the Court emphasized that the public-school context in *Stone* set the school displays apart from a relic placed decades ago among other monuments on the Texas Capitol grounds: "There are, of course, limits to the display of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. . . . [*Stone*] stands as an example of the fact that we have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools[.]" *Van Orden*, 545 U.S. at 690-91 (plurality opinion) (internal citations and quotation marks omitted);[38] *cf. Roake*, 2025 WL 1719978, at *14 (discussing *Van Orden*'s rejection of the *Lemon* test and affirmance of *Stone*).

---

[37] *American Legion* involved a challenge to a display on government property of a Latin cross statue commemorating lives lost in World War I. 588 U.S. at 37. The cross and the land were acquired by a government commission in 1961. *Id.* at 44. In upholding the display, the plurality explained that "[t]he passage of time gives rise to a strong presumption of constitutionality" but noted that "retaining established, religiously expressive monuments, symbols, and practices is *quite different from erecting or adopting new ones*." *Id.* at 57 (emphasis added).

[38] *See also Van Orden*, 545 U.S. at 703 (Breyer, J., concurring) ("The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." (citing *Stone*, 449 U.S. 39, and *Lee*, 505 U.S. at 592)).

2.    *Stone is directly applicable here.*

Defendants' position that *Stone* "is not directly applicable to this case," Ark. Br. 24, is belied by a comparison of the two statutes. As in *Stone*, 449 U.S. at 39, Plaintiffs assert a facial Establishment Clause challenge to state-law provisions mandating permanent displays of the Ten Commandments in every elementary and secondary public-school classroom. Neither statute expressly requires that the Commandments be displayed standing alone. *See generally id.* Additionally, as in *Stone*, 449 U.S. at 41 & n.1, Act 573 mandates that the Ten Commandments displays must be at least sixteen by twenty inches. Further still, neither the statute in *Stone* nor Act 573 requires that the Ten Commandments displays be integrated into a school curriculum. *Id.* at 42. And both the statute in *Stone* and Act 573 single out the Commandments for prominent display while declining to give preferential treatment to core Founding documents like the Declaration of Independence, U.S. Constitution, and Bill of Rights. *Cf.* Green Rep. p. 13, ¶ 27 (discussing the "[t]hree [p]rimary Founding [d]ocuments [e]stablishing the American [g]overnment and [l]egal [s]ystem"). If anything, Act 573 is more constitutionally egregious than the statute struck down in *Stone*: Unlike Arkansas's statute, the Kentucky law did not expressly mandate that the Commandments be "prominently displayed" in a "conspicuous place" in classrooms, require the use of a denominationally preferential version of the Commandments, or mandate that the displays also be in school libraries.[39] And, unlike in Arkansas, Kentucky lawmakers required that the displays include a (pretextual) statement to discuss the Commandments' purported relevance to U.S. law. Plfs. Br. 10. Given the direct parallels between the Kentucky and Arkansas statutes,

---

[39] Considering the Founders' and binding caselaw's warnings against government intrusion into theological questions and controversies, Plfs. Br. 21, the State's contention, Ark. Br. 24-25, that it is somehow better, as a matter of constitutional inquiry, that Arkansas *selected* and *enshrined* in state law the exact, denominationally preferential text of the Ten Commandments that must be used in the displays is puzzling. And the notion that the legislators chose a nonsectarian version of the Ten Commandments, *id.*, is contradicted by Plaintiffs' expert in this case. *See infra* pp. 37-38.

*Stone* is plainly apposite and determinative here. *See Roake*, 756 F. Supp. 3d at 165 (holding that "*Stone* [] directly control[s] this case, as its facts and reasoning are on all fours" and enjoining statute similar to Act 573).

        3.    *The school displays mandated by Act 573 are unconstitutionally coercive.*

Even if *Stone* were not dispositive, Act 573's elementary and secondary public-school classroom and library displays are impermissibly coercive under the Supreme Court's school-coercion jurisprudence. Defendants all but eschew this longstanding caselaw in favor of the six "hallmarks of religious establishment" they claim now govern the Establishment Clause analysis under *Kennedy. See* Ark. Br. 31 ("Coercion is not a standalone hallmark of religious establishment, but rather a shorthand for the six 'hallmarks of religious establishment' that can constitute an Establishment Clause violation" (citing *Kennedy*, 597 U.S. at 537 & n.5; *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring)).

Defendants' understanding of *Kennedy* and *Shurtleff* is wrong. *See infra* pp. 38-40. It also makes no sense. According to Defendants, the "historical hallmarks of an established religion" enumerated in Justice Gorsuch's *Shurtleff* concurrence, 596 U.S. at 287, somehow trump his later majority opinion in *Kennedy,* which expressly affirmed that it remains "problematically coercive" under the Establishment Clause for public schools to impose religious messages on a "captive audience" of students. 507 U.S. at 541-42 (citing *Lee*, 505 U.S. at 580, 598, and *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294, 311 (2000)). The Court's ruling in *Mahmoud* further lays waste to Defendants' theory. *See* 2025 WL 1773627, at *17 (discussing coercive nature of the school environment).

When the State finally does address coercion, its argument suffers from the same fatal flaw as its jurisdictional arguments: The State wrongly assumes that the coercion analysis depends on the specific content of individual displays. *See* Ark. Br. 31 ("Once again, Plaintiffs do not know

what the displays themselves will look like or the surrounding context."). Again, the legal analysis here does not depend on the content of specific displays. Rather, the Court must consider whether students will be religiously coerced as a result of the mandatory minimum requirements of the statutory scheme, which will subject students, including the minor-child Plaintiffs, to a state-approved, Protestant version of the Ten Commandments in every classroom for every day of their public-school education.

The State asserts that "the fact that children will see the display in public schools [does not] transform the passive display into coercion." Ark. Br. 32. But that position neglects the inherently coercive nature of the school environment. The Supreme Court has repeatedly "recognized the potentially coercive nature of classroom instruction" in public schools. *Mahmoud*, 2025 WL 1773627, at *17. "'The State exerts great authority and coercive power through' public schools 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'" *Id.* (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)). In addition, "mandatory attendance requirements," *Edwards*, 482 U.S. at 584, create a legal "obligation" for parents "to send their children to public school unless they find an adequate substitute." *Mahmoud*, 2025 WL 1773627, at *20 (discussing Maryland's compulsory-education laws). As a result, "'[t]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'" *Id.* at *17 (quoting *Lee*, 505 U.S. at 592).[40] Indeed, "[t]hat is why a religious practice may be deemed unconstitutional in the 'special context of the public elementary and secondary school system,' but deemed

---

[40] *See also Lee*, 505 U.S at 643 (Scalia, J., dissenting) ("[W]e have made clear our understanding that school prayer occurs within a framework in which legal coercion to attend school (*i.e.*, coercion under threat of penalty) provides the ultimate backdrop.").

constitutional elsewhere." *Roake*, 2025 WL 1719978, at *13 (quoting *Edwards*, 482 U.S. at 583).[41]

Courts in this Circuit have recognized such an effect: "The law of imitation operates, and non-conformity is not an outstanding characteristic of children." *Goodwin v. Cross Cnty. Sch. Dist. No. 7*, 394 F. Supp. 417, 425-26 (E.D. Ark. 1973). Under *Lee*, consistent with the Founders' concerns about religious coercion of any degree, the Establishment Clause forbids any coercion arising from the "subtle coercive pressure[s]" intrinsic to the school context. *Lee*, 505 U.S. at 592; *see also Santa Fe*, 530 U.S. at 312. Although *Lee* is the seminal and binding Supreme Court precedent pertaining to religious coercion of students, Defendants barely contend with it.

The State also fails to acknowledge, even in passing, that students in public-school *classrooms*, in particular, are a quintessentially captive audience. Once students are at school, staff control their movements and often their expression: Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. *See Mahmoud*, 2025 WL 1773627, at *19 ("The government's operation of the public schools . . . implicates direct, coercive interactions between the State and its young residents. The public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct."). This is especially true in the classroom context.[42] It follows that imposing permanently, unavoidable religious messages in this space is "problematically coercive." *See Kennedy*, 597 U.S.

---

[41] *Cf. Van Orden*, 545 U.S. at 691 (plurality opinion) ("The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day.").

[42] *See, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 957 (9th Cir. 2011) (students in mathematics classroom were "captive" to teacher's proselytizing his view on the "role of God in our Nation's history"); *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 99 (3d Cir. 2009), *as amended* (June 5, 2009) ("Parents of public school kindergarten students may reasonably expect their children will not become captive audiences to an adult's reading of religious texts."); *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1167 (7th Cir. 1993) (enjoining Bible distributions in public-school classrooms because "children are a captive audience" and "they are most assuredly not free to get up and leave").

at 541-42.[43] It is inevitable that the minor-child Plaintiffs—who will be acutely aware of the lengths to which the State has gone in ensuring that they encounter these displays in every classroom and library for nearly every minute of their school day—will reasonably feel pressured to observe, meditate on, venerate, and adopt or obey the State's preferred religious doctrine. Plfs. Br. 25; *see also, e.g.*, *Roake*, 2025 WL 1719978, at *9 (noting "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" (internal citation omitted)).

To that end, the State's attempt to equate attendance at a public school and the Act's required classroom displays of the Ten Commandments with "children attend[ing] . . . town meetings," "legislative prayers," and the appearance of "In God We Trust" on currency, are unavailing. *See* Ark. Br. 33 (citing *Town of Greece*, 572 U.S. at 591,[44] and *New Doe Child #1 v. United States*, 901 F.3d 1015, 1023-24, 27 (8th Cir. 2018)). As with many of the State's citations for most of its arguments, *none* of these precedents or examples involve ubiquitous scriptural displays on the walls of every public-school classroom, in which children are mandated to be present.

---

[43] In *Kennedy*, the Court upheld the right of a public-school football coach to engage in a quiet and private act of prayer after games, noting that the prayers looked "very different" from those in *Lee* and *Santa Fe*. 597 U.S. at 541-542. The coach's prayers were purely private and not attributable to the school, did not involve students, and were not imposed on a captive audience. *See id.* at 525, 531, 542.

[44] The Supreme Court's ruling in *Town of Greece* disproves the State's argument. The Court's assessment of coercion there was premised wholly on the fact that the objectors were "mature adults" who voluntarily attended government meetings and were "'free to enter and leave with little comment and for any number of reasons.'" *Town of Greece*, 572 U.S. at 590 (quoting *Lee,* 505 U.S. at 597). The minor-child Plaintiffs, by contrast, are students who are compelled by law to attend school and are under the thumb of State control while there—a distinction recognized by the Court in *Town of Greece*. *Id.* at 590-91. According to the Court, "[s]hould nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy[,]" and "should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Id.* at 590. It is an entirely different story for children, who are "readily susceptible to religious indoctrination or peer pressure." *See id.* (internal quotation marks omitted).

36

4.    *Act 573 impermissibly takes sides on theological questions and is denominationally preferential.*

The State's assertion that "Act 573 reflects a nonsectarian recognition of the Ten Commandments and their historical significance," Ark. Br. 33, is directly contradicted by the expert report of Dr. Steven K. Green. *See* Plfs. Mot., Ex. 12, Green Rep. ¶¶ 53-58; Plfs. Br. 3-4;[45] *see also, e.g.*, *Roake*, 756 F. Supp. 3d at 200 ("The Act requires the display of a specific Protestant version of the Decalogue."). In addition to Dr. Green's report, the Plaintiffs who do believe in the Ten Commandments have identified various ways in which the text mandated by Act 573 is distinctly Christian and in conflict with their beliefs.[46] *Cf. Roake*, 756 F. Supp. 3d at 200 ("[T]his required display conflicts with the religious views of Unitarian Universalists, agnostics, atheists, Presbyterians, and Reform Jewish parents, particularly about proselytizing, the Ten Commandments (both generally and this version), and the role of the secular authorities.").

Conclusory assertions aside, the State has offered no evidence in rebuttal to Dr. Green's report or Plaintiffs' declarations.[47] Indeed, as to the latter, the State's attorneys cannot dispute the validity of the minority-faith Plaintiffs' assertions about their religions and Act 573's conflict with their beliefs. Doing so would only further evince the constitutional infirmity of the State's position, as the State has no authority to wade into such deeply private theological questions and declare that one version of scripture is authoritative, representative of all believers, and preferred over other versions. *See* Plfs. Br. 6-7. The potential for this type of intrusion into religion is precisely why the Founders vehemently opposed official denominational preferences or the government

---

[45] On July 2, 2025, Defendants filed a motion in limine to exclude Dr. Green's testimony. ECF No. 54. Plaintiffs intend to file a separate response to that motion.

[46] Plfs. Mot., Ex. 2, Decl. of Samantha Stinson ¶¶ 7-14; Plfs. Mot., Ex. 3, Decl. of Jonathan Stinson ¶¶ 5-11; Plfs. Mot., Ex. 8, Decl. of Carol Vella ¶¶ 5-10.

[47] Even assuming that those who originally crafted the text of the *Van Orden* and similar monuments sought, in good faith, to produce a "compromise" version of the Ten Commandments that would be "nonsectarian" and acceptable to Catholics, Jews, and Protestants, Ark. Br. 33, they were not successful, as Dr. Green's report and the Plaintiffs' declarations demonstrate.

declaring which religious doctrine is correct, Plfs. Mot., Ex. 12, Green Rep. ¶¶ 21-26, and why even Justice Scalia recognized that "[t]he Establishment Clause would prohibit . . . governmental endorsement of a particular version of the Decalogue as authoritative." *McCreary Cnty.*, 545 U.S. at 894 n.4 (Scalia, J., dissenting). Because the Act's facial adoption of a Protestant version of the Ten Commandments, and its mandate that this version—and only this version—be posted in thousands of classrooms across the state, violates "[t]he clearest command of the Establishment Clause," it is subject to strict scrutiny. *See Catholic Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n,* 145 S. Ct. 1583, 1591 (2025) (internal quotation marks omitted) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). Having made no argument to rebut Plaintiffs' claim that Act 573 fails both prongs of this demanding standard, Plfs. Br. 26-29, Defendants and the State have waived the point.

5.    *Permanently displaying the Ten Commandments in every public-school classroom is not permissible under* Kennedy*'s "original meaning and history" test.*

The State's effort to reduce *Kennedy*'s "original meaning and history" test to the six hallmarks of establishment discussed by Justice Gorsuch's concurring opinion in *Shurtleff*, Ark. Br. 26-27, is not supported by *Kennedy* or the *Shurtleff* concurrence itself. While Justice Gorsuch's *Shurtleff* opinion may be useful with respect to assessing the validity of certain challenged practices under the Establishment Clause, it does not purport to set forth the entire universe of permitted or prohibited practices. Rather, the opinion identifies "*some* helpful hallmarks [of establishment] that localities and lower courts can rely on." *Shurtleff*, 596 U.S. at 285 (Gorsuch, J., concurring) (emphasis added). As Justice Gorsuch notes, "[b]eyond a formal declaration that a religious denomination was in fact the established church, . . . founding-era religious establishments *often* bore certain other telling traits" that "explain *many* of th[e] Court's

Establishment Clause cases[.]" *Id.* at 285-86 (emphasis added). He does not contend, however, that the six "hallmarks" discussed in his opinion are an exhaustive or definitive list.

Nor does *Kennedy*'s majority opinion, which was also penned by Justice Gorsuch, mandate Defendants' reductive reading of the "original meaning and history" inquiry. *See Roake*, 2025 WL 1719978, at *17 ("*Kennedy* did not adopt these 'hallmarks' as the exclusive Establishment Clause test and the *Shurtleff* concurrence is nonbinding." (internal citation omitted)). Rather, *Kennedy* instructs that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Id.* (quoting *Kennedy*, 597 U.S. at 535). "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* (internal citation omitted).

*Kennedy* and *Mahmoud*, *supra* pp. 33-36, as well as *Catholic Charities*, *supra* p. 38, make clear that the anti-coercion and denominational-neutrality principles at the heart of the Establishment Clause are just as vital today as they were at the Founding. The Court's longstanding jurisprudence protecting both remains robust and binding. Because Act 573's scriptural displays will be religiously coercive and will give preference to particular denominations—violating original First Amendment principles—the law cannot pass constitutional muster under *Kennedy*'s historical test.

As Plaintiffs explain in their preliminary-injunction memorandum, even if the historical record theoretically could redeem a statute that violates the Establishment Clause's fundamental prohibitions on religious coercion and denominational preference, here, there is no longstanding, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools. Plfs. Br. 22-23. Neither Defendants nor the State seriously try to prove otherwise. The only historical "evidence," submitted by the State, is a declaration—inadmissible here for

evidentiary purposes—from a different case challenging a Louisiana statute similar to Act 573 in which an employee of the Louisiana Attorney General's office haphazardly attached isolated instances of newspaper articles describing Ten Commandments displays in classrooms and excerpts from early textbooks.[48] After testimony from Dr. Green, who is also Plaintiffs' expert here, however, the district-court judge in that case rejected the Louisiana Attorney General's purported historical evidence,[49] ruled in favor of the parent-plaintiffs and minor-child plaintiffs, and enjoined implementation of the statute. *See Roake*, 756 F. Supp. 3d 93, 118. The Fifth Circuit recently affirmed that ruling in a unanimous opinion. *Roake*, 2025 WL 1719978, at *20.

Tellingly, other than the declaration misappropriated from the *Roake* case, Defendants do not point to a single piece of historical evidence specifically involving the Ten Commandments and schools. Instead, they resort to generic references to the Northwest Ordinance, Ark. Br. 29, vague assertions of Bible readings, *id.* at 29-30, and dicta from cases that had nothing to do with public schools, *id.* at 29 (citing *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 778 (8th Cir. 2005)). There is nothing to substantiate the State's claim that posting the Ten Commandments on classroom walls is akin to other "historical practices that do[] not violate the Establishment Clause." Ark. Br. 30. As in *Roake*, the evidence here supports the opposite conclusion. Plfs. Br. 22-23.

### B.    Plaintiffs Have Shown That They Are Likely to Succeed On The Merits Of Their Free Exercise Claim.

Like their other arguments, the State's objections to Plaintiffs' claims under the Free Exercise Clause fail to grapple with the problematic nature of the Act's statutory regime. Based

---

[48] *See* Ark. Br., Ex. C, Decl. of Zachary Faircloth.

[49] Ultimately, the evidence submitted by the Louisiana Attorney General's Office corroborated Dr. Green's testimony. *See Roake*, 756 F. Supp. 3d at 118 (finding that evidence provided by Louisiana Attorney General demonstrated only "scattered" instances Ten Commandments use in public schools and that there was no "convincing evidence that [such use] was common" at the time of the Founding or incorporation of the First Amendment (internal citation omitted)).

on the Act's minimum requirements alone, the minor-child Plaintiffs will be subjected to permanent, pervasive, and unavoidable displays of the State's preferred version of scripture throughout the entire school day, for the duration of their public-school education. These displays directly conflict with the Plaintiffs' religious and non-religious beliefs and practices.[50] As the Supreme Court held in *Mahmoud*, a public school "burdens the religious exercise of parents when it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." 2025 WL 1773627, at *5 (cleaned up). The State "cannot condition the benefit of free public education on parents' acceptance of such instruction." *Id.* Act 573 does just that.

1. *Act 573 is unconstitutionally coercive under the Free Exercise Clause.*

The Free Exercise Clause broadly secures the "right of every person to freely choose his own course [in matters of faith] . . . free of any compulsion from the state." *Schempp*, 374 U.S. at 222. It bars direct and "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (cleaned up); *see also Mahmoud*, 2025 WL 1773627, at *19 (rejecting notion that the Free Exercise Clause provides "nothing more than protection against compulsion or coercion to renounce or abandon one's religion").

As discussed above, Act 573's mandatory displays will religiously coerce students, who will be subjected to the Ten Commandments for nearly every hour they are in school, in every classroom, with no exceptions and without regard to the subject matter being taught or the age of the students. *See supra* pp. 33-36. Short of withdrawing from public school, there will be no ability

---

[50] *See generally* Plfs. Mot., Ex. 2, Decl. of Samantha Stinson; Plfs. Mot., Ex. 3, Decl. of Jonathan Stinson; Plfs. Mot., Ex. 4, Decl. of Stephen Caldwell; Plfs. Mot., Ex. 5, Decl. of Joseph Armendariz; Plfs. Mot., Ex. 6, Decl. of Talara Taylor; Plfs. Mot., Ex. 7, Decl. of Shane Taylor; Plfs. Mot., Ex. 8, Decl. of Carol Vella; Plfs. Mot., Ex. 9, Decl. of Daniel Rix; Plfs. Mot., Ex. 10, Decl. of Leah Bailey.

to opt out of these displays, and the State's official religious doctrine will be unavoidable. But "[p]ublic education is a public benefit, and the government cannot 'condition' its 'availability' on [Plaintiffs'] willingness to accept a burden on their religious exercise." *See Mahmoud*, 2025 WL 1773627, at *20 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

Downplaying the Act's unremitting assault on students' conscience, the State attempts to distinguish *Mahmoud* by noting that, "unlike the district policy in *Mahmoud*, Act 573 does not require any *teaching* . . . about the Ten Commandments." Ark. Br. 37 (emphasis added). The arbitrary line drawn by Defendants is a distinction without difference for purposes of the constitutional analysis.[51] Indeed, the State's reading of *Mahmoud* would allow the Respondent school district there to easily evade the Supreme Court's ruling by permanently posting excerpts from the LGBTQ-inclusive materials (to which the Petitioners objected) on every classroom wall in every school in the district. If anything, Act 573's imposition of religiously objectionable content on the minor-Plaintiffs is *more* egregious than in *Mahmoud*. There, the materials objected to by parents were *secular*, and used only *occasionally*.[52] Here, the minor-child Plaintiffs will be confronted with *denominationally preferential*,[53] patently religious materials—biblical scripture, no less—for nearly every hour of the school day, from kindergarten through senior year. The

---

[51] The First Amendment's prohibition against religious coercion applies to vocal or silent activities. *See Stone*, 449 U.S. at 42 ("Nor is it significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in Schempp and Engel[.]"); *Wallace v. Jaffree*, 472 U.S. 38, 60–61 (1985) (holding that state could not encourage students to engage in silent prayer); *cf. Jackson v. Nixon*, 747 F.3d 537, 542–43 (8th Cir. 2014) ("Even if the state had allowed [Plaintiff prisoner] to sit quietly during the prayers and other religious components . . . . the state's action may still amount to coercion.").

[52] *See Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 297 (D. Md. 2023).

[53] *See Catholic Charities*, 145 S. Ct. at 1591 ("The Establishment Clause's prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause, too[] . . . because the fullest realization of true religious liberty requires that government refrain from favoritism among sects." (cleaned up)).

displays are designed to attract students' attention and will be given a "conspicuous" and "prominent" place of honor on classroom and library walls.

Moreover, as lawmakers' own comments make clear, Plfs. Br. 4-5; Compl. ¶¶ 59-62, the displays are "designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *See Mahmoud*, 2025 WL 1773627, at *15. If Montgomery Public Schools' *occasional* use of *secular* LGBTQ-inclusive materials at school raised coercion concerns, so too—to an even greater extent—will Act 573's scriptural displays. Students will be coercively indoctrinated in the State's favored religious beliefs and concomitantly pressured to suppress their own religious beliefs and practices at school. That is anathema to the "freedom of conscience and worship" that the Free Exercise Clause embraces. *See Lee*, 505 U.S. at 591; Plfs. Br. 20-22.

2.    *The Act is not religiously neutral, and its mandatory displays will violate parent-Plaintiffs' free exercise rights.*

Generally speaking, government conduct will be subject to strict scrutiny under the Free Exercise Clause where a plaintiff shows "that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (cleaned up). The Supreme Court clarified in *Mahmoud*, however, that courts "need not [even] ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny" when it comes to a public-school "educational requirement or curriculum" that would "'substantially interfer[e] with the religious development' of [a] child or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in the child." 2025 WL 1773627, at *18 (quoting *Yoder*, 406 U.S. at 218). For all the reasons discussed above, *supra*,

the displays mandated by Act 753 will do just that.[54] As with their response to Plaintiffs' Establishment Clause argument, neither Defendants nor the State rebut Plaintiffs' arguments that Act 573 fails strict scrutiny and have thus waived the point.

### C.    Plaintiffs Have Shown That Their Facial Challenge Is Likely to Succeed.

As Plaintiffs have repeatedly explained, "knowing what donated Act 573 displays will look like or how those displays will be implemented in different classrooms," Ark. Br. 38, will have no bearing on the sufficiency of Plaintiffs' facial challenge. That is because "the issue is whether, as a matter of law, there is any constitutional way to display the Ten Commandments *in accordance with the minimum requirements of the Act*." *Roake*, 756 F. Supp. 3d at 160 (emphasis in original). There is not. *See, e.g.*, *id.* (finding nearly identical statute facially unconstitutional). As such, and for all the reasons outlined herein, Plaintiffs have demonstrated a significant likelihood that they will succeed with their facial challenge to Act 573's mandatory displays in elementary and secondary public-school classrooms and libraries.

### D.    Each of the Remaining Preliminary-Injunction Factors Has Been Met.

Each preliminary-injunction factor weighs in Plaintiffs' favor. *See* Plfs. Br. 29-30. First, Defendants' jurisdictional arguments fail for the reasons discussed above, and Plaintiffs are likely to succeed on the merits of their claims for the reasons already stated. Second, Plaintiffs will suffer irreparable injuries without an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Evangelism Fellowship of*

---

[54] As discussed in Plaintiffs' opening brief, Plfs. Br. 26-29, Plaintiffs also meet *Kennedy*'s threshold for strict scrutiny. 597 U.S. at 525. Act 753 is not neutral with respect to religion. By design, and on its face, the law mandates the display of expressly religious scripture in every public-school classroom. It also requires a specific version of that scripture to be used, one that is exclusionary of numerous faiths. *See supra* pp. 37-38; *Roake*, 756 F. Supp. 3d at 200 (Louisiana's H.B. 71 was "not neutral toward religion" because it "require[d] the display of a specific Protestant version of the Decalogue" and the legislative history further confirmed the departure from neutrality). And because Act 753 will coerce the minor-child Plaintiffs, *supra* pp. 33-36, and usurp the parent-Plaintiffs' rights, it will burden their religious exercise.

*Minn.*, 690 F.3d at 1000 (internal citation omitted) (quoting *Elrod*, 427 U.S. at 373 (plurality opinion)); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed. 2022) (updated June 2024) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary."). Both the parent-Plaintiffs and the minor-child Plaintiffs are highly likely to suffer a concrete invasion of their First Amendment rights if the Act is not enjoined.

Third, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (citations omitted). The State argues that the public interest weighs in its favor because an injunction will "prohibit it from enforcing a democratically enacted law." Ark. Br. 39. But that harm, if it exists, does not compare to the harm Plaintiffs would suffer from the egregious violation of one of this nation's and (Plaintiffs') most treasured fundamental rights.

## III.    THE COURT HAS THE AUTHORITY TO GRANT PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF.

The State's demand that this Court limit any preliminary injunction to Plaintiffs' specific classrooms and libraries ignores the realities of students' day-to-day life at school, their participation in school events and activities, and their advancement in the school system over the course of their public-school education. Notably, the Defendant School Districts do not challenge the scope of the relief requested, even though they would presumably be most interested in ensuring the adequacy and administrability of any relief granted to Plaintiffs. In any event, the State's argument should be rejected.

One of the "principles of equity jurisprudence" is that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff

class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."). Specifically, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The Eighth Circuit has recognized that broader injunctive relief may be warranted when the law at issue is "plainly unconstitutional" because the public interest is "best served by preventing government intrusions into the rights protected under the Federal Constitution," and "preventing [the enforcement of] a law that is plainly unconstitutional would cause no injury." *See Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

Here, the Court has authority to preliminarily enjoin the School District Defendants from implementing Act 573, and Plaintiffs are entitled to the district-wide preliminary injunction that they seek for each Defendant School District. Children regularly move between classrooms within schools, attend programs and activities in other schools within their district, and progress from elementary to middle to high school;[55] it is not feasible to grant relief on a classroom-by-classroom,

---

[55] Students attending the Defendant School Districts frequently attend events and activities that are held at other District schools, and sometimes at schools in entirely different school districts. *See, e.g.*, Prendergast Decl., Ex. 11 ("Jr. High Choir All Region Audition," Fayetteville Pub. Schs., Events (Oct. 11, 2025) (student event taking place at a high school in another school district, Springdale Public Schools)); Prendergast Decl., Ex. 12, Robotics Competition, Fayetteville Pub. Schs. (Nov. 2024) ("Last weekend, Fayetteville High School hosted the VEX V5 Robotics Competition, where 38 high school and 15 middle school teams from across the region competed in intense 2v2 robot battles!"); Prendergast Decl., Ex. 13, Quiz Bowl, Fayetteville Pub. Schs. (Facebook Post, Apr. 18, 2017) ("Teams from Holt Middle School, McNair Middle School, and The Owl Creek School battled yesterday in a Quiz Bowl competition. The teams practice with each other in preparation for the upcoming district Quiz Bowl competition."); Prendergast Decl., Ex. 14, "Senior Walk," Central Park Elementary, Bentonville Pub. Schs. (May 14, 2025) ("Past CPE Students will come back for one last walk in our halls. Parade type walk inside the school. Route to be provided later. Reception in the library (for seniors) to follow."); Prendergast Decl., Ex. 15, "Orchestra All Region Auditions," Bentonville High Sch., Bentonville Pub. Schs. (Oct. 26, 2024) ("Will use 1st Floor South including Band Orchestra, Choir, Gym Lobby, Commons, AAC Lobby, and 1st floor North including Commons and All Classrooms"); Prendergast Decl., Ex. 16, Celebration of Mind, Bentonville Pub. Schs. (Facebook Post, Mar. 14, 2017)

or even an intra-district, school-by-school basis. Attempting to do so would put the minor-child Plaintiffs at risk of repeated, "accidental" impositions of the Act's scriptural displays due to the impracticalities of implementing such an injunction.

Additionally, limiting the relief, as requested by the State, would impermissibly stigmatize the minority-faith and non-religious minor-child Plaintiffs, thereby compounding the violation of their religious-freedom rights. Every time affected children change classrooms or schools, including to visit other schools for District events and activities, *supra* n.55, they would have to make a new request for relief that any displays be removed, and each time, their peers will know that they are "to blame" for the change. By causing the minor-child Plaintiffs to be singled out in this manner, day after day, year after year, the artificially narrow injunction demanded by Defendants would send an unlawful, exclusionary, spiritually burdensome message to the Plaintiffs and their children: They do not belong and are "outsiders, not full members of the [school] community," because they do not subscribe to the state-approved version of the Ten Commandments. *See Catholic Charities*, 145 S. Ct. at 1591 (quoting *Santa Fe*, 530 U.S. at 309); *see also* Plfs. Br. n.10.

Accordingly, the district-wide relief requested by Plaintiffs falls squarely within the Supreme Court's conception of "complete relief." *Trump v. CASA, Inc.*, No. 24A884, 2025 WL

---

("Students at Fulbright Junior High School invited students from all over the area to their school for a day of math exploration in FJHS's second annual Celebration of Mind."); Prendergast Decl., Ex. 17, "Har-Ber High students host mock vet clinic," Springdale Pub. Schs. (Dec. 5, 2023) ("Har-Ber High School students hosted mock veterinary clinics Nov. 28 for about 100 Hellstern Middle School careers class students."); Prendergast Decl., Ex. 18, "Free ACT Boot Camp Offered at Springdale High School," Springdale Pub. Schs. (Mar. 2, 2022) ("The boot camp is open to all Springdale Public Schools students who are eligible to take the ACT."); Prendergast Decl., Ex. 19, Senior walk, Springdale Pub. Schs. (Facebook Post, May 18, 2017) ("After the Senior Walk at Smith Elementary, Springdale and Har-Ber graduating seniors who once were Smith Stallions gathered in the library to enjoy their elementary yearbooks, share memories and pose for a group picture."); Prendergast Decl., Ex. 20, "Welcome Night at Southside Elementary For Upcoming 3rd Grade Families," Siloam Springs Pub. Schs. (May 15, 2025) ("Join us at Southside Elementary for [a] brief intro meeting and a tour of your new 3rd grade school. Students are not require[d] to attend but are welcome."); Prendergast Decl., Ex. 21, "Kindergarten graduation information," Northside Elementary School, Siloam Springs Pub. Schs. (Apr. 15, 2025) (announcing that kindergarten graduation will be held at Siloam Springs High School).

1773631, at *10-11 (U.S. June 27, 2025). In *CASA*, the Court held that a *universal* injunction against an executive order, freezing its enforcement across the country, exceeded the equitable authority that Congress granted to federal courts. Here, Plaintiffs' proposed relief is much more modest and would extend only within the district in which each minor-child Plaintiff attends school. That is appropriate because there is "no way 'to peel off just the portion of the [constitutional violation]' that will harm each Plaintiff.'" *Id.* at *11 (internal citation omitted). As noted above, children readily move between classrooms and schools. They move from math to history class or from their homeroom to electives; they visit other schools in the Districts to take part in various events and activities; they graduate from elementary, to middle, to high school; and families move to different school zones. *CASA*'s nationwide application is simply not analogous here, and anything short of a district-wide solution would be a far cry from "complete relief" for Plaintiffs.

## CONCLUSION

For the reasons set forth above, this Court should issue the requested preliminary injunction, as outlined in Plaintiffs' Motion for Preliminary Injunction.

Date: July 9, 2025

Respectfully submitted,

By: */s/ Jonathan K. Youngwood*
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*

ARKANSAS CIVIL LIBERTIES UNION
FOUNDATION, INC.
John C. Williams (ABN 2013233)
Shelby H. Shroff (ABN 2019234)
904 W. 2nd St.
Little Rock, AR 72201
(501) 374-2842
*john@acluarkansas.org*
*shelby@acluarkansas.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*
*hweaver@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*
Jess Zalph*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
Nancy A. Noet*
PO Box 750
Madison, WI 53701
(608) 256-8900
*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

*Counsel for Plaintiffs*

*  Pro Hac Vice*

49