IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SAMANTHA STINSON and JONATHAN STINSON,
on behalf of themselves and on behalf
of their minor children, A.R.S. and A.W.S.;
STEPHEN CALDWELL, on behalf of himself
and on behalf of his minor child, W.C.;
JOSEPH ARMENDARIZ, on behalf of himself
and on behalf of his minor children, M.A. and W.A.;
TALARA TAYLOR and SHANE TAYLOR,
on behalf of themselves and on behalf
of their minor children, K.T. and M.T.;
CAROL VELLA, on behalf of herself
and on behalf of her minor children, E.M.V. and N.M.V.;
DANIEL RIX, on behalf of himself
and on behalf of his minor children, A.R., J.R., and W.R.;
and LEAH BAILEY, on behalf of herself
and on behalf of her minor children, C.T. and D.T.                    PLAINTIFFS

V.                                    CASE NO. 5:25-CV-5127

FAYETTEVILLE SCHOOL DISTRICT NO. 1;
SPRINGDALE SCHOOL DISTRICT NO. 50;
BENTONVILLE SCHOOL DISTRICT NO. 6;
and SILOAM SPRINGS SCHOOL DISTRICT NO. 21            DEFENDANTS

AND

STATE OF ARKANSAS, *ex rel.* TIM GRIFFIN,
ATTORNEY GENERAL                                    INTERVENOR


**<u>MEMORANDUM OPINION AND ORDER</u>**


1

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................. 3

II.  BACKGROUND .................................................................................. 5

    A.  Arkansas Act 573 .................................................................... 5

    B.  The Parties .............................................................................. 7

    C.  A Brief History of Relevant Precedent ................................. 10

III. DISCUSSION .................................................................................. 15

    A.  Preliminary Matters: Standing and Ripeness ..................... 15

        1.  *Contingent Private Funding of Ten Commandments Displays* ....... 17

        2.  *"Unknown" Content and Context of Displays* ................................. 19

        3.  *Ten Commandments Displays Not Merely "Passive"* ..................... 21

    B.  Preliminary Injunction ......................................................... 24

        *1. Likelihood of Success on the Merits* ................................. 25

            **a. Establishment Clause** ............................................. 25

                i. *Stone v. Graham* ................................................. 25

                ii. *Kennedy*'s Historical Practices and Understandings Test .......... 26

            **b. Free Exercise Clause** ............................................. 31

        *2. Other Preliminary Injunction Factors* ............................... 33

        *3. Scope of Relief* ................................................................ 33

IV.  CONCLUSION .................................................................................. 34

## I.  INTRODUCTION

*I am the Lord thy God.*
*Thou shalt have no other gods before me.*[1]

This is the first of ten commandments that Arkansas Act 573 requires be prominently displayed in every public-school classroom in the State. The question before the Court is whether the law violates the First Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment— which declares that a state "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, XIV.

The First Amendment's "Religion Clauses," quoted above, include the Establishment Clause and the Free Exercise Clause. The Supreme Court has explained that a violation of the Free Exercise Clause depends upon a "showing of direct governmental compulsion" that burdens individual religious belief or practice, whereas a violation of the Establishment Clause depends upon "the enactment of laws which establish an official religion." *Engel v. Vitale*, 370 U.S. 421, 430 (1962). Americans today might find it far-fetched to imagine a state establishing an "official religion"; but the Founding Fathers were not so sanguine. James Madison, the author of the Bill of Rights, warned that we should "take alarm at the first experiment on our liberties." *Abingdon Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963) (quoting Madison's *Memorial and Remonstrance Against Religious Assessments*). That "experiment" is happening now, in Arkansas.

---

[1] Exodus 20:2–3.

Forty-five years ago, the Supreme Court struck down a Ten Commandments law nearly identical to the one the Arkansas General Assembly passed earlier this year. That precedent remains binding on this Court and renders Arkansas Act 573 plainly unconstitutional. Why would Arkansas pass an obviously unconstitutional law? Most likely because the State is part of a coordinated strategy among several states to inject Christian religious doctrine into public-school classrooms. These states view the past decade of rulings by the Supreme Court on religious displays *in public spaces* as a signal that the Court would be open to revisiting its precedent on religious displays *in the public-school context*.

Louisiana began the trend, passing a bill in 2024 that directed the state's public schools to display the Ten Commandments in all classrooms. After a group of Louisiana parents and children sued, the District Court for the Middle District of Louisiana preliminarily enjoined House Bill 71 as violative of both the Establishment Clause and the Free Exercise Clause, *see Roake v. Brumley*, 756 F. Supp. 3d 93 (M.D. La. 2024), and the Fifth Circuit affirmed, *see Roake v. Brumley*, 2025 WL 1719978 (5th Cir. 2025). Undeterred, Arkansas has now passed Act 573, a law closely resembling the one enjoined in Louisiana. This has prompted a group of religious and non-religious parents of children attending public schools in Northwest Arkansas to file the instant suit against their respective school districts, raising almost the same concerns as their Louisiana counterparts. Just ten days after the Arkansas Plaintiffs filed suit, Texas enacted its own public-school Ten Commandments law. Similar laws appear to be in the works in other

4

states, which will lead to more lawsuits—until, it seems, the Supreme Court puts its foot down.

As for Act 573, this Court's duty here is to explain in direct and simple terms why the law is unconstitutional under any legal test and award appropriate relief. The rest is beyond its control. Plaintiffs' Motion for Preliminary Injunction is **GRANTED** for the reasons explained below.[2]

## II.  BACKGROUND

### A.  Arkansas Act 573

Act 573 requires all public-school districts in Arkansas to "prominently display" a 16"x20" poster or framed copy of the Ten Commandments in a "conspicuous place" in each "elementary and secondary school library and classroom." Act 573 §§ (a)(1)–(2). Students receiving instruction in algebra, physics, engineering, accounting, computer science, woodworking, fashion design, and German will do so in classrooms that

---

[2] In ruling on Plaintiffs' Motion for Preliminary Injunction (Doc. 8), the Court also considered Plaintiffs' Declarations (Docs. 8-2–8-10) and Brief in Support (Doc. 9); Defendant School Districts' Motion to Dismiss (Doc. 49) and Brief in Support (Doc. 50) and Intervenor the State of Arkansas's Motion to Dismiss (Doc. 52), both of which raise standing and ripeness challenges; the School Districts' Response to the Motion for Preliminary Injunction (Doc. 51); the State's Response to the Motion for Preliminary Injunction (Doc. 53); Plaintiffs' Response to the Motions to Dismiss and Reply to the Motion for Preliminary Injunction (Doc. 58); and the State's Reply in support of its Motion to Dismiss (Doc. 65). In addition, the Court held an eight-hour hearing on all pending motions on July 18, 2025, during which counsel for all parties presented oral argument on Plaintiffs' Motion for Preliminary Injunction and the Districts' and State's Motions to Dismiss, and Plaintiffs called Dr. Steven K. Green to the stand to testify. The Court accepted into evidence Dr. Green's expert report (Doc. 8-12) over the State's objections—all of which were previously asserted by the State in a Motion to Exclude Expert Testimony (Doc. 54) and overruled by the Court in an order (Doc. 64) issued one day prior to the hearing.

prominently display (the King James version of) the Ten Commandments. Every day from kindergarten to twelfth grade, children will be confronted with these Commandments—or face civil penalties for missing school.[3]

Regarding content, the State requires that each display contain "a historical representation of the Ten Commandments" that reads as follows:

The Ten Commandments
I am the Lord thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother, that thy days may be long upon the land
which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his
maidservant, nor his cattle, nor anything that is thy neighbor's.

*Id.* at § (a)(1)(B)(i)–(iii).[4]   The text must be "legible to a person with average vision from anywhere in the room." *Id.* at § (a)(1)(B)(ii)(a). The posters need not include any

---

[3] Arkansas law demands that parents send their minor children, ages five to seventeen, to school and "ensure the attendance of the child." Ark. Code Ann. § 6-18-201(a). Excessive unexcused absences may lead to educational punishments, including "denial of course credit, promotion, or graduation," *id.* § 6-18- 222(a)(1)(A)(i), and the student's parents "shall be subject to a civil penalty" of up to $500 in circuit court, plus court costs and fees. *Id.* § 6-18-222(a)(5)(A). The purpose of the penalty is "to impress upon the parents . . . the importance of school . . . attendance." *Id.* § 6-18-222(a)(7)(A). Arkansas public schools must be in session for at least 178 days—or 1,068 instructional hours— each year. Ark. Code Ann. § 6-17-2403(c),

[4] Notably, Act 573 amends and expands Section 1-4-133 of the Arkansas Code, which in 2017 mandated the display of 11"x14" posters of the national motto, "In God We Trust," in all public-school libraries and classrooms. *See id.* at §§ (a)(1)(A)(i), (a)(2)(A).

explanation of why the Ten Commandments were selected for display or why a particular version of the text was chosen. According to the State, "Act 573 does not require any teaching"; the purpose of displaying the Commandments is self-explanatory. (Doc. 53, p. 47).[5]

The main difference between Arkansas's Ten Commandments law and the one passed by Louisiana in 2024 is the source of funding. Louisiana House Bill 71 authorized the use of public funds to purchase displays, while Arkansas Act 573 mandates that all displays be either donated or purchased with private funds. Act 573 § (b). However, "[i]f a [donated] copy or poster . . . does not meet the requirements [of Act 573], then an institution . . . may replace the copy or poster" with a version "that meets the requirements" using "public funds" or "a private donation." *Id.* at § (c).

### B. The Parties

Plaintiffs are nine parents who sue individually and on behalf of their minor children who attend public schools in the Fayetteville, Springdale, Bentonville, and Siloam Springs School Districts. The Districts were named as defendants because Act 573 requires them to display all Ten Commandments posters they receive and to use donated funds to purchase posters.

Early on, the Districts informed the Court and Plaintiffs that they were not inclined to defend Act 573 on the merits. Therefore, the State of Arkansas, by and through its

---

[5] By contrast, Louisiana's bill required its displays to include an approved historical context statement purporting to explain some uses of the Ten Commandments in American education during the 1600s and 1800s. Of course, Louisiana's law was held unconstitutional—despite the context statement.

Attorney General, Tim Griffin, sought and was granted leave to intervene soon after Plaintiffs filed their Motion for Preliminary Injunction (Doc. 8). Both the Districts and the State filed Motions to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) (Docs. 49 & 52), arguing that Plaintiffs lack standing to bring their claims and that such claims are not yet ripe. According to the Complaint (Doc. 2), Plaintiffs seek a permanent injunction of the enforcement of Act 573 and a judicial declaration that mandating the display of the Ten Commandments in every public elementary- and secondary-school classroom and library in Arkansas violates the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution.

Plaintiffs bring a facial challenge to Act 573 under the Establishment Clause. This means they contend that there are no circumstances under which it would be constitutional to display the Ten Commandments in accordance with the minimum requirements of Act 573. *See Bowen v. Kendrick*, 487 U.S. 589, 601 (1988) (defining facial challenge). Plaintiffs also bring an as-applied challenge under the Free Exercise Clause. They argue that hanging the Ten Commandments in their classrooms will burden their sincere religious practice pursuant to a policy that is not neutral or generally applicable. *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025) (defining as-applied challenge). The State must therefore satisfy strict scrutiny by demonstrating that Act 573 is justified by a compelling state interest and is narrowly tailored in pursuit of that interest. *Id.*

The nine parent-Plaintiffs and their children are Jewish, Unitarian Universalist, atheist, and agnostic. Below is a concise summary of their claims taken from their sworn declarations:

8

- **Samantha and Jonathan Stinson** (Docs. 8-2 & 8-3) and **Carol Vella** (Doc. 8-8) are Jewish and are raising their children in the Jewish faith. They object that the school displays required by Act 573 present a Christian interpretation of the Ten Commandments that conflicts with Jewish tradition and will promote and forcibly impose on their children scripture in a manner that is contrary to their Jewish faith. They believe the State's endorsement of a Christian version of the Ten Commandments will send the message to their children that the government-mandated Christian version is authoritative and that their beliefs are excluded or do not belong. They worry that teachers are likely to be questioned by students about the Ten Commandments and will answer those questions in a way that could proselytize Christian beliefs to their children and undermine Jewish traditions and teachings at home.

- **Joseph Armendariz** (Doc. 8-5) is a member of the Unitarian Universalist Church, and he and his wife are raising their children in that faith. He states that his family's faith does not impose the religious dictates of several of the Ten Commandments on anyone, and Unitarians outright reject some of the Commandments. For example, he notes that the final Commandment required under Act 573—"Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's"—suggests an endorsement of personal servitude and slavery that is contrary to his church's teachings. He further objects that the Ten Commandments displays will convey a message of religious intolerance, which is contrary to his family's religious beliefs. He is concerned that the displays will usurp his parental role in guiding his children's religious education.

- **Talara and Shane Taylor** (Docs. 8-6 & 8-7), **Stephen Caldwell** (Doc. 8-4), and **Daniel Nix** (Doc. 8-9) are atheist or nonreligious. They do not subscribe to the religious dictates of the Ten Commandments and observe that the first half of the Commandments are purely religious rules about how to appropriately worship one particular God. They consider the Commandment "I am the Lord Thy God" to be a proselytizing statement, and they believe Act 573's mandatory religious displays will have the effect of proselytizing to their children. They note that their children have already experienced unwanted proselytizing, punishment, and ostracism from certain teachers who will likely be emboldened once State-sponsored scripture is displayed on schoolroom walls. They fear the displays are likely to pressure their children to adopt the State's preferred Christian doctrine over their families' preferred nonreligious tradition.

- **Leah Bailey** (Doc. 8-10) is agnostic and encourages her children to explore various religious beliefs. She is concerned that the displays required by Act 573 will teach her children that the school favors Christianity over other religious beliefs and over nonbelief. She maintains that hanging the Ten Commandments in her

children's classrooms will likely suggest to them that there is one preferred religion and that they have no choice in their religious beliefs.

### C.  A Brief History of Relevant Precedent

One of the earliest Supreme Court cases involving an Establishment Clause challenge in the public schools was *Engel v. Vitale*, 370 U.S. 421 (1962). There, the Supreme Court held that a New York law requiring public-school students to pray aloud, in unison with their teachers, at the start of each school day violated the First Amendment even though the prayer was short and non-denominational, and children could choose to remain silent or leave the room. *See id.* at 430. According to the Supreme Court, imposing the practice of group prayer in public schools was the problem—not the content of the prayer—because "in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." *Id.* at 425.

The following year, the Court examined a similar Pennsylvania statute that required all public schools to start the day with readings from the Bible. *Abingdon Sch. Dist. v. Schempp*, 374 U.S. 203, 205 (1963). At Abingdon Senior High School, where the Schempp children attended, students would recite ten verses over the intercom system, so that their voices were broadcast to the entire school, and after that, they would recite the Lord's Prayer, with all students encouraged to stand at their desks and join in. *Id.* at 207. The Supreme Court observed that "the Bible is worthy of study for its literary and historic qualities . . . . when presented objectively as part of a secular program of education," *id.* at 225, but Pennsylvania's morning-prayer law had no such educational

10

function and instead imposed a form of "religious exercise" on "students who are required by law to attend school," *id.* at 223.

Fast-forwarding to 1980, the Court faced another state law that posed a potential Establishment Clause problem. In *Stone v. Graham*, 449 U.S. 39 (1980), Kentucky had mandated that all public-school classrooms display 16"x20" posters of the Ten Commandments, purchased entirely with private donations. Kentucky maintained that the purpose of the displays was purely "secular and nonreligious." *Id.* But the Court disagreed. In a short, *per curiam* opinion that granted *certiorari* for the sole purpose of striking down the law, the Court acknowledged the Ten Commandments as "a sacred text in the Jewish and Christian faiths" and observed that they "do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness" but also set forth "the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Id.* at 41–42 (citing Exodus 20:1–17, Deuteronomy 5:6–21). Since Kentucky did not "integrate[ ] [the Ten Commandments] into the school curriculum," for example "in an appropriate study of history, civilization, ethics, comparative religion, or the like," posting them on the wall "serve[d] no . . . educational function." *Id.* at 42. Moreover, the fact that the displays were donated "d[id] not matter" to the constitutional inquiry, nor did the fact that the displays were not "read aloud" to the students, as "the mere posting" of a religious text "under the auspices of the legislature provides the official support of the State Government that the Establishment Clause prohibits." *Id.* (cleaned up).

In the decade following *Stone*, the Court entertained a number of Establishment Clause challenges in the public-school setting, including *Wallace v. Jaffree*, 472 U.S. 38 (1985), where an Alabama statute authorizing a daily period of silence in public schools for prayer was deemed an unconstitutional endorsement of religion lacking any secular purpose. Then, in the 1990s and early 2000s, the Court encountered a handful of school-prayer cases, including *Lee v. Weisman*, 505 U.S. 577, 599 (1992), where a school district's practice of including clergy-led prayers during an official public-school graduation ceremony was held to violate the Establishment Clause. The *Lee* Court emphasized that the critical feature of the case was the unique character of the public-school setting: "the State . . . in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student" and left no real possibility for dissenters to opt out. *Id.* at 598. Employing similar reasoning, in the year 2000 the Court ruled unconstitutional the Santa Fe Independent School District's practice of allowing students to lead pre-football-game prayers broadcast over the school's intercom system. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 305–06 (2000).

Although the Supreme Court decided several Establishment Clause cases in the first decade of the twenty-first century, none involved the public-school setting. For example, in 2005, the Court in *McCreary County. v. ACLU of* Kentucky, 545 U.S. 844 (2005), affirmed a preliminary injunction that banned two counties from posting the Ten Commandments in its courthouses. The evidentiary record revealed that the counties had no educational, historical, or otherwise secular reason for posting the Commandments. *Id.* at 869–71. The same day *McCreary* was decided, the Court issued an opinion in *Van*

12

*Orden v. Perry*, 545 U.S. 677 (2005), finding constitutional the display of a donated six-foot-tall stone monument of the Ten Commandments that had remained on the grounds of the Texas State Capitol for forty years without challenge. The monument did not violate the Establishment Clause because it was considered a "passive" display that citizens could choose to encounter or avoid entirely when they visited the Capitol. *See id.* at 691. Still, the *Van Orden* Court took pains to distinguish the monument display at the Texas Capitol from the school poster display in *Stone*, which was decidedly *not passive* because "the text [of the Ten Commandments] confronted elementary school students every day." *Id.*

Finally, over the past decade or so, the Supreme Court has presided over a few more Establishment Clause cases—though, again, none have involved public-school religious displays. In *Town of Greece v. Galloway*, 572 U.S. 565 (2014), the Court found constitutional a town council's practice of opening monthly board meetings with a prayer. Viewing the practice "against the backdrop of histor[y]," the Court opined that "legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' at the opening of this Court's sessions." *Id.* at 587. Because town citizens were free to leave board meetings if they "would rather not hear" the prayer, there was no worry that the government was "engag[ing] in impermissible coercion." *Id.* at 590. By contrast, such a worry *would have been* justified, according to the *Town of Greece* Court, if the prayer practice had been imposed in the public schools,

13

where students have no meaningful opportunity to "free[ly] . . . enter and leave." *Id.* at 590 (quoting *Lee*, 505 U.S. at 597).

Just three years ago, the Court's ruling in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022)—another prayer case—solidified the need for in-depth inquiry into historical practices and understandings when evaluating certain Establishment Clause cases. *Kennedy* involved a school district's decision to suspend a football coach for kneeling in personal prayer on the field after several football games. *Id.* at 512–14. He brought a Free Exercise claim against the district, arguing that it had suppressed his personal right to engage in private religious speech. The district defended itself by claiming that Coach Kennedy's prayers qualified as government speech that implicated the Establishment Clause. *Id.* at 532.

Justice Gorsuch, writing for the majority, blamed the so-called "*Lemon* test," derived from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), for producing "mistaken[ ]" and "misguided" results—like Coach Kennedy's suspension. *Kennedy*, 597 U.S. at 514. The *Lemon* approach "called for an examination of a law's purposes, effects, and potential for entanglement with religion." *Id.* at 534 (citing *Lemon*, 403 U.S. at 612–13). But in Coach Kennedy's case, there was no law at issue, so the *Lemon* test was not very helpful in analyzing whether his spoken prayers and religious practice qualified as government speech. "An Establishment Clause violation does not automatically follow whenever a public school or other government entity fails to censor private religious speech." *Kennedy*, 597 U.S. at 534–35 (cleaned up). The Court remarked that it was appropriate to abandon the *Lemon* test and focus instead on evaluating challenged

14

religious speech "by 'reference to historical practices and understandings.'" *Id.* at 535 (quoting *Town of Greece*, 572 U.S. at 576). Given the long constitutional tradition of tolerating state actors' diverse expressive activities, including demonstrative religious speech, Coach Kennedy's prayers on the field did not violate the Establishment Clause. *See id.* at 540–41.

Despite the *Kennedy* Court's rather sweeping announcement that the *Lemon* test had been "abandoned," *id.* at 534, there is no cause to believe that all Supreme Court precedent that relied on the *Lemon* test has been—or will be—overruled. The *Kennedy* opinion itself makes that crystal clear. *Kennedy* cited two public-school Establishment Clause cases, *Lee v. Weisman* and *Santa Fe Independent School District v. Doe*—both of which applied the *Lemon* test—and treated them as still-binding precedent. *See id.* at 541. In fact, Justice Gorsuch made a point of distinguishing *Lee* and *Santa Fe* from the "very different" facts in *Kennedy*, *id.* at 541; *Lee* and *Santa Fe* involved "problematically coercive" religious practices that had been imposed upon students and "compelled [their] attendance and participation," *id.* at 541–42. It follows that if *Lee* and *Santa Fe* are still good law per the Supreme Court, then so are the other public-school Establishment Clause cases that struck down "problematically coercive" state laws—like *Stone*.

## III.  DISCUSSION

### A.  Preliminary Matters: Standing and Ripeness

The School Districts and the State move to dismiss Plaintiffs' Complaint on the grounds that their claims of imminent injury are merely speculative or hypothetical, which renders the suit premature or "unripe" for judicial review. *See* Docs. 49 & 52. The purpose

of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "It is well settled that the ripeness inquiry requires the examination of both 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar*, 345 F.3d 570, 572–73 (8th Cir. 2003) (quoting *Abbott Labs.*, 387 U.S. at 149). "A party seeking judicial relief must necessarily satisfy both prongs to at least a minimal degree." *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000).

Related to the concept of ripeness is that of standing. Plaintiffs who file suit in federal court must establish they have standing to sue, which requires proof of: (1) an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent," that is (2) "fairly . . . traceable to the challenged action of the defendants" and (3) "likely, as opposed to merely speculative" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). In assessing standing at the preliminary injunction stage, the Court must assume that "the complaint's allegations are true and view[ ] them in the light most favorable to the plaintiff[s]." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022). In addition, the Court may consider matters outside the pleadings, including undisputed facts evidenced in the record. *See Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008)

16

The School Districts and State raise three arguments concerning ripeness and standing. First, they question whether Plaintiffs' alleged constitutional injuries are certainly impending in view of the fact that Act 573 only requires the Ten Commandments to be displayed *if* displays (or money to buy displays) are donated. Second, they contend that Plaintiffs' injuries are too speculative to warrant relief when the content and surrounding context of the Ten Commandments displays are not yet known. And third, the State maintains that Plaintiffs will not be injured because the displays are merely "passive"— like the stone monument in *Van Orden*, 545 U.S. at 691—and will not burden their constitutional rights. The Court addresses each argument in turn.

### 1. Contingent Private Funding of Ten Commandments Displays

The District Superintendents argue that since their compliance with the Act is entirely dependent on voluntary contributions, Plaintiffs' likelihood of injury is too speculative for their claims to be ripe for judicial review. However, on August 1, 2025, Fayetteville School District 1 received *hundreds* of donated Ten Commandments posters. *See* Doc. 70.[6] And other evidence of record, summarized below, shows it is substantially likely that the Districts will soon receive enough posters for every classroom:[7]

- During the preliminary injunction hearing on July 18, the Court received unrebutted evidence about the State's 2017 effort to display posters bearing the national motto "In God We Trust" in all public-school classrooms. These posters were also funded exclusively through private donations, and it is undisputed that the day after the law went into effect, the Districts received enough donations to furnish *every single*

---

[6] The Districts attached a photograph of one of these posters. *See* Doc. 70, p. 4. Notably, only "I am the Lord thy God" is conspicuously centered under the title, while the rest of the commandments follow along the left margin.

[7] The Districts agree they will immediately display the posters they receive.

*classroom* with a poster. This is powerful evidence that the Ten Commandments are very likely to be donated to the Districts once Act 573 goes into effect.

- Senator Jim Dotson, the Act's lead legislative sponsor, explained in an interview: "There are so many organizations working right now to implement this law as far as a project to help volunteer and pay for the displays in schools. . . . Many of these organizations will be contributing posters, and since they haven't existed for the last 40–50 years, there will be many attempts to come up with designs and posters that fit the parameters of the law, and as those are released over the next month— through organizations like [Million Voices]—people can begin to go and contribute to that effort, and even sponsor their own local public buildings and schools." (Doc. 58-1, pp. 37–41).

- Certain organizations, like Million Voices and its partner organization Restore American Schools, have already launched an organized campaign to ensure that the Ten Commandments displays are posted in Arkansas classrooms. *See id.* at pp. 42–52.

- Million Voices estimates that a $30 donation is sufficient to fund the "printing and delivery of Ten Commandments posters" for an entire school, at a cost of merely $1 per classroom. *See id.* at pp. 58–60. The donation website features buttons supporters can click to instantly donate $30 for 30 classrooms, $60 for 60 classrooms, $150 for 150 classrooms, $300 for 300, or $1,000 for 33 schools. *Id.* at p. 60. Further, the website specifies the deadline to contribute is August 5—the day Act 573 goes into effect. *See id.* at p. 71.

- A group of Arkansas clergy and other advocates started a campaign to "mak[e] sure that Ten Commandments are posted in Arkansas K-12 . . . classrooms." The group is convening a "strategy session and conference to advance the Biblical laws," and set a "goal of registration from all 75 Arkansas counties during the first 10 days in July." *Id.* at pp. 82–111.

- Engaged Ministries Church in Lowell, Arkansas, has been raising funds online (in partnership with Restore American Schools) to purchase Ten Commandments posters to deliver to the eighty-two schools within a fifteen-mile radius of the Church. *See* Docs. 69, 69-1. A $30 donation will fund 30 posters and "get the Word of God back in our schools" to "move the needle for His Kingdom." (Doc. 69-2).

At the motion hearing, the Court received a stipulation that there are 4,019 classrooms across the four Districts. Neither the Districts nor the State submitted any evidence to dispute Plaintiffs' estimated cost-per-poster of $1, which means the total cost

to supply every classroom in the four Districts with a Ten Commandments poster would only be $4,019. This *de minimis* amount is not only likely but *extremely* likely to be raised once Act 573 goes into effect. Therefore, the Court is satisfied that the private-donation requirement of Act 573 does not render this dispute unripe for judicial review.

### 2. "Unknown" Content and Context of Displays

The State maintains that the exact content of the Ten Commandments displays is, as yet, unknown, which means Plaintiffs cannot reasonably predict the nature and extent of any alleged injury to their constitutional rights; they must wait until the posters appear on the walls. This argument is disingenuous. Act 573 mandates the exact text to be used in all displays, the minimum size of the displays, and the requirement that the text be large enough to be visible from anywhere in the classroom. The "unknowns" the State speaks of include the fact that displays *could be larger* than the minimum size or contain extra subject matter of a "historical" nature. Yet the State fails to explain how bigger posters could cause less injury, and it has no idea the sorts of "historical facts" that could be added to the approved text to *mitigate* Plaintiffs' injuries.[8]

With respect to the +possibility of added "context," the State similarly offers no specifics, instead suggesting vaguely that the Ten Commandments could be hung near other posters—presumably with purely secular content—to mitigate the religious burden

---

[8] In fact, when the Court pressed the State during oral argument for examples of extra historical content, counsel agreed that adding a drawing of Moses holding the Ten Commandments in his arms on Mount Sinai would qualify as "historical." Certainly, the State cannot argue that such an addition would mitigate the injury.

Plaintiffs contend they will face.[9] However, the reason why the possible added content and surrounding context of the displays is immaterial to the standing inquiry is because Plaintiffs' claimed injuries—which the Court will discuss in greater detail below—depend only on the *minimum* display requirements of Act 573, i.e., the text of the Ten Commandments selected by the State. The Supreme Court's recent decision in *Mahmoud v. Taylor* supports Plaintiffs' argument that there is no need to "wait and see the context" before seeking a preliminary injunction. 145 S. Ct. at 2358. In *Mahmoud*, the parents of public-school children alleged that a school district's inclusion of certain children's books in the English curriculum, along with the inability of their children to "opt out" from that curriculum, unconstitutionally burdened their religious exercise under the First Amendment. *Id.* at 2342. The *Mahmoud* Court held that the plaintiffs were entitled to a preliminary injunction despite the parents' inability to allege "*how* a particular book was used or is planned for use at a particular time." *Id.* at 2358 (emphasis added). The Court criticized the Fourth Circuit for "fault[ing] the parents for failing to make specific allegations

---

[9] The State offers no examples of mitigating context either. Perhaps the State imagines that in a math classroom, the surrounding context of equations would be mitigating? Or in a French classroom, photographs of the Eiffel Tower and French greetings would be mitigating? Such speculation is pointless.

Furthermore, it is telling that the State's asserted secular purpose for displaying the Ten Commandments is to teach schoolchildren about the "historical significance of the Ten Commandments to our Nation's history, legal system, and education," (Doc. 52, p. 35); yet the State has never mandated the display of *any* foundational secular documents of unquestionable importance to our Nation's heritage—such as the Declaration of Independence or the Constitution. Those historic documents need not be displayed. The only items Arkansas believes a child must see every day in school to convey a proper sense of this Nation's rich history are: (1) a poster with the words "In God We Trust" and (2) a poster of the Ten Commandments.

describing how the books are actually being used in classrooms." *Id.* Further, the *Mahmoud* Court noted—as relevant here—that it is "not realistic to expect parents to rely on after-the-fact reports by their young children to determine whether the parents' free exercise rights have been burdened." *Id.*

Moreover, it is evident that Plaintiffs have standing to sue in view of other factually analogous Supreme Court precedent. *See, e.g.*, *Lee*, 505 U.S. at 584 (affirming Jewish parent's standing to challenge future graduation invocations based on student's enrollment in high school and likelihood that her graduation would include a prayer); *Schempp*, 374 U.S. at 224 n.9 (affirming atheist and Unitarian families' standing to challenge law requiring Bible and the Lord's Prayer to be read aloud at the start of the public-school day); *Stone*, 449 U.S. 39 (1980) (adjudicating claims of parents who stood in the same position as Plaintiffs with respect to their facial challenge to a materially identical Kentucky law).

### 3. Ten Commandments Displays Not Merely "Passive"

The State's last, and, frankly, most intellectually dishonest argument as to standing is that Act 573 mandates only "passive" displays which invite no student participation. As a result, the displays cannot possibly burden Plaintiffs' religious rights. The State's authority for claiming its Ten Commandments displays are merely passive is the Supreme Court's *Van Orden* decision, which, as described above, found that a stone monument of the Ten Commandments on the grounds of the Texas State Capitol was a "passive" display. 545 U.S. at 691. The State disingenuously omits from its discussion the fact that *Van Orden* explicitly distinguished its holding from that of *Stone*—the public-school Ten

21

Commandments case. *See id.* ("The placement of the Ten Commandments monument on the Texas State Capitol grounds *is a far more passive use of those texts* than was the case in *Stone,* where the text confronted elementary school students every day." (emphasis added)). The State also fails to cite the portion of the *Van Orden* order that recognizes that a stone monument on the grounds of the Texas Capitol "is . . . also quite different from the prayers involved in *Schempp* and *Lee*," both of which involved the public-school context. *Id.*

The State in its briefing made a weak attempt to distinguish the spoken prayers broadcast over the school intercom in *Schempp*, 374 U.S. at 207–08, from Act 573's Ten Commandments displays. According to the State, hanging a copy of the Ten Commandments on a classroom wall is not "a religious *practice* or *activity* that invites participation"; it is merely a "non-participatory *display*" that imposes no constitutional burden. (Doc. 65, p. 8) (emphasis in original). During oral argument, the Court questioned why a *written* display of scripture was less burdensome than a *spoken* prayer. After all, the State surely expects that the Commandments will actually be read by students. The Court also questioned the State's counsel about whether a 16"x20" poster featuring the Lord's Prayer—instead of the Ten Commandments—would be similarly passive, and counsel flatly refused to engage, pleading that the analysis was too "fact intensive" and that "context matters." (Doc. 68, pp. 262–63 (Hrng. Transcript)). The Court also wondered aloud during oral argument whether displaying a crucifix on every classroom wall would

be passive (and constitutional) under the State's logic. Once again, the State refused to engage.[10]

The State agrees that the Ten Commandments are a religious document lifted from Judeo-Christian scripture and that some of the Commandments concern the religious duties of believers, rather than merely secular matters. Plaintiffs affirm in their declarations that they will suffer personal spiritual offense as a result of the posting of the Ten Commandments mandated by Act 573. Plaintiffs are not just bystanders to religious practice who fail to allege personal injury; their grievances are not of the "generalized offense" variety. The child-Plaintiffs claim they will be subjected to a state-mandated, religiously preferential version of the Ten Commandments in every classroom for the remainder of their elementary and secondary public-school education. According to the Complaint, which the Court must accept as true at this stage of the litigation, the displays will: (1) substantially burden the parent-Plaintiffs' religious exercise by usurping their parental authority to direct their children's religious upbringing and education; (2) forcibly subject their children to religious doctrine and beliefs in a manner that conflicts with the families' own religious beliefs and practices; (3) send a message to their children that they do not belong in their own school community because they do not subscribe to the State's preferred religious doctrine; and (4) religiously coerce their children by pressuring them

---

[10] Though the crucifix hypothetical may go too far, the Lord's Prayer hypothetical does not, given the State's broad claim that displaying Christian scripture in public schools is unobjectionable—apparently because some of the Founding Fathers were Christian.

23

to observe, meditate on, venerate, and follow the State's favored religious text, and to suppress expression of their own religious beliefs and backgrounds at school.

Contrary to the State's contention, the Ten Commandments are not passive because students in public schools are forced to engage with them and cannot look away. *See Mahmoud*, 145 S. Ct. at 2357 (Alito, J.) ("The government's operation of the public schools . . . implicates direct, coercive interactions between the State and its young residents. The public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct."). Therefore, Plaintiffs have standing to assert their Establishment Clause and Free Exercise Claims. The Districts' and the State's Motions to Dismiss (Docs. 49 & 52) are **DENIED**. Plaintiffs' claims are ripe for the reasons stated.

## B. Preliminary Injunction

In determining whether to grant Plaintiffs' Motion for Preliminary Injunction, the Court must weigh the following four considerations: (1) the threat of irreparable harm to Plaintiffs; (2) their likelihood of success on the merits; (3) the balance between the harm Plaintiffs will suffer if the injunction is denied versus the harm the Districts and State will suffer if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citation modified). The Court therefore begins with that factor.

### 1.  Likelihood of Success on the Merits

#### a.  Establishment Clause

##### i. *Stone v. Graham*

This case begins and ends with *Stone*, a Supreme Court decision from 1980 that analyzed a law almost identical to the one before this Court and found that it violated the Establishment Clause. The Court already discussed why *Kennedy v. Bremerton School District* sought to root out the *Lemon* test's undesirable effect of "singl[ing] out private religious speech for special disfavor." 597 U.S. at 514. But *Kennedy* did not overrule any public-school Establishment Clause cases involving a state's or school district's imposition of religious doctrine or practices on public-school children. *See supra*, Section II.C. *Kennedy* does not alter the reasoning and outcome of *Stone*—or even mention the case. The *Kennedy* Court explicitly acknowledged that state-mandated religious displays and practices in the public-school setting are subject to special treatment because public-school children are a captive audience. 597 U.S. at 541–42. And as *Stone* explains, posting the Ten Commandments on a classroom wall "serves no . . . educational function." 449 U.S. at 42.

When the Court suggested during oral argument that the likely purpose of Act 573 is to promote children's moral development, the State's counsel disagreed and countered that the purpose of a law can only be gleaned from the text itself. Counsel then suggested that Act 573's purpose is to display a "historical representation of the Ten Commandments." Act 573 at § (a)(1)(B)(i)–(iii). But the historical representation is only the *context* in which the display must be presented, not the legislative *purpose* for posting

25

this religious text.[11] And it is not credible that the State's purpose for displaying the Ten Commandments is merely *to display it*. Nor is it likely that the State's purpose is to teach history to children, since no contextualizing historical statement is mandated, and the State emphasizes that "Act 573 does not require any teaching . . . about the Ten Commandments." (Doc. 53, p. 47). Rather, as in *Stone*, the Arkansas General Assembly's purpose is "to induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." 449 U.S. at 42. That is illegal. Therefore, Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.

### ii. *Kennedy*'s Historical Practices and Understandings Test

Even if *Stone* did not control, Act 573 would still violate the Establishment Clause under *Kennedy*'s historical practices and understandings test. 597 U.S. at 535–36. The Eighth Circuit suggests that in applying this test, courts should ask: "First, what do historical practices indicate about the constitutionality of [the relevant practice]. Second, is the [practice] impermissibly coercive?" *New Doe Child #1 v. United States*, 901 F.3d 1015, 1021 (8th Cir. 2018).

During the preliminary injunction hearing, Plaintiffs called expert witness Dr. Steven K. Green, to testify about: (1) the Founding Fathers' conceptions of the First Amendment's Religion Clauses, (2) whether the Ten Commandments formed the basis of the U.S. legal system or government, and (3) whether the historical record shows a longstanding, widespread tradition of displaying the Ten Commandments permanently in

---

[11] Though counsel shied away from verifying the moral and religious purpose or the Act, the State's legislators did not. *See* Doc. 2, ¶¶ 59–62.

public-school classrooms. His testimony mirrored his expert report (Doc. 8-12), which the Court received into evidence. Furthermore, Dr. Green's background and qualifications as a scholar of law, religion, and history, and, in particular, religion's historical role in the development and operation of public schooling, were never challenged by the State. *See also* Doc. 64 (Order Denying State's Motion to Exclude Expert). His testimony on these subjects was thorough, compelling, and uncontroverted by any State evidence. Indeed, the State called no expert witness[12] even though, under its interpretation of *Kennedy*, its defense of Act 573 hangs on whether historical practices and understandings justify the Act's existence.[13]  Accordingly, the Court finds Dr. Green's testimony credible and his approach consistent with the methodology used by professional historians.

His conclusions are summarized as follows:

- The Religion Clauses of the First Amendment were rooted in the Founders' profound concerns for protecting the conscience of individuals and religious communities against all forms of coercion; avoiding official denominational discrimination and preferences, including the official promotion of religious doctrine; and preventing the religious divisiveness that flows from government favoritism of some religions over others or non-religion.

---

[12] The Court granted Professor Mark David Hall leave to file an *amicus curiae* brief (Doc. 57-1), but he was not identified as an expert and his brief was not considered for evidentiary purposes. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 642 n.11 (2021).

[13] The State cites only caselaw, rather than historical sources, to support its argument that posting the Ten Commandments on classroom walls is consistent with historical practices and does not violate the Establishment Clause. *See, e.g.*, Doc. 53, pp. 36–41. The State also attached to its Motion to Dismiss a collection of newspaper articles and a declaration (Doc. 52-3) submitted by Principal Deputy Solicitor General for the State of Louisiana Zachary Faircloth—concerning a different case and a different Ten Commandments law. The Court does not know what to make of the newspaper articles or Mr. Faircloth's affidavit. Suffice it to say that the only credible evidence of record in this case that explains the relevant historical practices was supplied by Dr. Green.

- The historical record demonstrates that the Declaration of Independence, the U.S. Constitution, and the Bill of Rights—the three primary founding documents establishing the American government and legal system—and the legal system more generally, were not based on the Ten Commandments.

- There is no evidence of a longstanding historical practice of widespread, permanent displays of the Ten Commandments in public-school classrooms.

- The version of the Ten Commandments adopted under Act 573 is derived from the King James Bible and is thus sect-specific.[14]

With respect to the first part of the historical practices and understandings test, Act 573's mandate is incompatible with the Founding Fathers' conception of religious liberty. The Founders were deeply committed to the principle that government must not compel religious observance or endorse religious doctrine, and that commitment is reflected in multiple foundational texts, such as the Declaration of Independence and the Virginia Statute for Religious Freedom, both of which were authored by Thomas Jefferson. (Doc.

---

[14] The State asserted in its briefing and throughout oral argument that the approved text of the Ten Commandments is "non-sectarian"—without citing to any factual support. By contrast, Dr. Green established through reference to the historical record why the opposite is true. *See* Doc. 8-12, ¶¶ 53–58. The King James version of the Ten Commandments in Act 573 differs from other Protestant, Catholic, and Jewish versions, and those differences have substantial theological implications, according to Dr. Green. Furthermore, Plaintiffs who believe in the Ten Commandments have identified in their declarations various ways in which the text mandated by Act 573 is distinctly Christian and in conflict with their beliefs.

It is still not clear to the Court what the State means by labeling its translation "non-sectarian." During oral argument, counsel for the State seemed to use the term to mean "generally unobjectionable"—and that is certainly not true. The State also falsely labeled the text as "not align[ed] with any faith tradition." (Doc. 53, p. 35). Even if it were possible to create a completely non-sectarian version of scripture that all Christians and Jews could agree on, *it would still be Judeo-Christian scripture*, which atheists, agnostics, and those of various other religious traditions do not believe.

8-12, ¶ 22 (Green Rep.)). Indeed, Jefferson and the Enlightenment writers on whom he relied made a point of differentiating between natural law and Old Testament law; the Declaration itself proclaims that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed." *Id.* at ¶ 33. Moreover, James Madison's *Memorial and Remonstrance Against Religious Assessments*, which he wrote in 1785, expressed his vehement opposition to government support for religious instruction. *Id.* at ¶ 22. Madison wrote: "The religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right." *Memorial and Remonstrance Against Religious Assessments*.

There is also insufficient evidence of a broader tradition of using the Ten Commandments in public education, and there is no tradition of permanently displaying the Ten Commandments in public-school classrooms. *See id.* at ¶¶ 38, 47. Public schools did not exist at the time of the Founding. Back then, education occurred in private academies or through tutors, and it generally incorporated a strong religious component because tutors were mostly composed of local clergy. *Id.* at ¶ 38. As the nineteenth century drew to a close, fewer and fewer public schools were engaging in any religious practices. *Id.* at ¶ 42. And the first state law permitting public schools to hang the Ten Commandments was not passed until 1927—and immediately struck down. *See id.* at ¶ 50 (citing *Ring v. Grand Forks Pub. Sch. Dist.*, 483 F. Supp. 272 (D. N.D. 1980)).

The second part of the historical practices and understandings test asks whether evidence suggests that displaying the Ten Commandments in the manner mandated by

Act 573 will be religiously coercive. In *Kennedy*, the majority expressly affirmed that it remains "problematically coercive" for public schools to impose religious messages on a "captive audience" of students. 507 U.S. at 541–42 (citing *Lee*, 505 U.S. at 580, 598, and *Santa Fe*, 530 U.S. at 294, 311). And less than two months ago, the Supreme Court again "recognized the potentially coercive nature of classroom instruction" in public schools. *Mahmoud*, 146 S. Ct. at 2355. Coercion is rife in such an environment "because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)). In addition, "mandatory attendance requirements," *id.*, create a legal "obligation" for parents "to send their children to public school unless they find an adequate substitute." *Mahmoud*, 145 S. Ct. at 2359 (discussing Maryland's compulsory-education laws). As a result, "'[t]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'" *Id.* at 2355 (quoting *Lee*, 505 U.S. at 592). Indeed, "[t]hat is why a religious practice may be deemed unconstitutional in the 'special context of the public elementary and secondary school system,' but deemed constitutional elsewhere." *Roake*, 2025 WL 1719978, at *13 (quoting *Edwards*, 482 U.S. at 583).

Once students are at school, staff control their movements and often their expression. Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. This is especially true in the classroom context. Therefore, the Court finds that the second part of the historical practices and

understandings test has been satisfied, and Act 573 would be unconstitutional even if *Stone* were not binding law.[15]

### b.  Free Exercise Clause

"A plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (citation modified). Where a plaintiff makes this showing, courts must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.*

Act 573 is not neutral with respect to religion. By design, and on its face, the statute mandates the display of expressly religious scripture in every public-school classroom and library. The Act also requires that a specific version of that scripture be used, one that the uncontroverted evidence in this case shows is associated with Protestantism and is exclusionary of other faiths. "[T]he government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the

---

[15] The State's attempt to equate attendance at a public school and the Act's required classroom displays of the Ten Commandments with "children attend[ing] . . . town meetings," "legislative prayers," and the appearance of "In God We Trust" on currency, is unavailing. *See* Doc. 53, p. 43 (citing *Town of Greece*, 572 U.S. at 591, and *New Doe Child #1*, 901 F.3d at 1023–24, 1027).

Free Exercise Clause." *McCreary*, 545 U.S. at 875–76. Act 573 is likely to burden Plaintiffs' exercise of their sincere religious or nonreligious beliefs in substantial ways.

First, the displays are likely to interfere with and usurp the fundamental rights of the parent-Plaintiffs "as contrasted with that of the State, to guide the religious future . . . of their children." *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Second, the displays are likely to send an exclusionary and spiritually burdensome message to the child-Plaintiffs—who do not subscribe to the state-approved version of the Ten Commandments—that they are outsiders who do not belong in their own school community. *See Santa Fe*, 530 U.S. at 309 (observing that school sponsorship of a religious message causes members of other faiths to feel "that they are outsiders, not full members of the political community'" (citation modified)). Third, the displays are likely to pressure the child-Plaintiffs into religious observance, meditation on, veneration, and adoption of the State's favored religious scripture, and into suppressing expression of their own religious or nonreligious backgrounds and beliefs while at school.

These impositions on Plaintiffs' religious beliefs and practices cannot be sustained under strict scrutiny. The State has not established that burdening Plaintiffs' Free Exercise rights "serve[s] a compelling interest and [is] narrowly tailored to that end." *See Kennedy*, 597 U.S. at 532. Even if the State were to meet its burden of showing a compelling interest, it would fail the "narrowly tailored" prong. There are many ways in which students could be taught the relevant history of the Ten Commandments without the State approving an official version of scripture and then displaying it to students in every classroom on a permanent, daily basis. For example, the Ten Commandments

might be taught "objectively as part of a secular program of education," *Schempp*, 374 U.S. at 225, through "an appropriate study of history, civilization, ethics, comparative religion, or the like," *Stone*, 449 U.S. at 42. The State has made no effort to do this, nor has it attempted to limit the Ten Commandments' use to relevant course curricula, such as civics or world religious studies. Instead, the State has mandated posting the Commandments in every classroom—even in gym class.

### 2.  Other Preliminary Injunction Factors

Now that the Court has concluded that Act 573 is likely to violate Plaintiffs' Establishment and Free Exercise rights and be held unconstitutional as a matter of law, the remaining preliminary injunction factors are presumed to weigh in their favor, as well. "Loss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And the balance of the equities and public interest favor Plaintiffs, given the likelihood of the infringement of their First Amendment rights. Conversely, the Districts and State have failed to demonstrate they will suffer any harm if the preliminary injunction is granted.

### 3.  Scope of Relief

The last issue to decide is the scope of injunctive relief. In the State's briefing, it asked the Court to limit the injunction to Plaintiffs' specific classrooms and libraries. At the hearing, after questioning by the Court, counsel for the State conceded that this request was not feasible, as it ignored the realities of students' day-to-day lives at school, their participation in school events and activities district-wide, and their advancement in

33

the school system over the course of their public-school education. There is evidence in the record[16] that children regularly move between classrooms within schools, attend programs and activities in other schools within their district, and progress from elementary, to middle, to high school. It is not feasible to grant relief on a classroom-by-classroom, or even an intra-district, school-by-school basis. Attempting to do so would put child-Plaintiffs at risk of repeated, accidental impositions of the Act's scriptural displays due to the impracticalities of implementing such an injunction. Additionally, limiting the relief, as requested by the State, would impermissibly stigmatize the minority-faith and child-Plaintiffs, thereby compounding the violation of their religious-freedom rights.

## IV.  CONCLUSION

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 8) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 65(a), all Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other

---

[16] The evidence referred to here is Plaintiffs' Hearing Exhibits 13L–13U. These are photocopies of pages from the Districts' websites. They illustrate various District-wide events—such as student club meetings, graduation activities, and competitions for quiz bowl, robotics, and orchestra. The State does not object to the authenticity of the exhibits; the parties are in agreement that these pages actually appear on the Districts' websites. Rather, the State's objection to these Exhibits is that there is no proof that any of the parent- or child-Plaintiffs participate or participated in any of the activities mentioned in the Exhibits. The objection is overruled. Plaintiffs' purpose in introducing these Exhibits is to illustrate the fact—which the State does not dispute—that students who attend schools in the Districts must occasionally travel from school to school to participate in both mandatory and voluntary school-related activities. Therefore, restricting the scope of a preliminary injunction to just the individual child-Plaintiffs' classrooms or schools is unlikely to avoid constitutional injury. The least restrictive remedy that protects Plaintiffs from unexpected constitutional injury is to grant relief District-wide.

ER

persons or entities in active concert or privity or participation with them, are **PRELIMINARILY ENJOINED** from complying with Act 573 of 2025 by displaying the Ten Commandments in public elementary- and secondary-school classrooms and libraries in Fayetteville School District No. 1, Springdale School District No. 50, Bentonville School District No. 6, and Siloam Springs School Dist. No. 21, pending a final disposition of the issues on the merits.

      **IT IS SO ORDERED** on this 4th day of August, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE