**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**SAMANTHA STINSON** *et al.*                                   **PLAINTIFFS**

**V.**                          **CASE NO. 5:25-CV-5127**

**FAYETTEVILLE SCHOOL DISTRICT NO. 1** *et al.*                 **DEFENDANTS**

**AND**

**STATE OF ARKANSAS** *ex rel.* **TIM GRIFFIN,**
**ATTORNEY GENERAL**                                           **INTERVENOR**

<u>**MEMORANDUM OPINION AND ORDER**</u>

<u>**TABLE OF CONTENTS**</u>

I. INTRODUCTION ................................................................................................ 2

II. BACKGROUND ............................................................................................... 3

III. LEGAL STANDARD ....................................................................................... 8

IV. DISCUSSION.................................................................................................. 9

   A. Standing ...................................................................................................... 9

      *1. Original Plaintiffs* ................................................................................... 9

      *2. New Plaintiffs* ...................................................................................... 11

   B. Ripeness ................................................................................................... 12

   C. Merits Claims ............................................................................................ 15

      *1. Establishment Clause* ........................................................................ 15

      *2. Free Exercise Clause*......................................................................... 22

   D. Irreparable Harm, Balance of the Equities, and the Public Interest ............... 25

   E. Scope of Relief.......................................................................................... 25

V. CONCLUSION................................................................................................ 26

*Who does not see that the same authority which can establish Christianity,
in exclusion of all other Religions, may establish with the same ease
any particular sect of Christians, in exclusion of all other Sects?*

James Madison, *Memorial and Remonstrance against Religious Assessments* (1785)

## I.     INTRODUCTION

On August 4, 2025, this Court preliminarily enjoined four Arkansas public-school districts from complying with Arkansas Act 573 of 2025, a law that requires each elementary and secondary school in the State to "prominently display" in every "library and classroom" a poster measuring at least 16" x 20" bearing the State's approved text of the Ten Commandments. Act 573 §§ (a)(1)–(2). The Court found at the preliminary injunction stage of the proceedings that Act 573 was likely to violate Plaintiffs' Establishment and Free Exercise rights under the First Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment. The Constitution prohibits states from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, XIV.

On August 5, 2025, the day after the Court entered its preliminary injunction, Act 573 went into effect statewide. Four school districts were preliminarily enjoined, but the rest were not. Several unenjoined districts hung Ten Commandments posters in their classrooms, and parents and students from two of those districts were added to the existing lawsuit. Now, a total of six Arkansas school districts have been preliminarily enjoined.

The State took an interlocutory appeal of the preliminary injunction order. In the meantime, the parties completed approximately four months of discovery followed by

2

merits briefing. So, "with little additional effort," the Court's resolution of their Cross-Motions for Summary Judgment (Docs. 164 & 168) will present the Eighth Circuit with "one appeal instead of two" and "a final resolution of the case instead of a provisional one." *W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1229 (8th Cir. 2019). For the reasons explained below, Plaintiffs' Motion is **GRANTED**, the State's Motion is **DENIED**, and Defendants are **PERMANENTLY ENJOINED** from complying with Act 573.

## II.     FACTUAL BACKGROUND

On April 14, 2025, the Arkansas Legislature passed Act 573, which amends and expands Arkansas Code § 1-4-133 to require all public schools in the state to display the Ten Commandments. Each classroom display must contain the following "historical representation of the Ten Commandments" derived from the Protestant King James Bible:

The Ten Commandments
I am the Lord thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother, that thy days may be long upon the land
which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his
maidservant, nor his cattle, nor anything that is thy neighbor's.

Act 573 § (a)(1)(B)(i)–(iii). The text must be "legible to a person with average vision from anywhere in the room" and be "prominently display[ed]" in a "conspicuous place" in every

3

"elementary and secondary school library and classroom." *Id.* § (a)(1)–(2). All displays must be donated or purchased with private funds. *Id.* § (b).

Thirteen parents, individually and on behalf of their minor children, sued the Fayetteville, Springdale, Bentonville, Siloam Springs, Conway, and Lakeside School Districts to enjoin them from enforcing Act 573. They contend the law's requirements violate the Establishment Clause and burden their sincere religious practice under the Free Exercise Clause. Below is a summary of their claims:

**Samantha and Jonathan Stinson** are parents to A.R.S. and A.W.S., who are students in the **Fayetteville School District**. The Stinsons are raising their children in the Jewish faith, and it is important to them that their children practice Judaism. *See* Doc. 164-13, p. 62 (S. Stinson Dep.). They "assume responsibility" for their children's religious education and believe strongly that no religion should be introduced to school children, except perhaps "in later high school years" through an elective class discussing it in a historical context. *Id.* at pp. 66–67. The version of the Ten Commandments mandated in Act 573 is not the same as the version taught in the Stinsons' synagogue; they identify the State-approved wording as a "Protestant version" of the Ten Commandments. *Id.* at p. 44. There are many differences between the wording of the Commandments selected by the State and the wording embraced by Jewish believers. For example, Ms. Stinson explains that Jews do not assign God a gender and, therefore, would never use the word "Lord" in the Ten Commandments—yet "Lord" appears in the State-approved version. *Id.* The Stinsons also believe that if their schools complied with Act 573, A.R.S. and A.W.S. would feel pressure "to suppress their Jewish faith while in school to avoid being perceived as different by their peers and school staff merely because they are not part of the majority religion." (Doc. 8-2, ¶ 15 (S. Stinson Decl.)).

**Joseph Armendariz** is a parent to M.A. and W.A., who are students in the **Fayetteville School District**. Mr. Armendariz is a Unitarian Universalist and is raising his children in that faith. According to Mr. Armendariz, his religion "does not impose such religious dictates [as the Ten Commandments] on children or anyone, in part, because an authoritative assertion that one specific scripture or religious dogma is 'correct' would impede the ability to conduct a free and responsible inquiry for the truth,'" which is vital to the Unitarian Universalist faith. (Doc. 8-5, ¶ 10 (Armendariz Decl.)). In his view, displaying the Ten Commandments in class transforms them into

"instruction[s]" for the children to follow, akin to "district-required knowledge." (Doc. 164-5, p. 24 (Armendariz Dep.)). Mr. Armendariz sees the text as an "inherently religious" "list of rules from one particular religion" that he does not follow. *Id.* at pp. 24, 39–40. Furthermore, he is concerned about "expos[ing] elementary-aged students" to mature concepts in the Ten Commandments, like "adultery" and "covet[ing]." *Id.* at p. 39. It "would make [him] feel very uncomfortable" if he were forced to engage in such discussions with his children "before [he and his spouse] decided, as their parents, that they're ready to understand something like that." *Id.*

**Talara and Shane Taylor** are parents to K.T. and M.T., who are students in the **Springdale School District**. Mrs. Taylor is a Humanist and an atheist who also follows Native American spiritual traditions. *See* Doc. 164-7, pp. 13–15 (T. Taylor Dep.). Mr. Taylor shares aspects of those identities with his wife but does not ascribe to "any particular set of beliefs." (Doc.164-16, p. 8 (S. Taylor Dep.)). Mrs. Taylor testified that her children would view the Ten Commandments displayed in their classrooms as religious rules they must follow. *See* Doc. 164-7, p. 27 (T. Taylor Dep.). The Taylors object to the government "sponsoring one religion and . . . from a place of authority . . . forcing [their] children to read [the Ten Commandments] every day." *Id.* at p. 9. In their view, the displays mandated by Act 573 are "exclusionary and forceful of a religious indoctrination of [their] children." *Id.* at p. 26. The Ten Commandments' message conflicts with what they are teaching their children "about all religions" and how no one religion is "better or worse than the other." *Id.* at p. 17. They worry that if Act 573 is made effective in their school district, their children will "be bullied and feel like they have to believe in what our government is sponsoring." *Id.* at p. 25.

**April Christine and Kyle Berry** are parents to children K.B. and C.B., who are students in the **Conway School District**. Mr. and Mrs. Berry are Methodists and are raising their children in that faith. Rather than focus on the Ten Commandments, which appears in the Old Testament of the Protestant Bible, the Berrys "focus more on the teachings found in the New Testament, such as to love God and to love thy neighbor as you love yourself." (Doc. 90-3, ¶ 5 (K. Berry Decl.)). Ten Commandments displays were posted in all of K.B.'s and C.B.'s classrooms from August 18 to August 28, 2025. During that brief time, the Berrys were "astonished by how quickly [C.B.] had absorbed that much of the poster." (Doc. 164-9, p. 16 (A.C. Berry Dep.)). The Berrys object to the promotion of the Ten Commandments over other Christian teachings and do not believe in the version of the Ten

Commandments required by Act 573. For example, the Berrys object to "the reference to 'manservants' and 'maidservants'" because it is "morally troubling and contrary to [their] faith and the faith values [they] teach K.B. and C.B. about principles of equality and humanity." (Doc. 90-2, ¶ 6 (A.C. Berry Decl.)). The Berrys feel that "the posters result in coercion and pressure to follow religious dictates." (Doc. 164-10, p. 20 (K. Berry Dep.)).

**Daniel Rix** is a parent to W.R., J.R., and A.R., who are students in the **Bentonville School District**. Mr. Rix left the Mormon Church three years ago and no longer subscribes to a particular faith. Together with his wife, he is raising their children in a nonreligious tradition. To Mr. Rix, this means "raising them to be openminded," which includes "teaching them to . . . be kind and loving toward [family members who are faith-believing]." (Doc. 164-12, pp. 26–27 (Rix. Dep.)). Mr. Rix objects to Act 573 because he believes that the Ten Commandments displays "will send the message to [his] children that the school, as an institution of authority, favors Christianity over other religious beliefs and nonbelief." (Doc. 8-9, ¶ 8 (Rix Decl.)). He has already seen the "social pressure" his children have experienced to conform to the Christian religion of their peers. *See* Doc. 164-12, pp. 51–52 (Rix Dep.). He observes that the displays mandated by Act 573 are not part of the school curriculum, and "context really matters." *Id.* at p. 58.

**Julee Jaeger** is a parent to U.J., who is a student in the **Conway School District**. Ms. Jaeger is not religious and is not raising her child in any specific religion. She testified that a Ten Commandments display compliant with Act 573 was posted at the front of U.J.'s classroom at the start of the school year, along with other rules, like what to do "for a fire evacuation or a tornado drill." *See* Doc. 164-11, p. 23 (Jaeger Dep.). She explained that her child is precocious and "reads everything around," including "things that are on the walls." *Id.* at p. 35. U.J. interpreted the Ten Commandments poster as listing rules U.J. "needed to follow"; this made U.J. "feel[ ] excluded" because U.J.'s family is not religious *Id.* at p. 29. Ms. Jaeger clarified that "for the nonreligious community," posting the Ten Commandments causes "a lot of confusion," *id.* at p. 32; and despite "do[ing] [her] best to let U.J. know U.J. doesn't have to follow these rules," the presence of the display alone "can create a lot of dissonance," *id.* at p. 33.

**Leah Bailey** is a parent to C.T. and D.T., who are students in the **Siloam Springs School District**. Ms. Bailey is agnostic and is raising her children in a non-religious household. When her "children bring religious beliefs to [her], [she] ask[s] them what does that mean to them; where did they learn it; what are the implications of that[,] and help[s] them think through religious tenets." (Doc. 164-4, p. 25 (Bailey Dep.)). She objects to Act 573 because posting the Ten Commandments "will directly interfere with and substantially burden and undermine" her ability to "direct[ ] [her] children's nonreligious upbringing and protect[ ] their ability to develop their own views on religious matters." (Doc. 8-10, ¶ 8 (Bailey Decl.)). Ms. Bailey testified that when she spoke with her children about Act 573, they said "that they would feel pressured and uncomfortable" "about having the Ten Commandments in the[ir] classrooms." (Doc. 164-4, p. 38 (Bailey Dep.)). The children "felt like those are rules that had to be followed," and if they did not believe in them, "they would be considered outsiders [by peers and teachers] and . . . treated differently." *Id.* at p. 39.

**Christine Benson** is the mother of B.B., who is a student in the **Lakeside School District**. Ten Commandments posters were posted in all the teachers' classrooms at B.B.'s school. (Doc. 164-15, pp. 22-23 (Benson Dep.)). Ms. Benson is Catholic and raising her child in the Catholic faith. She believes that Act 573 promotes the Ten Commandments over "the Bible's most important command[,] . . . to love your neighbor as yourself" and other New Testament teachings, which are "most central to [the Bensons'] faith." (Doc. 133-1, ¶ 7 (Benson Decl.)). Therefore, in Ms. Benson's view, the Ten Commandments display posted in her child's room imposed a set of religious rules that "contradicts what [she] [is] teaching" at home and what her child is learning at church. (Doc. 164-15, p. 21 (Benson Dep.)). She labeled the text selected by the State as "the Protestant version" of the Ten Commandments and not the Catholic version that her church ascribes to and she believes. *Id.* at pp. 28–29.

**Stephen Caldwell** is the father of W.C., a student in the **Fayetteville School District**. Mr. Caldwell is an atheist and is raising his child in a non-religious household. He believes the Ten Commandments posters will be perceived by students as "com[ing] from the teacher because of the . . . authority that is granted by the teacher, by the institution, by the administration . . . by placing it on the wall." (Doc. 164-6, p. 25 (Caldwell Dep.)). In his view, "there's no difference between putting a sign on the wall

that says: 'You must raise your hand to go to the bathroom,' versus, 'Thou shalt have no other gods before me.' Those are equal in their instruction." *Id.* at pp. 25–26. Mr. Caldwell and his spouse "do not want any other entity, person, institution, or otherwise proselytizing to [their] child without [their] explicit knowledge"—though permission to do so would never be given "in any case." *Id.* at p. 39. He testified that he plans to discuss religion, including the Ten Commandments, with his child at an "age-appropriate" time. *Id.* at p. 59. But he fears that if W.C.'s school "presented [W.C.] with the Ten Commandments," Mr. Caldwell's parental rights would be compromised, and he would have to act quickly "to preempt the institution's ability to describe the nature of their God" to W.C. *Id.*

**Carol Vella** is the mother of E.M.V. and N.M.V., two students who attend the **Bentonville School District**. Ms. Vella is Jewish and is raising her children in the Jewish faith. As a Reform Jew, Ms. Vella accepts the Ten Commandments as scripture, though she objects to the specific text of the Ten Commandments required by Act 573. (Doc. 8-8, ¶ 6 (Vella Decl.)). She believes that displaying the Ten Commandments in the schools "violate[s] Jewish tenets that oppose proselytizing." *Id.* ¶ 9. Her children have already been treated differently at school because of their Jewish faith. For example, E.M.V. has been pressured by a school official to attend a prayer circle and an event at a local Christian church. *See* Doc. 164-8, p. 39 (Vella Dep.). Ms. Vella finds that simply posting the Ten Commandments is "coercive" because her children "would be forced to see, meditate, observe, venerate, and abide by [the Commandments]." *Id.* at p. 37. Moreover, she feels that the State's chosen wording aligns with "the Christian religion," and not the Jewish religion, and as such, "give[s] the impression that the school is Christian and that [her children] should be Christian." *Id.* at pp. 58–59.

### III.  LEGAL STANDARD

A party requesting summary judgment must establish the absence of any genuine disputes of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). Once the moving party meets its burden, the nonmoving party must "come forward

with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). Where, as here, both sides have filed motions for summary judgment, the motions are to be reviewed in their own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

Plaintiffs seek a permanent injunction. To succeed, they must demonstrate "actual success on the merits, and if they do, then the court must also consider the threat of irreparable harm to the moving parties, the harms an injunction might inflict on other parties, and the public interest." *Watkins v. Lawrence Cnty.*, 102 F.4th 933, 942 (8th Cir. 2024). The State seeks to defeat this claim.

## IV.    DISCUSSION

### A. Standing

### *1. Original Plaintiffs*
### *(Fayetteville, Springdale, Bentonville, and Siloam Springs Public Schools)*

The original Plaintiffs filed suit before Act 573 went into effect. As Justice Alito recently explained, "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit," provided that the damage is sufficiently likely and imminent. *Mahmoud v. Taylor*, 606 U.S. 522, 560 (2025). In its Preliminary Injunction order, the Court made a factual finding that all four original school districts—Fayetteville, Springdale, Bentonville, and Siloam Springs—were likely to receive enough Ten Commandments donations to hang one in every classroom; this meant the original Plaintiffs' likelihood of injury was real and imminent. *See* Doc. 71, pp.

15–24. Now on summary judgment, the State rehashes its old standing arguments and adds a new one: that the Court gauge Plaintiffs' likelihood of injury by the number of posters the four school districts received after the preliminary injunction went into effect. *See* Doc. 185, p. 3. For the following reasons, the Court rejects that argument.

There was plenty of evidence before Act 573 went into effect that compliant poster donations were not only likely, but *highly* likely. Furthermore, the four original school districts admitted that they would have displayed the compliant posters they received— had they not been stopped by the preliminary injunction. As for raw numbers, discovery confirmed that the Court's initial predictions were sound. Fayetteville School District received **510** Ten Commandments posters by the date of the preliminary injunction. *See* Doc. 168-13. Springdale School District received more than **20,000** posters by then— some compliant with Act 573 and some not compliant. *See* Doc. 168-11. Bentonville School District received **60** posters, *see* Doc. 168-12; and Siloam Springs School District received **325** posters, *see* Doc. 168-15. There are only 4,019 classrooms across the four school districts. And again, these are *pre-injunction* numbers.

"Standing is assessed at the time the action commences." *L.H. v. Independence Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (citation modified). Therefore, the volume of post-injunction donations is immaterial to the pre-injunction standing analysis. Moreover, it is impossible to determine how the Court's preliminary injunction affected the quantity of donations. It stands to reason that donors would have stopped donating once they realized the school districts were not allowed to display the posters.

10

Finally, the Court observes that when the original Plaintiffs filed suit, they were not merely interested observers or concerned citizens; they were—and are—school children who attend public schools and their parents. Their school districts affirmed they would comply with Act 573 if it went into effect. Therefore, all original Plaintiffs possessed standing to sue based on the pre-enforcement likelihood of First Amendment injury.

### 2. New Plaintiffs
### (Conway and Lakeside Public Schools)

After Act 573 took effect, multiple non-enjoined school districts posted Ten Commandments posters in classrooms. Two such non-enjoined districts were Conway and Lakeside. Conway School District received **850** posters by August 4 and hung one in every classroom, including those of Julee Jaeger's minor child and April Christine and Kyle Berry's minor children. The Jaegers and the Berrys moved to join the lawsuit on August 28, and Conway School District was added to the preliminary injunction on September 10. *See* Docs. 87 & 111. Meanwhile Lakeside School District was contacted by a group of pastors who donated enough Ten Commandments posters for **every classroom in Garland County**, including Lakeside School District. One such poster was hung in the classroom of Christine Benson's minor child, and on October 23, the Bensons joined the suit. The Court added Lakeside to the preliminary injunction on November 10. *See* Docs. 131 & 149. It is conceivable that the process of adding students, parents, and school districts might have continued for several more months had the Court not issued a final scheduling order with an abbreviated deadline to add parties. *See* Doc. 101, ¶ 1.

11

Given these facts, the State has not challenged the new Plaintiffs' standing to sue. They asserted *actual* constitutional injury that persisted until the Court ordered their schools to remove the Ten Commandments posters from their classrooms. Their injuries are therefore concrete and fairly traceable to Act 573 and their school districts' actual compliance with the law. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### B. Ripeness

Next, the Court must consider whether the issues raised in this lawsuit are ripe for judicial consideration. The ripeness doctrine "requires the examination of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar*, 345 F.3d 570, 572–73 (8th Cir. 2003) (citation modified). "[A] case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities." *Id.* at 573. The State contends that the original Plaintiffs' claims are not ripe because they have never seen an Act 573 display in their classrooms and do not know "what the displays will look like and what the surrounding context will be." (Doc. 165, p. 21).[1] The Court disagrees. This case is ripe because no guesswork or speculation is required to determine exactly how Act 573

---

[1] They further claim that Plaintiff Rix admitted in his deposition that in some contexts, he would have no objection to the introduction of the Ten Commandments in his children's classrooms. *See* Doc. 165, p. 16. He actually stated that he would find the posters acceptable *only* if they were incorporated into a history curriculum where the "children understand that the context is purely educational." (Doc. 164-12, p. 58). The State does not envision any curricular integration, or indeed, any teaching associated with the Ten Commandments displays. *See* Doc. 166, ¶¶ 8 & 9.

12

will be implemented by Arkansas school districts. Plaintiffs have provided the following proof of how the displays look:



Classroom of Plaintiff U.J., Conway School District (Doc. 131, p. 18).



Classroom of Plaintiff C.B., Conway School District (Doc. 131, p. 19).



Classroom of Plaintiff B.B., Lakeside School District (Doc. 131, p. 21).

Notice that the displays are the same—which is not a surprise. They look exactly as Act 573 requires and as the Legislature intended. The posters hang at the front of each classroom—a "prominent" and "conspicuous" spot, per Section (a)(1) of the Act. The posters contain the Ten Commandments text and nothing more. There is no explanation as to why the Ten Commandments are displayed—which, again, is not a surprise, because Act 573 states no educational reason to display the Ten Commandments.

Further, the plain text of Act 573 does not suggest that other documents be posted alongside the Ten Commandments for educational reasons or mitigating context. That is because the Legislature intends the posters to hang in all classrooms without regard to the subject matter taught in class, the age of the students, or any other material consideration. *Nothing* could possibly justify hanging the Ten Commandments—with or without historical context—in a calculus, chemistry, French, or woodworking class, to name a few. And the words "curriculum," "school board," "teacher," or "educate" don't appear anywhere in Act 573. Accordingly, there is no need to strain our minds to imagine a constitutional display mandated by Act 573. One doesn't exist. This matter is ripe for review.

### C. Merits Claims

### *1. Establishment Clause*

a. Binding Precedent of *Stone v. Graham*

The Supreme Court has already determined that a state law mandating the posting of the Ten Commandments in public schools—without integrating such displays into the curriculum "in an appropriate study of history, civilization, ethics, comparative religion, or

15

the like"—violates the Establishment Clause. *Stone v. Graham*, 449 U.S. 39, 42 (1980). This precedent has not been explicitly overturned and is binding upon all lower courts— including this one.   The facts in the case at bar are identical in all material respects to the law that was deemed unconstitutional by the Supreme Court in *Stone v. Graham*. As will be discussed in further detail below, there is no genuine, material dispute of fact that Act 573—like the nearly identical law in *Stone*—was enacted "to induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* Much as the State wishes *Stone* were a dead letter, it is not for the reasons previously stated in the preliminary injunction order. *See* Doc. 71, pp. 10–15, 25–30.

No public-school Establishment-Clause case involving *school-wide* dissemination of religious speech, whether pre- or post-*Stone*, has ever been reversed, including *Abingdon School District v. Schempp*, 374 U.S. 203, 205 (1963); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Lee v. Weisman*, 505 U.S. 577, 599 (1992); and *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 305–06 (2000).   In fact, the Supreme Court's more recent opinion in *Kennedy v. Bremerton School District*, which disavowed the so-called "*Lemon* test" derived from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971),   cited favorably to both *Lee* and *Santa Fe*, which had relied on *Lemon*. *See* 597 U.S. at 534, 541. In short, there is no reason to think the Supreme Court has thrown the baby out with the bathwater. Abandoning the *Lemon* test does not mean that public-school children's religious liberties are now in a state of limbo and ripe for state exploitation.

According to the *Kennedy* Court, state-mandated religious speech in public schools is still "problematically coercive" if students are required to engage with it. *See id.*

16

at 541. *Kennedy* involved a state actor's *private* prayers, and "permitting private speech is not the same thing as coercing others to participate in it." *Id.* "The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. *Students were not required or expected to participate*." *Id.* at 542 (emphasis added). By contrast, Act 573 requires that the Ten Commandments be posted in every public-school classroom, K–12, without exception. It is a coercive law that results in universal participation by students. Because *Kennedy* is inapposite, it fails to provide the State with legal cover to do as it pleases.

The State's other references to caselaw also fall flat. For example, the State claims that posting the Ten Commandments in public schools is no different than erecting a monument of the Ten Commandments on the lawn of a government building—as was the case in *Van Orden v. Perry*, 545 U.S. 677 (2005)—or saying a collective prayer at the start of a town council meeting—as was the case in *Town of Greece v. Galloway*, 572 U.S. 565, 590 (2014). Neither case is helpful to the State. According to the Supreme Court, a monument bearing state-sanctioned religious speech is "passive" rather than coercive because the public can avoid it if they choose. By the same token, the public can avoid listening to prayers at the start of a legislative meeting by staying out of the room. Children cannot similarly avoid reading the Ten Commandments posted in their classrooms for thirteen years of compulsory schooling.[2]

---

[2] Arkansas law requires parents to send their minor children, ages five to seventeen, to school and to "ensure the attendance of the child." Ark. Code Ann. § 6-18-201(a). A child who fails to attend school will receive academic punishments, *id.* § 6-18-222(a)(1)(A)(i), and a truant student's parents "shall be subject to a civil penalty" of up to $500 in circuit court, plus court costs and fees, *id.* § 6-18-222(a)(5)(A).

The State hedges its position by arguing that even if Act 573 is, in fact, coercive, it's only *a little* coercive because no student will be required to stand at the front of the class and publicly "affirm or reject" the Ten Commandments or "be tested on them." (Doc. 180, p. 17). The State offers no law to support the argument that a little coercive religious indoctrination is fine. The Supreme Court has clearly held that where "the text [of the Ten Commandments] confront[s] . . . students every day," the Establishment Clause is violated. *Van Orden*, 545 U.S. at 691.

Given that Act 573 is coercive, the only thing left to consider is why it was enacted in the first place. The State's lawyers claim at various points in their briefing that Act 573's purpose is "to acknowledge the historical importance of the Ten Commandments." (Doc. 165, p. 10). This claim finds no support in the record. First, the word "historical"—or any form of that word—appears only *twice* in Act 573, and both times it is used to describe the ancient quality of the sacred text, not how the text will be used in schools. *See* Act 573, § (a)(1)(B)(i), (ii) (describing the text as "a historical representation of the Ten Commandments").

Second, the State makes three important factual stipulations about Act 573:

(1) **"Act 573 does not direct teachers to provide instruction about the Ten Commandments or about the displays."**

(2) **"Act 573 does not require classroom instruction, and it does not require that the Ten Commandments be incorporated into public school curriculum."**

(3) **"There is no requirement for teachers, other school officials, or students to interact with, bring attention to, or even acknowledge the posters in any way."**

18

(Doc. 166, ¶¶ 8 & 9 (State's Statement of Undisputed Material Facts)). In other words, the State admits there is no educational purpose in displaying the Ten Commandments— *no teaching*, *no learning*, and *no curricular integration*.

The Court is "reluctan[t] to attribute unconstitutional motives to the State[ ], . . . when a plausible secular purpose . . . may be discerned from the face of the statute." *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983). But here, a plausible secular purpose is expressly disavowed. Act 573's purpose is only *to display* a sacred, religious text in a prominent place in every public-school classroom. And the only reason to display a sacred, religious text in every classroom is to proselytize to children. The State has said the quiet part out loud.

Given the State's factual admissions coupled with the plain language of Act 573, there is no need to delve into the motivations of individual legislators who voted in favor of Act 573. *See Bd. of Educ. of Westside Comm. Schs. v. Mergens*, 496 U.S. 226, 249 (1990). However, the State attached full transcripts of the House and Senate floor debates on Act 573 to its summary judgment briefing. *See* Doc. 180-9 (Arkansas Senate Transcript, March 19, 2025); Doc. 180-8 (Arkansas House of Representatives Transcript, April 2, 2025). Presumably, the State intended the Court to read the transcripts, and doing so confirms that the Legislature understood Act 573's religious purpose. For example:

- One Senator stated that the Act's "valuable" purpose was "for everyone [to be] reminded once a day that there is a God and we're not him." (Doc. 180-9, pp. 2–3).

- Another Senator opined that "educating our young people on the tenets of morality" through the Ten Commandments was a necessary "counterattack . . . to that total secularization of Western society." *Id.* at p. 17.

19

- A third Senator thought displaying a religious text in public schools was "just sharing with our children our culture." *Id.* at p. 18.

- And a fourth Senator saw the Ten Commandments as "the moral compass of our nation," something "good for our kids to see . . . visually." *Id.* at p. 19.

- The Act's sponsor in the House observed that asking students to read the Ten Commandments every day was no different than asking them to say the Pledge of Allegiance. *See* Doc. 180-8, p. 18.

- Another Representative announced, "the Ten Commandments is the foundation of our society," *id.* at p. 31.

- A third Representative celebrated that Act 573 would enable "a large number of students who don't go to church" to have "at least have some exposure," to God's commandments. *Id.* at p. 49.

- A fourth Representative noted that reading and meditating on the Ten Commandments teaches children to appreciate the "virtues and qualities that we should all aspire to as Christians." *Id.* at p. 73.

- Finally, a fifth Representative wondered what all the fuss was about—since, in his mind, the Establishment Clause did not even apply to the States. *See id.* at pp. 58–59.

   b. Relevance of "Historical Practices and Understandings" Test

The State asks the Court to evaluate this case through the lens of American history. In support of this framing, the State cites *Town of Greece* and *Kennedy* for the proposition that Act 573 should be judged only "by 'reference to historical practices and understandings.'" *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576). However, the *Kennedy* Court did not endorse using this test in every context—particularly where religious speech was clearly coercive and the audience was composed of public-school children. *See id.* at 541–42. Nevertheless, Plaintiffs gamely review the history— just in case it's necessary.

20

Plaintiffs' expert, Dr. Steven K. Green, submitted a thorough report to the Court on the history of public schooling in America, *see* Doc. 168-4, and also testified live at the preliminary injunction hearing on July 18, 2025. At the time of the hearing, the State had not retained a history expert, which was odd considering that an attorney had advised the Legislature during debate on Act 573 that the law would face a legal challenge that would "ultimately turn on the history and tradition test." (Doc. 180-8, p. 28).[3] It was only after the Court issued its preliminary injunction that the State retained a history expert named Dr. Mark David Hall, who wrote a report for the Court on his research regarding the role of the Ten Commandments in public schooling.

Having reviewed both experts' reports and Dr. Hall's deposition testimony,[4] there are several key areas of agreement. First, they agree that the government had little to do with public elementary and secondary school education until at least the twentieth century. *See* Doc. 164-1, p. 22 (Dr. Hall's Report); Doc. 168-4, pp. 25–26 (Dr. Green's Report). Second, in the early- to mid-nineteenth century before the advent of modern public education as we know it, there were a number of early-elementary primers and spelling books in wide circulation in many states, and these primers and spellers featured religious messages and Bible verses, including the Ten Commandments. S*ee id.* Third, these early primers "fell into disuse" sometime during the nineteenth century, before the

---

[3] Also, the Act's sponsor invited a purported historian to testify before the House in favor of Act 573 and provide the members with facts about the historical significance of the Ten Commandments in public schools and other public spaces. *See id.* at pp. 6–10, 20–22. To the Court's knowledge, that historian was never retained by the State for this lawsuit.

[4] Dr. Green was not deposed.

rise of public education. (Doc. 178-1, pp. 3–4 (Hall Dep.); Doc. 168-4, p. 26 (Green Report)). Fourth, there is no longstanding, widespread history of permanently displaying the Ten Commandments in public-school classrooms. (Doc. 168-28, p. 21 (Hall Rebuttal Report) (stating he was "unaware of any source that documents permanent displays (religious or otherwise) in the Nation's public school classrooms over the last two hundred years"); Doc. 168-4, p. 29 (Green Report)).[5]

Discussing history is both unhelpful and irrelevant when the challenged law is coercive, applied universally in the public-school context, and has no educational, secular purpose. Even so, there are no historical practices and understandings to support the posting of the Ten Commandments in the public-school context.

### 2. Free Exercise Clause

In addition to the Establishment Clause violation, Plaintiffs have also proven that Act 573 violates their Free Exercise rights under the First Amendment. The "government burdens the free-exercise rights of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 606 U.S. at 530 (citation omitted). The parent-Plaintiffs describe their Free Exercise injuries precisely and personally in their depositions. *See* Docs. 164-4–164-16. And the State does not materially dispute their contention that exposing their children to the State's mandated displays of the Ten

---

[5] Indeed, Dr. Hall stated he would "find it hard to imagine" any educational purpose for hanging the Ten Commandments in, say, a math or science classroom. *See* Doc. 178-1, p. 3 (Hall Dep.).

Commandments will interfere with their ability to provide religious instruction and will induce their children to suppress their own religious or non-religious beliefs.

Focusing for a moment on the claims of the parent-Plaintiffs whose children attend schools in the Conway and Lakeside School Districts, their testimony provides vivid details about the deleterious effects both they and their children experienced when Ten Commandments displays were hung in their classrooms. During the eleven days that the Ten Commandments were displayed in Conway's public schools, the Berrys were "astonished by how quickly [C.B.] absorbed that much of the poster" since "C.B. does not fully understand what some of the language means." (Doc. 164-9, p. 16 (A.C. Berry Dep.)). Likewise, after Ms. Jaeger's minor child saw the display in Lakeside's public schools, Ms. Jaeger was forced to explain what the "sabbath" was, define the concept of polytheism, and describe what it means to "covet" someone's wife. (Doc. 168-6, p. 3 (Jaeger Response to Interrogatories)). Ms. Jaeger would have preferred to discuss these concepts at an appropriate time of her choice, but because of Act 573, the State imposed its preferred religious doctrine upon Ms. Jaeger's child without her consent.

The State counters that "Plaintiffs have [no] evidence that the displays have caused their students to affirm or disavow any beliefs or required them to engage in a formal religious exercise or required them to do anything prohibited by their religious or non-religious beliefs." (Doc. 180, pp. 15–16). However, the law does not require a child to experience a crisis of faith or a total religious conversion to establish a First Amendment injury. *See Mahmoud*, 606 U.S. at 569. Plaintiffs' claimed injuries are serious enough.

23

The presence of these displays alone will compromise the parents' efforts "to raise their children in accordance with their religious faith." *Id.* at 542 (citation modified).[6]

According to the Supreme Court's decision in *Mahmoud*, "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." 606 U.S. at 564. However, when a law is religiously motivated—as is the case here—and "substantially interferes with the religious development" of the parents' children in the compulsory public-school setting— as was the case in *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)—"strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable." *Mahmoud*, 606 U.S. at 564–65.

Act 573 is subject to strict scrutiny because it is denominationally preferential and burdens parent-Plaintiffs' right to direct their children's religious upbringing. Accordingly, it is the State's burden to demonstrate that its impositions on Plaintiffs' "protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. The State acknowledges that its sole reason for enacting Act 573 was to display the Ten Commandments in all public schools. The purpose, therefore, is to expose children

---

[6] The State also argues that Act 573 is unobjectionable because the Legislature "specifically crafted" the Commandment text to be "non-sectarian." (Doc. 165, p. 9). However, that claim is misleading at best. The text was not "crafted" at all; members of the Legislature did not sit down with interested religious groups to broker an egalitarian textual compromise. As the State well knows, the only reason the Legislature chose this particular text was because it appeared on the stone monument in *Van Orden* that the Supreme Court found constitutional. *See* 545 U.S. at 691. The State overlooks the fact that it was not *the text* that mattered in *Van Orden* but *the non-coercive setting*. That setting is not present with respect to Act 573.

to Protestant Christian scripture. "[T]he government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause." *McCreary County. v. ACLU of Kentucky*, 545 U.S. 844, 875–76 (2005). Furthermore, as Act 573 applies broadly to every classroom in every Arkansas public school, it is not tailored in any respect and fails strict scrutiny.

### D. Irreparable Harm, Balance of the Equities, and the Public Interest

Act 573 must be permanently enjoined. Failing to do so would violate the Establishment Clause rights of all Arkansas public-school children and their parents and also violate Plaintiffs' Free Exercise rights. The law serves no educational purpose, as the State admits, and consequently deprives Plaintiffs of their rights. Such deprivations, "even for minimal periods of time, constitute irreparable injury." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Further, the balance of the equities and the public interest favor Plaintiffs, given the certain infringement of their First Amendment rights, and the school districts' and the State's lack of expected harm if a permanent injunction issues. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022). All factors weigh in Plaintiffs' favor.

### E. Scope of Relief

Only district-wide relief—across all Defendant school districts—will satisfy the Supreme Court's definition of "complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). As this Court previously explained, "restricting the scope of a preliminary injunction to just the individual child-Plaintiffs' classrooms or schools is unlikely to avoid

constitutional injury." (Doc. 71, p. 34 n.16). An injunction limited to the child-Plaintiffs' classrooms would be too narrow to address the realities of their experiences. The Court rejects the State's invitation to create "Ten Commandment-free bubbles" around each child-Plaintiff; that would entail removing and re-hanging posters each time a child-Plaintiff entered or exited a classroom. A narrow injunction would put the child-Plaintiffs at risk of repeated "accidental" encounters with the Act's scriptural displays, which is unacceptable.

## V.    CONCLUSION

The downside of a constitutional democracy is that its citizens must contend with the "occasional tyrannies of governing majorities." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel v. Vitale*, 370 U.S. 421, 431 (1962). It appears that with the passage of Act 573, the State may have lost sight of the fact that "a union of government and religion tends to destroy government and to degrade religion." *Id.*

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 168) is **GRANTED**, the State's Motion for Summary Judgment (Doc. 164) is **DENIED**. Defendants are **PERMANENTLY ENJOINED** from complying with Act 573.

**IT IS SO ORDERED** on this 16th day of March, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE

26